UNITED STATE DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

CASE NO: 6:21-cv-00896-RBD-EJK

ROSE MARIE CELESTIN, as
Next of Kin and Personal
Representative of the Estate of JEAN
SAMUEL CELESTIN, deceased,

    Plaintiff,

v.

CITY OF OCOEE, Officer JOSHUA BODE,
individually, Officer CHRISTOPHER BONNER,
individually, Officer DOMINIC
CHIUCHIARELLI, individually, Officer
BRIAN HARRIS, individually, TOWN OF
WINDERMERE, and Officer GRIFFIN
HEBEL, individually,

    Defendants.
_____/

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT TOWN OF WINDERMERE'S PARTIAL MOTION TO DISMISS AND
INCORPORATED MEMORANDUM OF LAW**

Emery Celli Brinckerhoff Abady Ward & Maazel LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

TABLE OF CONTENTS

PAGE NO.

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ..........................................................................................................................2

ARGUMENT .................................................................................................................................7

    I.    WINDERMERE IS LIABLE FOR NEGLIGENT HIRING .........................................7

        A.    Sovereign Immunity Does Not Apply to Operational-Level Functions ......8

        B.    Windermere's Motion Is Premature..............................................................11

    II.    WINDERMERE'S TRAINING ACTIVITIES ARE NOT IMMUNE.........................12

CONCLUSION............................................................................................................................13

COMES NOW, Plaintiff, Rose Marie Celestin, as Next of Kin and as Personal Representative of the Estate of Jean Samuel Celestin, deceased, by and through undersigned counsel, hereby files and serves her response in opposition to Defendant Town of Windermere's partial motion to dismiss and incorporated memorandum of law.  See ECF. No. 11.

## PRELIMINARY STATEMENT

Ocoee and Windermere police officers killed Jean Samuel Celestin.  On the night of his death, Mr. Celestin's family called 911 for help while he was in an acute mental health crisis, but the officers who responded treated him like a criminal to be subdued, not a patient in need of treatment.  After violating numerous standard practices for interactions with mentally ill people and escalating the interaction into a confrontation, Mr. Celestin sat defeated on the porch of his home, put his wrists in the air, and begged the officers to arrest him.  But the officers were not satisfied.  They screamed confusing orders at him, pointed a gun at his chest, and threatened to shoot him if he did not comply.  Mr. Celestin grew afraid and tried to flee, and the officers chased and tackled him to the ground, tased him again, applied a controversial "hobble" restraint to Mr. Celestin, and ignored decades-old guidance for safe use of such dangerous restraints.  After standing idly by as he lay motionless and face down on the ground for fifty-five seconds, the officers finally discovered that Mr. Celestin was not breathing and did not have a pulse.  For ten minutes before EMTs could arrive, they performed chest compressions, but refused to clear his airway or administer mouth-to-mouth resuscitation.  Mr. Celestin was taken to the hospital and pronounced dead.  A medical examination revealed that he died of sudden cardiorespiratory arrest during law enforcement subdual and restraint, and ruled his death a homicide.

Defendant Town of Windermere's ("Windermere") motion is a narrow and surgical attempt to chip away at the theories of liability available to Plaintiff under two of her thirteen

claims for relief.[1]  In the end, Windermere's motion is an exercise in misdirection, in clear contravention of the rules governing motions under Rule 12.  Rather than accepting the allegations and the theories as actually alleged in the Complaint, it rests on what Windermere wishes the facts to have been, and it mischaracterizes Plaintiff's causes of action to suit their own legal theories for dismissal.

Plaintiff alleges negligent hiring against Windermere based on its faulty investigation into the background, training, and prior job performance of Defendant Hebel, and its failure to contact his references or prior employers.  These operational-level failures are not the type of quasi-legislative government functions that are entitled to sovereign immunity, as Windermere suggests.  *See infra* Section I.  Plaintiff also alleges that Windermere was negligent in its failure to adequately train Defendant Hebel.  Plaintiff's negligent hiring, retention, and/or supervision claim does not challenge Windermere's decisions about how to train its officers as a matter of *policy*, or what subject matter to include in training, as Windermere suggests.  It asserts that Windermere failed operationally to train Hebel—and thus Windermere's plea for immunity fails on this ground as well.  *See infra* Section II.

Windermere's motion must be denied.

## BACKGROUND

**Mr. Celestin's Family Requests a Mental Health Intervention**

Jean Samuel Celestin experienced a mental health crisis on April 11, 2019, and his family called for help.  See Amended Complaint, ECF No. 1-1 ("Complaint" or "Compl.") ¶¶ 1, 3.  His

---

[1] Without conceding any merit to Windermere's motion, Plaintiff stipulated to the dismissal of Counts III and IV only against Defendant Windermere, and to striking the word "design" from paragraph 216 of the Amended Complaint.  *See* ECF No. 28.  Accordingly, the Court need only rule on Windermere's motion to dismiss Counts V and XIII only to the extent they challenge "through state law Windermere's decisions as to how to train its law enforcement officers and what subject matter to include in training" and Count XIII only to the extent Plaintiff alleges negligent hiring.  *See* Def. Windermere Mot. to Dismiss, ECF No. 11 ("Def. Br."), at 8-12.

2

mother and sister informed the 911 dispatcher that Mr. Celestin had a history of mental illness, asked for assistance removing him from the house, and later communicated with the responding Defendant officers about Mr. Celestin's mental health condition. *Id.* ¶¶ 3, 28, 44-48.

Nonetheless, when Mr. Celestin's sister explained that she was going to leave the scene with her children, Defendant Bode was incredulous, stating, "You're leaving? I mean, we have a crime here. I mean we need to investigate a crime," making clear that he had no interest in addressing Mr. Celestin's mental health crisis, and was singularly focused on apprehending Mr. Celestin as a criminal. *Id.* ¶¶ 49-51. When he arrived at Mr. Celestin's house, Defendant Bode, contrary to standard practice, did not request assistance from any mental health professionals, notify any mental health facilities that Mr. Celestin may need to be admitted, notify his supervisor that he was about to confront a person experiencing a mental health crisis, or even update Defendant Bonner about what he had learned from Mr. Celestin's sister. *Id.* ¶¶ 54-55.

**Defendant Officers Confront Mr. Celestin as a Criminal, Not a Patient**

As they approached the front door, rather than announce their presence and the purpose of their visit—which is standard practice for officers engaging with people in mental health crisis—Defendants Bode and Bonner knocked on the door, said nothing, and obfuscated when Mr. Celestin answered the door and asked why they were there. *Id.* ¶¶ 56-58. When Mr. Celestin opened the door and displayed obvious signs that he was in mental distress, the officers responded with callous sarcasm, compounding Mr. Celestin's confusion and paranoia, and fatally undermining a critical tool in a police officer's tool kit for de-escalation: clear communication. *Id.* ¶¶ 59-67. After the officers escalated the interaction, Mr. Celestin attempted to move past the officers and out the door of the house, but Defendant Bonner fired his taser gun at Mr. Celestin's back, knocking him to the ground in the entryway of the house. *Id.* ¶¶ 76-78.

Mr. Celestin propped himself up against a pillar and pleaded with the officers to stop their violent attack. *Id.* ¶ 81. He put his hands up, placed his wrists together so the officers could handcuff him, and repeated over and over, ""I'll stop! I'll stop! I'll stop! I'll stop! I'm sorry! I'm sorry sir," and begged them to arrest him: ": "Sir, I'm sorry. Arrest me. I'm so sorry." *Id.* ¶¶ 81, 92. Without any provocation, the officers responded by screaming at Mr. Celestin and threatening to tase or shoot him if he did not comply with their confusing commands. *Id.* ¶¶ 82-84, 88, 95. When the officers refused to conform their conduct and instructions to the demands of the situation and make accommodations for Mr. Celestin's illness, *id.* ¶¶ 95, 98, 99, 103, Mr. Celestin got up from the ground and fled, making sure to avoid all officers present, *id.* ¶¶ 104-05.

**Officers Kill Mr. Celestin by Tasing and Restraining Him with a "Hobble"**

As soon as Mr. Celestin crossed the street, he was tackled to the ground by Windermere officer Defendant Hebel. *Id.* ¶ 106. While Defendant Hebel attempted to pin Mr. Celestin, Defendant Chiuchiarelli fired his taser gun at Mr. Celestin, sending electricity through his body for twelve continuous seconds. *Id.* ¶ 107. He then unnecessarily fired his taser two more times, firing for five and then twenty continuous seconds, exceeding guidelines for safe and appropriate taser deployment. *Id.* ¶¶ 113-15. As he did so, Defendant Bonner placed his baton across Mr. Celestin's back and shoulders and pressed his chest into the ground for two minutes. *Id.* ¶¶ 116-17.

Defendant Hebel then volunteered to gather a "hobble" from his car. *Id.* ¶ 119. A "hobble," otherwise known as a "hogtie," is a controversial restraint known to cause death by positional asphyxia. *Id.* ¶ 120. To apply a hobble, a person is placed in the prone position, with their hands handcuffed behind their back, and their ankles attached by handcuffs or other

restraints. *Id.* ¶ 121. The hobble is then used to connect the handcuffs and leg restraints. *Id.* A 1995 bulletin from the United States Department of Justice warns of the "potential for in-custody injury or death" resulting from hobble use and instructs officers to avoid the use of hobbles wherever possible. *Id.* ¶¶ 122-23. To avoid in-custody death, the bulletin instructs officers: "As soon as the subject is handcuffed, get him off his stomach," *id.* ¶ 124, and directs officers to "[m]onitor [the] subject carefully and obtain medical treatment if needed," *Id.* ¶ 125.

Defendant Hebel applied a hobble to Mr. Celestin, despite these clear warnings about the dangers of hobble restraints, and even though Mr. Celestin had already been subdued. *Id.* ¶¶ 126-27. Notwithstanding the standard safety requirement of turning prisoners off of their stomachs *as soon as they are handcuffed* and monitoring them carefully for medical emergencies, Defendants Hebel, Bode, Bonner, Chiuchiarelli, and Harris simply stood up after applying the hobble restraint to Mr. Celestin and left him on his stomach for approximately fifty-five seconds. *Id.* ¶ 131. During those fifty-five seconds, the officers did not turn Mr. Celestin off of his stomach or monitor him carefully. *Id.* ¶¶ 132-34.

During those fifty-five seconds, one officer asked if Mr. Celestin was okay on one occasion, and if he was breathing on another, but no officer turned Mr. Celestin off of his stomach or checked to see if he was breathing. *Id.* ¶¶ 138-142. When the officers finally turned Mr. Celestin off of his stomach, Defendant Hebel announced that Mr. Celestin was not breathing and did not have a pulse. *Id.* ¶ 146. At this point, the officers left Mr. Celestin in the dangerous hobble restraint for another *five minutes*, making it impossible to administer effective CPR. *Id.* ¶¶ 147-149. Defendant Hebel did not check Mr. Celestin's airway until almost a minute after he noted that Mr. Celestin was not breathing. *Id.* ¶ 150.

When Defendant Hebel noted that the airway was blocked and asked Defendant Bode to clear it, Defendant Bode refused to clear it completely, stating, "I did a little bit, but I don't want him to bite my finger off here either, he already lunged at me with a knife here." *Id.* ¶¶ 150-53. Mr. Celestin never lunged at Defendant Bode. *Id.* ¶ 154. But, regardless, Defendant Bode made this remarkable decision to withhold life-saving measures almost *two minutes after* Defendant Hebel had announced that Mr. Celestin *did not have a pulse*. *Id.* ¶ 155.

Defendants used an Automated External Defibrillator ("AED"), which instructed the officers to "give breath" approximately every twenty seconds during the ten minutes that they administered CPR before EMTs arrived. *Id.* ¶¶ 160-61. No Defendant *ever* performed mouth-to-mouth resuscitation on Mr. Celestin, even though they were in possession of a barrier mask that would have enabled them to safely do so. *Id.* ¶¶ 162-64, 167.

EMTs eventually arrived on the scene, administered additional CPR, and then transported Mr. Celestin to the hospital, where he was pronounced dead. *Id.* ¶¶ 174-75. The medical examiner who conducted Mr. Celestin's autopsy concluded that Mr. Celestin's death was caused by "sudden cardiorespiratory arrest during law enforcement subdual and restraint, with significant contributory factors of recurrent depression with psychotic features, mild cardiac hypertrophy, and obesity," determined that the "manner of death is classified as homicide," and noted the use of "prone hobbling." *Id.* ¶ 176.

Mr. Celestin's death could have been avoided. When Windermere hired Defendant Hebel, who applied the deadly hobble restraint, it failed to conduct an effective investigation into Defendant Hebel's background, training, and prior job performance, and it failed to contact his references. *Id.* ¶ 291(a)-(b). If Windermere had conducted an investigation and contacted Defendant Hebel's references, as Florida law and their policies required, it would have learned of

incidents and a pattern of behavior exhibited by Defendant Hebel demonstrating his unfitness to use hobble restraints or taser devices. *Id.* Windermere also failed to train Defendant Hebel on the appropriate use of hobble restraints, taser devices, and CPR. *Id.* ¶ 291(e). Adequate training on these issues would have prevented Mr. Celestin's death. *Id.*

## ARGUMENT

The standards governing a motion to dismiss are familiar. The allegations in the complaint "must be accepted as true and construed in the light most favorable to the plaintiff." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 694 (11th Cir. 2016). A "court reviewing a motion to dismiss must draw all reasonable inferences from the factual allegations in a plaintiff's complaint in the plaintiff's favor." *Bailey v. Wheeler*, 843 F.3d 473, 482 (11th Cir. 2016). And finally, a claim must not be dismissed "unless it is shown that plaintiff can prove no set of facts in support of this claim, which would entitle him to relief." *Jackam v. Hosp. Corp. of Am. Mideast, Ltd.*, 800 F.2d 1577, 1579 (11th Cir. 1986). Applying these standards, Windermere's motion to dismiss must be denied.

**I.     WINDERMERE IS LIABLE FOR NEGLIGENT HIRING**

Count XIII plausibly alleges that Defendant Windermere was negligent in the hiring, retention, and/or supervision of its employee, Defendant Hebel. Windermere moves to dismiss Count XIII, in part, to the extent it alleges negligent hiring.[2] Windermere does not dispute that the Complaint alleges facts sufficient to demonstrate that Windermere was negligent in hiring Defendant Hebel; rather Windermere argues that the doctrine of sovereign immunity shields the municipality. In its motion, Windermere assumes without argument that it is a "sovereign

---

[2] Windermere does not seek dismissal of Count XIII to the extent it alleges negligent retention and/or supervision, except insofar as those claims challenge Windermere's planning-level training decisions. *See* Def. Br. at 12. The motion should also be denied in that regard. *See infra* Section II.

immune governmental entity." Def. Br. at 11. Windermere is not immune. Count XIII alleges only *operational-level* negligence, which is not protected by sovereign immunity. Regardless, Windermere's motion cannot be decided at this early stage in the litigation.

Under Florida law, Windermere is liable in tort for "any act for which a private person under similar circumstances would be held liable." *Id.* (citing *Pollock v. Fla. Dep't of Highway Patrol*, 882 So. 2d 928, 932 (Fla. 2004)). "Florida's legislature has explicitly waived sovereign immunity for liability" where, as here, Plaintiff alleges "personal injury [or] wrongful death." *Joseph v. Chronister*, No. 16 Civ. 274, 2019 WL 8014507, at *2 (M.D. Fla. Jan. 3, 2019) (citing Fla. Stat. § 768.28). Sovereign immunity is only available to "planning-level" functions; it is *not* available when a claim challenges "operational-level functions." *See generally Wallace v. Dean*, 3 So. 3d 1035 (Fla. 2009). Planning-level functions involve "an exercise of executive or legislative power such that, for the court to intervene by way of tort law, it inappropriately would entangle itself in fundamental questions of policy and planning." *Kaisner v. Kolb*, 543 So. 2d 732, 737 (Fla. 1989); *see also Wallace,* 3 So. 3d at 1053 (explaining that sovereign immunity is only available for "certain quasi-legislative policy-making, planning or judgmental governmental functions" (cleaned up)). Operational-level functions, on the other hand, are "not necessary to or inherent in policy or planning" and merely "reflect[] a secondary decision as to how . . . policies or plans will be implemented." *Kaisner*, 543 So. 2d at 737.

In other words, only Windermere's planning-level functions are immune. Windermere is subject to tort liability for its operational-level functions.

    A.    **Sovereign Immunity Does Not Apply to Operational-Level Functions**

Sovereign immunity does not apply to Count XIII, which alleges that Windermere was operationally negligent in the course of hiring Defendant Hebel. "Plaintiff challenges *the manner* in which Defendant [Windermere] carried out" its hiring policies, not "the policies

8

themselves," so immunity is not available. *Hughey v. Sheriff of Brevard Cnty.*, No. 15 Civ. 840, 2015 WL 9218790, at *4 (M.D. Fla. Dec. 17, 2015) (emphasis in original).

Plaintiff alleges that Windermere failed to conduct an effective investigation into the background, training, and prior job performance of Defendant Hebel, and that it failed to contact his references or prior employers prior to hiring him. Compl. ¶ 291 (a)-(b).[3] These allegations are supported by Plaintiff's allegations that Defendant Hebel, a Windermere employee, applied a hobble device to Mr. Celestin and then left Mr. Celestin face down in the grass, where he lay dying for 55 seconds, and that this indifference to Mr. Celestin's life was not only callous and barbaric, it was in direct contravention of commonly known best practices concerning the use of hobble restraints, which require a restrained person to be turned off of their stomach *immediately* after a hobble restraint is applied. *See* Compl. ¶¶ 119-131. Plaintiff's detailed allegations about Defendant Hebel's misuse of the hobble restraint and disregard for industry-standard safety precautions command the inference that, had Windermere conducted an effective investigation of the background, training, and prior job performance of Defendant Hebel, and had Windermere contacted Defendant Hebel's references, Windermere would have discovered "incidents and a pattern of behavior demonstrating unfitness to use hobble restraints." Compl. ¶ 291(b). At this stage in the litigation, the Court must draw those inferences in Plaintiff's favor. *Bailey*, 843 F.3d at 482.

Count XIII does not challenge Windermere's hiring policies—it challenges the *implementation* of those policies. Although Windermere's precise hiring policies are not yet known, the Court "can reasonably infer that [Windermere] had a policy of conducting a full

---

[3] Although Paragraph 291(b) of the Complaint refers specifically to Defendant Hebel, Paragraph 291(a) refers generally to "applicants," due to a typographical error. If the Court deems it necessary, Plaintiff is amenable to amending Paragraph 291(a) to replace the words "its applicants" with the words "Defendant Griffen Hebel."

9

background investigation to ensure that each employee had good moral character," because it was required by Florida law. *See Washington v. City of Waldo*, No. 15 Civ. 73, 2016 WL 7666121, at *12 (N.D. Fla. Nov. 1, 2016) (citing Fla Stat. § 943.13(7)). The critical issue, then, "is not what the policy should have been, but what [Windermere] knew or should have known" about Defendant Hebel before he was hired. *Vaden v. Campbell*, No. 09 Civ. 12, 2009 WL 1919474, at *4 (N.D. Fla. July 2, 2009); *see also Washington*, 2016 WL 7666121, at *11 ("Negligent-hiring claims are *not* barred, however, if the municipality, in an operational capacity, disregarded or negligently implemented preexisting hiring protocols." (emphasis in original)).

Where, as here, Plaintiff alleges negligent implementation of hiring policies—i.e., that the municipality failed to check references or do an appropriate and thorough background check of the officer-applicant that would have revealed disqualifying information—"Florida courts have recognized that there is no sovereign immunity barrier . . . ." *Diaz v. Broward Cnty., Fla.*, No. 05 Civ. 61477, 2006 WL 8431676, at *3 (S.D. Fla. May 11, 2006) (collecting cases and holding that "that the doctrine of sovereign immunity and Florida Statute § 768.28(9) do not serve as a bar to [plaintiff's] claims for negligent hiring, supervision, and retention"); *Christie v. Lee Cnty. Sheriff's Off.*, No. 10 Civ. 420, 2011 WL 4389621, at *7 (M.D. Fla. Sept. 21, 2011) (noting that "more than one Florida court has explicitly held" that sovereign immunity is not a barrier to negligent retention or supervision claims and denying motion to dismiss because "hiring, firing, and supervision is not necessarily an immune activity" (cleaned up)). The only negligent hiring immunity case Windermere relies on supports Plaintiff's position: *Hazleton v. City of Orlando*, No. 10 Civ. 342, 2011 WL 13175527 (M.D. Fla. Oct. 19, 2011). *See* Def. Br. at 11. In *Hazleton*, the Court explicitly noted that a "claim that a municipality acted negligently in its 'operational' capacity is not barred by sovereign immunity" and that a negligent hiring claim

10

is viable under Florida law where a municipality "either disregarded or negligently implemented pre-existing protocols." 2011 WL 13175527, at *15.

Count XIII alleges that Windermere was negligent, specifically with regard to Defendant Hebel, in "*the manner* in which [it] carried out" its policy of conducting background investigations and contacting references, as was required under Florida law. *Hughey*, 2015 WL 9218790, at *4 (emphasis in original); *see also Washington*, 2016 WL 7666121, at *12 (where there was "no other evidence that a background check occurred . . . a reasonable jury could find that [the defendant city] failed to apply its policy of conducting a full and complete background investigation" so it was not entitled to sovereign immunity). These operational-level failures caused Mr. Celestin's death and are not immune under Florida law.

### B.     Windermere's Motion Is Premature

At this early stage in the litigation, "the facts necessary to determine whether [Windermere's] decisions relating to hiring, retention, or supervision were actually operational or discretionary" simply are not available to the Court. *Hemmings v. Jenne*, No. 10 Civ. 61126, 2010 WL 4005333, at *7 (S.D. Fla. Oct. 12, 2010). And Windermere identifies no state or federal court that has held, at the motion to dismiss phase, a negligent hiring claim to be barred by sovereign immunity. Without the benefit of discovery, "the Court cannot yet determine whether sovereign immunity bars [Plaintiff's] negligent hiring, retention, and supervision claims," and so dismissal is not appropriate. *Id.* Indeed, Florida law disfavors application of the sovereign immunity doctrine at this early stage in the litigation, because "sovereign immunity under Florida law is no[t] immunity from suit, but only immunity from liability." *CSX Transp., Inc. v. Kissimmee Util. Auth.*, 153 F.3d 1283, 1286 (11th Cir. 1998). "'[A]lthough [Windermere] will have to bear the expense of continuing the litigation, the benefit of the *immunity from liability,* should [Windermere] ultimately prevail on the sovereign immunity issue, will not be

11

lost simply because review must wait until after final judgment." *Id.* (quoting *Dep't of Educ. v. Roe*, 679 So.2d 756, 759 (Fla. 1996)) (emphasis in original).

## II. WINDERMERE'S TRAINING ACTIVITIES ARE NOT IMMUNE

On a similar theory of sovereign immunity, Windermere also narrowly seeks dismissal of Counts V and XIII, only to the extent they challenge "through state law Windermere's decisions as to how to train its law enforcement officers and what subject matter to include in training."[4] Def. Br. at 12. Windermere's motion is based on a misreading of the Amended Complaint. As an initial matter, neither Count V (Wrongful Death) nor Count XIII (Negligent Hiring, Retention, and/or Supervision) is styled as a "negligent training" claim. More importantly, Windermere identifies no specific language in Counts V or XIII that actually *does* challenge Windermere's training policies or planning-level decisions about the subject matter included in the trainings. *See* Def. Br. at 8-10. That's because Count V does not include *any* allegations that specifically mention Windermere's training programs at all, while Count XIII alleges only that Windermere specifically failed to adequately train Defendant Hebel as a matter of fact. *See* Compl. ¶ 291(e) (alleging that Windermere was negligent in its hiring, retention, and supervision of Defendant Hebel through its "failure to adequately train Griffen Hebel"). None of these allegations address Windermere's policy- or planning-level decisions about training.[5] Taking Windermere's argument at face value—that if Plaintiff had alleged planning-level training negligence, Windermere would be immune—Windermere's motion amounts to a tautology: that Plaintiff's

---

[4] Plaintiff attempted to resolve this portion of Windermere's motion by offering to stipulate that she would not rely on any of Windermere's planning-level decisions about how to train its law enforcement officers or what subject matter to include in such training as a basis for Windermere's liability under Counts V and XIII, but Windermere declined to so stipulate.

[5] Of course, these issues may still be subject to discovery, because they are relevant to Count II, which is brought under 42 U.S.C. § 1983 against the Town of Windermere and the City of Ocoee pursuant to *Monell v. Department of Social Services* and its progeny. 436 U.S. 658, 694 (1978). In discovery related to Count II, Plaintiff will seek documents and information concerning Windermere's policies and the decisions of its policymakers, but Count II is not subject to Windermere's motion.

12

claims should be legally barred to the extent they can be interpreted as legally barred. The Court need not entertain such hypothetical motions. *See, e.g.*, *Zanakis v. Scanreco, Inc.*, No. 18 Civ. 21813, 2019 WL 2210956, at *3 (S.D. Fla. Apr. 8, 2019) (warning that "hypothetical motions that waste judicial resources will not be tolerated").

Importantly, Windermere does not and could not move to dismiss the allegations that actually appear in Counts V and XIII, which challenge the implementation of Windermere's training policies during the course of training Defendant Hebel, because "challenges to the implementation of a training program are 'operational' acts not subject to sovereign immunity." *Langston v. City of N. Port*, No. 14 Civ. 2592, 2015 WL 369450, at *3 (M.D. Fla. Jan. 27, 2015) (citing *Mercado v. City of Orlando,* 407 F.3d 1152, 1162 (11th Cir. 2005)). Where, as here, allegations "refer specifically to the training provided" to a specific defendant officer, those "training allegations . . . fall outside the discretionary function exception" and are not subject to sovereign immunity. *Vasconez v. Hansell*, 871 F. Supp. 2d 1339, 1344 (M.D. Fla. 2012); *see also Wade v. Jenne*, No. 05 Civ. 61516, 2007 WL 9698309, at *3 (S.D. Fla. Jan. 8, 2007) (denying sovereign immunity where plaintiff alleged that a sheriff's office "failed to properly implement [its] policies with respect to" training a particular officer).

## CONCLUSION

For the foregoing reasons, Windermere's motion should be denied.

Dated: June 22, 2021
      Orlando, Florida

                                      /s/ Jeremy K. Markman
                                      JEREMY K. MARKMAN, Esquire
                                      Florida Bar No.: 0080594
                                      KING & MARKMAN, P.A.
                                      941 Lake Baldwin Lane, Ste. 101
                                      Orlando, Florida 32814
                                      Tel:   (407) 447-0848
                                      Fax:   (407) 271-8999

markman@kingmarkman.com
cuwabera@kingmarkman.com
*Attorney for Plaintiff*


EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

By:_____/s/_____
     Andrew G. Celli, Jr.*
     Jonathan S. Abady*
     Earl S. Ward*
     Andrew K. Jondahl*

600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000
*Attorneys for Plaintiff*

\* *Admitted pro hac vice*

14