UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ROSE MARIE CELESTIN, as Next of Kin and Personal Representative of the Estate of JEAN SAMUEL CELESTIN, deceased,

          Plaintiff,

-against-

CITY OF OCOEE, Officer JOSHUA BODE, individually, Officer CHRISTOPHER BONNER, individually, Officer DOMINIC CHIUCHIARELLI, individually, Officer BRIAN HARRIS, individually, TOWN OF WINDERMERE, and Officer GRIFFIN HEBEL, individually,

          Defendants.

CASE NO: 6:21-cv-00896-RBD-EJK

## EXPERT REPORT AND DISCLOSURE OF RICHARD H. MASTEN PURSUANT TO RULE 26(a)(2)

The law firm of Emery Celli Brinkerhoff Abady Ward & Maazel, LLP has retained me in order to review the facts of <u>Celestin v. City of Ocoee, et. al.</u> and formulate opinions regarding the policies, procedures, practices, training and actions of the City of Ocoee, the Town of Windermere, its employees and agents. I have completed my review of the documents provided and my report follows. I am prepared to offer testimony in this action including the opinions set forth herein and reasonable inferences thereof. The report is divided into six sections: (I) qualifications, background and expertise; (II) the facts or data considered as well as any exhibits that will be used to summarize or support the opinions; (III) a complete statement of all opinions I will express and the basis and reasons for them; (IV) a listing of all publications authored by me within the preceding ten (10) years; (V) a listing of cases in which I have testified as an expert at deposition or trial within the preceding four (4) years; and (VI) compensation to be paid for the study and testimony in the case.

I.      <u>Qualifications, Background and Expertise</u>

I am a security and law enforcement consultant whose principal office is in Davie, Florida. I have over fifty (50) years of law enforcement experience in the State of Florida. I received my Bachelor's Degree in Professional Studies from Barry University, graduating

with a 4.0 GPA and receiving a Dean's Award Nomination. My professional career began in 1972 with the Florida Department of Criminal Law Enforcement (now the Florida Department of Law Enforcement [FDLE]) serving in both the Tallahassee, Florida and the Miami, Florida field offices. In 1975, after graduation from the Southeast Florida Institute of Criminal Justice, I joined the Miami Shores, Florida Police Department. From 1975 through 1994 I worked in every rank and division, reaching the rank of Assistant Chief of Police. During my tenure in Miami Shores, I was privileged to be chosen for the 166th Session of the Federal Bureau of Investigation's National Academy in Quantico, Virginia. After graduation, and to the present day, I remain a member of the F.B.I. National Academy Associates. Along with attendance at numerous training schools and academies, I also attended the National Crime Prevention Institute at the University of Louisville - Louisville, Kentucky, and the U.S. Department of Justice-Drug Enforcement Administration's program in Narcotics and Dangerous Drugs. Further, I attended the United States Secret Service Dignitary Protection program in Washington, D.C. and served as a local resource partner.

In 1994 I was selected to be the Chief of Police for the City of Cocoa, Florida. Following my service in Cocoa, Florida I had the opportunity to return to the Miami Shores Police Department where I served as the Chief of Police until 2005 when I retired from Miami Shores. I assumed the position of Assistant Chief of Police for the Miami-Dade College from 2005 until 2008. In 2008 I became the Executive Director for Miami-Dade County Crime Stoppers and worked there until 2016.

I am currently a State of Florida Licensed Private Investigator and Asset Locator. My licensure in both disciplines is assigned to the licensed Florida Security Agency, Carson, Carson and Associates, P.A. in Tallahassee, Florida.

With respect to my expertise in the field of security and law enforcement, I have been found to be an expert in the area of safety and security issues by courts in the state of Florida and elsewhere. I have been found to be a qualified expert in law enforcement policy and procedure by the U.S. District Court Florida Southern District - (ANDERSEN vs. MASCARA). I am regularly retained in municipal, county, state and federal courts as an expert witness in law enforcement policies, procedures and the on-going responsibilities of law enforcement officers related to arrest procedures, prisoner custody, restraints, use of force, police pursuits, deployment of intermediate weapons and the use of deadly force upon persons. Additionally, I review and examine the hiring, training, retention practices, disciplinary policies and procedures of Sheriffs and Police Departments in both local and state jurisdictions.

As a command officer—Lieutenant, Captain, Assistant Chief and Chief of Police—I have reviewed and determined the response to employee actions, violations of Departmental policy and procedure, disciplinary actions of reprimand, suspension and termination. I was the City Representative in labor negotiations and disputes, as well as in the development of the negotiating position in the contractual bargaining process.

Administratively, I developed and directed the police budgetary process. I determined personnel strength and salaries, training and recruitment goals, purchasing, and the competitive bid process, compliance with local, state and national regulations.

Throughout my career, I have personally conducted or overseen hundreds of law enforcement related investigations and interviews of officers, criminals, victims and witnesses. Additionally, I have supervised and directed investigative units of peace officers in criminal investigations, internal personnel investigations, prisoner custody, restraints, use of force, police pursuits, deployment of intermediate weapons, the use of deadly force upon persons and intelligence gathering efforts. This experience has provided me with many years of specialization and knowledge regarding law enforcement policies, procedures, actions, the use of force and compliance. My expertise includes the classification, analysis, and validation of documentation and information developed and utilized by law enforcement agencies in their on-going efforts to provide a safe environment and positive relationship between law enforcement and the communities they serve. I have direct knowledge and administrative experience in the development of law enforcement policies and procedures.

I have experience providing expert witness testimony on a broad spectrum of issues, including: death in custody, adequacy of policies, and the application of codified rules, regulations, and policies governing law enforcement operations, and safety equipment. My opinions have never been disqualified. Please see my curriculum vitae attached hereto and incorporated by reference herein.

II.     Materials Reviewed including facts or data considered as well as any exhibits that will be used to summarize or support the opinions

The following are the basis for my opinions as well as the data or other information considered by me in forming my opinions. In forming my opinions, I have personally reviewed the following materials produced by Plaintiff's counsel to me to date and other materials relevant to the case:

Case Documents
- CELE 1254-1255
- CELE 1266-1267
- CELE 1269
- CELE 1279
- CELE 1361-1389
- CELE 1490-1558
- CELE 1636-1752
- CELE 1837-1838
- CELE 1852-1853
- CELE 1867-1883
- CELE 3778-3842
- CELE 3873-3876
- CELE 3890-3924

- CELE 3933-3965
- CELE 4098
- CELE 4289-4291
- CELE 4325-4429
- CELE 4668-4669
- CELE 4671-4676
- CELE 4735-4914
- CELE 5046-5047
- CELE 5071-5193
- CELE 5291-5298
- CELE 5302
- CELE 5308
- CELE 5315
- CELE 5317
- CELE 5322
- CELE 5331
- CELE 5359
- CELE 5363
- CELE 5380
- CELE 5383
- CELE 5393
- CELE 5395
- CELE 5396
- CELE 5401
- CELE 5403
- CELE 5553-5557
- CELE 5587-5591
- CELE 5608-5612
- CELE 5630-5635
- CELE 5838-6026
- CELE 6028-6053
- CELE 6061-6107
- CELE 6467-6677
- CELE 15691-15703
- CELE 17436-17437
- CELE 17441-17784
- CELE 17973-17977
- CELE 17978-17985
- PL000023-61
- PL000256-306
- PL000722-872
- PL001599-1604
- PL001608-1616
- PW000001-08

- PW0000016-32
- PW000078-527
- 9387-9395 Celestin
- 9610-9623 Celestin
- 10234-10240 Celestin
- 11942 Celestin
- 13545-13604 Celestin
- First Amended Complaint
- Video available at https://www.youtube.com/watch?v=pwOWHkar9gE (Marked as Plaintiff's Deposition Ex.52)
- Document produced by Town of Windermere with the following file name: "Takedowns, Weapons Retention, Kicks.pdf"
- Document produced by Town of Windermere with the following file name: "Table of Contents REVISED 01.14.19.pdf"
- Document produced by Town of Windermere with the following file name: "Hebel Complete Training File Redacted.pdf
- Transcript of November 29, 2021 deposition of Joshua Bode
- Transcript of December 3, 2021 deposition of Christopher Bode
- Transcript of December 9, 2021 deposition of Brian Harris
- Transcript of December 16, 2021 deposition of Griffin Hebel
- Transcript of February 4, 2022 deposition of Dominic Chiuchiarelli
- Transcript of April 6, 2022 Rule 30(b)(6) deposition of City of Ocoee
- Transcript of April 8, 2022 Rule 30(b)(6) deposition of Town of Windermere
- City of Ocoee's verified answers to Plaintiff's First Set of Interrogatories
- Town of Windermere's verified answered to Plaintiffs First Set of Interrogatories

Other Materials
- https://www.clickorlando.com/news/local/2021/09/09/no-charges-for-officers-involved-in-death-of-ocoee-man-with-schizophrenia/#:~:text=%E2%80%93%20The%20Windermere%20and%20Ocoee%20police,Attorney%20Monique%20Worrell%20announced%20Thursday.
- https://www.orlandosentinel.com/news/crime/os-ne-jean-samuel-celestin-ocoee-death-lawsuit-20210429-vkxv6qtilrdofcbbjfkejmoqgu-story.html
- https://www.orlandosentinel.com/news/crime/os-ne-jean-samuel-celestin-ocoee-death-state-attorney-20210430-p3g5vzxag5forjbrubkhegrweq-story.html
- https://www.blackstarnews.com/us-politics/justice/florida-body-camera-video-shows-ocoee-police-killing-samuel
- "Taser Issues New Warning on Shooting into Chest Area" Conductive Electronic Weapons and Their Faults; Trevor Langevin - Copyright 2011 - ISBN: 978-1-257-09734-0. (pages 121-122)
- SUPREME COURT OF THE UNITED STATES No. 09-420 October 5, 2009. Linda Lewis, as mother and personal representative of the estate of her son, Donald George Lewis, *Petitioner* v. City of West Palm Beach, Florida; Raymond Shaw, Robert Leroy Root, III, Randall Maale, Thelton Luke, and Audrey Dunn, Police Officers for the City of West Palm Beach Police Department, in their individual

capacities, *Respondents*. On Petition for Writ of Certiorari to the United States Court of Appeals for the Eleventh Circuit.

- "The role of restraint in fatal excited delirium: a research synthesis and pooled analysis" - Ellen M.F. Strommer, Wendy Leith, Maurice P. Zeegers, Michael D. Freeman; Forensic Science, Medicine and Pathology (2020) 16:680-692 Published 22 August 2020
- "GPD training slideshow states risk of restraint that killed Greensboro's George Floyd" - Ian McDowell; www.yesweekly.com , July 8, 2020 Article 6534d00c-c13b-11ea-9237-037729e30a7d.html
- "NEVER HOG-TIE a prisoner: Instructions on device warn against fatal restraint : Ian McDowell; www.yesweekly.com February 18, 2019 Article 62feb4f9-77c2-574f-b56e-cc5b002ee414.html
- "Sudden Custody Death Syndrome" - A.J. Levatino & J. Gabelman , August 2010 Training Bulletin - SANTA ANA POLICE DEPARTMENT - David Valentin-Chief of Police - *Education promotes professional and responsive law enforcement.*
- "Cardiorespiratory consequences to hobble restraint" M. Roeggia; pubmed.ncbi.nim.nih.gov/9200808 PubMed PMID: 9200808. ABSTRACT
- "Suspect Restraint and Sudden Death"; D.T, Reay - U.S. DEPARTMENT OF JUSTICE - Office of Justice Programs - JOURNAL/FBI Law Enforcement Bulletin Volume: 65 Issue 5 - May 1996, Pages 22-25.
- "VIOLENT SPD ARREST TO COST CITY $ 1.75 MILLION" - Mike Carter : *THE SEATTLE TIMES - August 9, 2013.*
- *"*PRONE RESTRAINT BY POLICE: POOR POLICE TRAINING CAUSES ASPHYXIATION"- Erik Heipt; October 24, 2015 - budgeandheipt.com/blog

My opinions are based on my background, education and experience together with review and analysis of the documents, depositions and exhibits listed above. These documents and materials are of the kind upon which I normally rely on when formulating policy, procedure, discipline, use of force determinations, investigations in my practice in law enforcement, as well as in rendering opinions in cases similar to these involving police policies, procedures and actions of law enforcement officers.

III.  Summary and Complete Statement of Opinions

**INFORMATION AND PREFACE TO MY OPINIONS:**
In order to understand this case, and to develop and summarize my conclusions in this matter, I reviewed substantial information regarding the CITY OF OCOEE and the CITY OF WINDERMERE, POLICE DEPARTMENTS' contact, use of force, arrest, restraint, control and custody of JEAN SAMUEL CELESTIN on April 19, 2019.

***Background and Factual Basis:*** On April 11, 2019 the plaintiff (deceased), Mr. Jean Samuel Celestin, was in a state of mental distress. He suffered from schizophrenia and bipolar disorder. His family called police (the Ocoee Police Department) to respond to the residence located at 322 Calliope Street - Windsor Landing (Sagecrest Dr.) in Ocoee, Florida. Mr. Celestin had become involved in an altercation with his family members causing them to become concerned for his, and their own, safety. The family hoped for

assistance from the Police in having Mr. Celestin removed from the house and to possibly have him taken to a facility for crisis intervention.

When Officers arrived, they were met by Mr. Celestin's mother, Rose-Marie Celestin, and his sister, Joanne Celestin Grace. Mr. Celestin's sister and mother told police about Mr. Celestin's condition. Additionally, Ms. Grace advised them that she was a health professional and recognized Mr. Celestin as needing crisis intervention. Officers asked about the blow that Mr. Celestin was alleged to have committed and the decision to "press charges" as "we have a crime here." Ms. Celestin and Ms. Grace minimized the blow and wanted Mr. Celestin to receive psychological/medical help and attention. Ms. Grace was to depart, leaving Ms. Celestin to remain on the scene with the officers.

Officers Bode and Bonner went to the front door, knocked and were answered by Mr. Celestin. Mr. Celestin questioned whether the Officers were, in fact, actually Police Officers, stating, "Are you a real cop?" These and other remarks were indicative of his confusion, delusions and detachment from reasoning with the officers. The Officers responded with remarks that were sarcastic and not calculated to deescalate the encounter (by slowing things down, creating time and distance, etc.). Rather than demonstrating empathy and a calming demeanor, and reassuring Mr. Celestin that they understood his situation and they were there to help him, the Officers became almost immediately loud and aggressive. Mr. Celestin closed the front door which was then reopened.

Mr. Celestin was given orders by the officers to submit to arrest and, as Mr. Celestin continued to act erratically, including by holding a knife (in a non-threatening, downward-pointed direction), keys and a TV remote in one hand, both officers deployed their Taser devices--Bode in the doorway and Bonner on the front porch—striking Mr. Celestin. Mr. Celestin fell to the floor and, raising his arms and wrists, submitted to an arrest, even asking the Officers to arrest him. There was an adequate number of officers on the scene to control Mr. Celestin and, if his outreached hands had been simply cuffed at that point, Mr. Celestin could have been safely and securely handcuffed. One common technique that could have been employed would have been to direct Mr. Celestin to place his hands on top of his head, restrain him, and handcuff him in that manner. Instead, the Officers failed to accept his surrender and eventually forced him into the prone position that foreseeably escalated the situation and led to circumstances that culminated in his death.

Instead of securing Mr. Celestin, Officer Bode produced his firearm and pointed it at Mr. Celestin. Officer Bode ordered Mr. Celestin to get onto his stomach and threatened Mr. Celestin with being "*about to get shot*". It appears from the video that Mr. Celestin, was frightened and confused and could not understand the Officers' commands. Therefore, he could not comply with Officer Bode's directions. The directions themselves were being given by Officers in an excited and stressful state, a manner that only furthered Mr. Celestin's inability to satisfy the Officers' commands. It should be noted that a warning such as "*you're about to get shot*" does not properly substitute for the "Taser" warning. Even in his state of fear and confusion Mr. Celestin could have been expected to panic

when he heard that he could have been killed by gunshot. This expectation comports with his next immediate reaction of "fight or flight".

Mr. Celestin fled outside and was tackled and tasered multiple times, including one burst of electrical current lasting approximately twenty seconds. This excessive deployment of the Taser conducted electronic weapon deviates from the practice prescribed in the Taser company's own required training material and practices of properly trained Officers. Additionally, that training and practice requires an affirmative, clear command of "TAZER" prior to deployment of the weapon's probes. This is intended for a clear warning to a subject and for Officers' safety as well. The proper warning, having been completely bypassed, was never given to Mr. Celestin. The desired compliance by Mr. Celestin did not occur and the tasering was delivered abruptly. The Taser warning was not given, once again, before any of the "drive-stun" direct contact activations were applied, including one activation that lasted for approximately twenty seconds. These continuous deployments were not properly paused to allow Mr. Celestin an opportunity to avoid any further use of force. These applications of the Taser are in contravention to known training and practice.

As Mr. Celestin was disabled by the tackle and Taser, Officers placed him into the prone position and began steps to restrain him (now face-down and on his stomach) with a combination of handcuffs and a Hobble device. (This disabling practice is sometimes known as "hogtying".).

While Officer Hebel went to his vehicle to retrieve his Hobble device, and after Mr. Celestin had already been handcuffed, the Officers continued to keep Mr. Celestin in a prone position for several minutes. Even after being handcuffed and having the Hobble device attached to the handcuffs, the Officers kept Mr. Celestin in the prone position for approximately one additional minute. The practice of placing a restrained person into a prone position, face down on the stomach, is widely known to inhibit the ability to breathe. Mr. Celestin's obesity, clearly observable, was yet another factor that inhibited his ability to breathe. While Mr. Celestin was being restrained and "hobbled," Officer Bonner applied a downward pressure onto Mr. Celestin's back with his expandable baton (ASP) and pushed his face into the ground. I am aware of no application of this weapon, in such a manner, that is authorized by any training materials or manufacturer's guidelines. After this use of his ASP, Officer Bonner was unable to relax and release the weapon into a closed position. It remains unclear as to whether the use upon Mr. Celestin's back could have been so severe as to have deformed or distorted the weapon while extended. The video of Officer Bonner trying to close the ASP baton never reveals whether or not he had ever been successful in returning it to a closed position. The request to examine the ASP was unable to be answered by the Ocoee Police Department in that it could not be located.

It is widely known that when a subject is placed into a prone position, restrained and prevented from regaining a face-up position to allow unobstructed breathing, that the condition of "Positional Asphyxia" can occur. This condition is well-known to law enforcement, having been first alerted to the phenomenon over twenty-seven years ago

(U.S. Department of Justice, *National Institute of Justice*-National Law Enforcement Technology Center, June 1995. Dr. Charles S. Perry, Professor of Forensic Pathology, University of Texas and Dr. Edward T. McDonough, Deputy Chief Medical Examiner, State of Connecticut. Reviewed by the D.O.J. Less-Than-Lethal Liability Task Group). This report/bulletin states that one of the first indications and conditions that a death from "positional asphyxia" has occurred is when a subject becomes "unresponsive during or immediately after a struggle." The study further describes the struggle as culminating with the subject being restrained in a face-down position (wherein) breathing may become labored. Subsequently when weight is applied to the person's back, the more weight, the more severe the degree of compression becomes. The study goes on to illustrate predisposing factors to Positional Asphyxia. Two are: (1) Obesity and (2) When physical restraint includes use of behind-the-back handcuffing combined with placing the subject in a stomach-down position. The study emphasizes that a subject should be turned off of this position as soon as they are handcuffed.

As an example of guidelines to preventing deaths in custody from positional asphyxia, the New York Police Department specifies the following information:

- **As soon as the subject is handcuffed, *get him off his stomach.* Turn him on his side or place him in a seated position.**

- **Do not sit on his back.**

- **Never tie the handcuffs to a leg or ankle restraint.**

When Officers finally turned Mr. Celestin over, he had, in fact, stopped breathing and had no pulse. Even as Officers began attempts to revive him, he initially remained handcuffed. The Officers started chest compressions but left Mr. Celestin handcuffed behind his back. Police Officers properly trained in CPR know to place victims flat on their backs with legs extended fully outward and arms outstretched. Only after a supervisor arrived several minutes after the chest compressions began and gave instructions to remove Mr. Celestin's handcuffs was this achieved.

Further, none of the Officers were willing to complete the CPR process with an airway clearing and opening component. One of the Officers had
a protective airway/breathing mask but the officer did not put it into place/use. He offered the device to the other officers, but the offer was declined. Additionally, the Officers gave no breaths or artificial respiration, even ignoring the audible directions from an automatic defibrillator which had been produced and the device's pads placed on the chest of Mr. Celestin.

Mr. Celestin never regained consciousness and was finally attended to by Fire-Rescue personnel from the Ocoee Fire Department. Still unresponsive, he was attached
to an automatic chest compressor and backboard. A bag valve mask (BVM or "ambu-bag" forced air breathing device) was observable on the ground above Mr. Celestin's

head, but it was never observed in use. The BVM is a handheld tool capable of delivering positive pressure ventilation to a non-breathing patient without mouth-to-mouth contact.

Mr. Celestin was transported to the hospital where he was pronounced dead.

## **OPINIONS:**

**1.** The response to, and initial handling of, the situation at the Celestin residence was treated as a crime, rather than the need for crisis intervention originally sought by the family of Jean Samuel Celestin. This initial approach established circumstances that would lead to a lack of de-escalation, positive communication and the possibility that Mr. Celestin could be safely calmed and reassured that the Officers were there to help him. He could have been taken to a facility for treatment and evaluation. Instead, he suffered extreme physical assaults and threats of being shot.

**2.** Mr. Celestin, a mentally ill person suffering from schizophrenia and bipolar disorder, was in need of psychiatric/medical attention rather than criminal arrest. Officers either failed to recognize the conditions of his mental illnesses or blatantly disregarded them in favor of making an arrest and using deadly force to effect that arrest. The responding Officers, through a lack of adequate training and practice, were unable to correctly assess the needs of Mr. Celestin and treated him in the manner resulting in his death. The threatened use of a firearm to shoot him could reasonably be expected to panic him and provoke an extreme risk of flight or fight response. When exactly that result occurred, his tackle and the physical pain compliance measures exerted upon him (Taser application, hobble restraint, ASP baton pressure application) were improper, excessive and unwarranted. The hobbling, pressure upon his back as he lay prone, face-down (a practice exacerbated in individuals suffering obesity) are all practices widely known by law enforcement officers to cause positional asphyxia and death.

**3.** Officers Bode and Bonner had the opportunity to secure Mr. Celestin on the porch when he raised his wrists and offered his surrender. Any reasonable officer faced with those circumstances would have instructed Mr. Celestin to place his hands on his head and would have placed him in handcuffs in that manner. The Officers' failure to accept Mr. Celestin's surrender and restrain him in a manner other than prone restraint foreseeably escalated the situation and led to circumstances that culminated in his death.

**4.** At the time the Officers successfully secured both of Mr. Celestin's wrists in handcuffs, there were at least four Officers in the immediate vicinity, and Mr. Celestin was not moving. Under these circumstances, no reasonable officer would have considered Mr. Celestin to be a flight risk or a risk to any person's safety. Under these circumstances, the use of a hobble restraint was not indicated and was not necessary. Well-known guidelines and standard practices law enforcement officers use to minimize

injury and death during restraint instruct that the Officers should have turned Mr. Celestin onto his side as soon as the handcuffs were applied.

**5.** Well-known guidelines and standard practices law enforcement officers use to minimize injury and death during restraint instruct that the Officers should have turned Mr. Celestin onto his side as soon as the hobble was applied. The Officers' failure to turn Mr. Celestin onto his side *immediately* after the hobble was applied was contrary to standard training regarding hobble devices, including the training Officer Hebel received from the Windermere Police Department. The Officers ignored well-known guidance against prone positioning of a restrained subject that presents a high risk of positional asphyxia and death

**6.** When Mr. Celestin lost consciousness, displayed no pulse and was not breathing, the attention paid to his observable condition was grossly inadequate and negligent. The Officers failed to correctly respond to Mr. Celestin's immediate need for life-saving measures. They failed to ensure an open and unobstructed airway. They failed to clear the obvious material in Mr. Celestin's mouth and airway and, while they started manual chest compression, they failed to perform rescue breaths even though they were clearly necessary. The one Officer that was in possession of a protective pocket mask failed to use it himself and his offers to give it to any of the other Officers to use went ignored and refused. The Officers placed Automatic External Defibrillator (AED) diagnostic pads onto Mr. Celestin and even when its audible directions to "give breaths" were clearly pronounced, the Officers still failed to administer any ventilations. The Officers also failed to place Mr. Celestin into the proper position for CPR, by removing his handcuffs and hobble and ensuring that his legs were extended fully outward and arms were outstretched. The medical care they provided was inconsistent with the standard CPR and basic life support training developed by the American Heart Association and delivered to most law enforcement Officers.

**7.** Once Mr. Celestin was tackled and restrained, the 911 operator/dispatcher was advised that Mr. Celestin was "secure" and that additional Officers could "slow down". The request was then made for the Fire Department to respond for a routine check of Mr. Celestin following a "Tazer Deployment". Two minutes passed and the dispatcher advised that the Fire Department was en route. Two more minutes passed and the dispatcher was advised that CPR was in progress and another three minutes passed before the dispatcher advised that the Fire Department was updated with the information that CPR was being administered to Mr. Celestin and yet another minute passed before the first Fire Department unit arrived upon the scene. Six minutes later the second Fire-Rescue unit arrived, placed Mr. Celestin on a backboard and connected him to an automatic chest compressing device. Thirteen minutes later the Fire-Rescue ambulance advised that they were en route to the hospital and were still "working code" (still attending to Mr. Celestin's lack of vital signs). Had the original request for Fire Department/Rescue been requested as a life-threatening emergency, instead of a "routine Taser Deployment," life-saving measures could have begun many critical minutes earlier. Four full minutes had elapsed after the "routine" characterization before Officers even advised that they had started CPR. Under the circumstances present that night, any reasonable Officer

would have informed the dispatcher of the need for emergency medical treatment *immediately* after the Officers discovered that Mr. Celestin was not breathing and did not have a pulse.

**8.** Officers responding to the call involving Mr. Celestin had not been properly trained for crisis intervention and the Ocoee Police Department did not require crisis intervention training for its Officers. The Officers threatened to shoot Mr. Celestin and did so in a loud and violent manner. These actions, rather than offering the possibility of de-escalating and calming the interaction, exacerbated the stress, confusion and fear that was frightening Mr. Celestin. This type of engagement with a person in crisis is contrary to Crisis Intervention Training. The failures of the Officers to properly interact with Mr. Celestin did nothing to calm and resolve his distress. These actions exposed Mr. Celestin to the Officers' insensitivity to his illness and the violent, malicious treatment that ultimately would lead to his death.

**9.** Crisis Intervention Training (CIT) has been an integral component of Police training for decades. Additionally, a Police Department and its leadership should know that to a "moral certainty" their Police Officers will be required to respond to, come into contact with and interact with persons suffering from mental illness. The failure of the Ocoee Police Department to adequately provide training, retraining and an emphasis on CIT to all of its Officers establishes a failed responsibility and demonstrates a "deliberate indifference to to the rights of persons with whom the Police come into contact with." (489 U.S. at 387-88). Where this failure exists, there is a strong likelihood that the failure to train Officers in Crisis Intervention will result in wrong decision making. The facts and acts of the Officers that were involved in dealing with Mr. Celestin bear this out. These failures led to the circumstances that resulted in the death of Mr. Celestin.

**10.** The Tasers' use in this case was excessive and deviated from Taser training and standards for use. The following items illustrate the violations of training and policy:

   a. For every Taser deployment by each of the Officers, there was no command given to Mr. Celestin accompanied by a warning that, if he failed to comply, a "TASER!" would be used against him.
   b. For every Taser deployment by each of the Officers, there was a failure to warn Mr. Celestin that a Taser deployment was about to immediately take place.
   c. Before the drive stun Taser deployments there was no warning to the other Officers that a Taser deployment about to take place.
   d. The use of the Taser in this case exceeded known safety limits (15 total seconds). Officer Chiuchiarelli deployed his Taser for 19 nearly continuous seconds (with a brief pause of less than a second) without the required pause after each 5-second deployment offering the opportunity for Mr. Celestin to comply with a command, or the opportunity for the Officers to consider other force options before use of the Taser for additional 5-second deployments.
   e. The deployment of the Taser, when five Officers were there and there was no flight risk, was excessive and not necessary. At all times lower uses of force were reasonable and available to the Officers.

**11.**  The manufacturer's guidelines for the ASP baton do not include pressure on the back as an intended use. The training for ASP baton usage is confined to weapon strikes and the body zones of targeting. The use of the baton to add pressure upon the back of a prone, face-down, restrained, obese and mentally ill subject is an egregious misuse of the baton.

**12.** Officer safety and the imperative to share information with all officers during the response to a police call for service is fundamental law enforcement protocol. In the case of the Ocoee Police Department's response to Mr. Celestin's mental crisis, OPD Officer Bode was, or should have been, abundantly aware that Mr. Celestin was an individual with clearly identified mental diagnoses (schizophrenia/bipolar disorder). This was clearly articulated by Ms. Grace when he met with her on his arrival. However, when Officer Bonner arrived as his back-up, he never relayed the information on Mr. Celestin that he (Mr. Celestin) was experiencing a mental crisis to Officer Bonner. This failure contributed to Officer Bonner's comportment and verbalization to Mr. Celestin, a failure that only served to compound Mr. Celestin's confusion and fear. Notwithstanding Officer Bode's failure to properly apprise Officer Bonner of Mr. Celestin's condition, he (Officer Bonner) would have had the opportunity to know same from the broadcast information by the dispatcher to Officer Bode.

*******************

I hold these opinions to within a reasonable degree of professional certainty based upon my education, training and my extensive experience of over forty years in law enforcement.

I reserve the right to continue my research, examination of evidence and development of additional information in this matter. If any of these efforts yield new or additional opinions, I will prepare supplemental information and provide same to counsel expediently.

IV.   Publications
      None.

V.    Testimony at Deposition or Trial During Past Four Years

- *Juli Arnold vs. Sheriff Ken Mascara*: For the Plaintiff; Attorney- Janice Fisher, Esq. Fort Pierce, FL; deposition (Police Procedures, Policies, Police Pursuit- Personal Injury).

- *Urcie Anglin vs. West Broward Shoppes LLC:* For the Plaintiff; Attorney- Christopher Chestnut, Esq. Fort Pierce, FL; deposition (Premises Security/Wrongful Death).

- *Estate of Dorothy Wright vs. City of College Park*: For the Plaintiff; Attorney- Christopher Chestnut, Esq., Atlanta, Georgia; deposition (Police Policies, Procedures, Police Pursuit-Wrongful Death).

- *Estate of James Anderson vs. Sheriff Ken Mascara, et al.:* For the Plaintiff; Attorney- Richard Slinkman, Esq., Jupiter, FL; deposition. (Police Procedures, Policies, Police Excessive Force-Wrongful Death).

- *Lorraine Smith vs. Sunrise Mills (MLP), Valor Security Services, Luxury Retail Sawgrass d/b/a Sunglass Oasis*: For the Plaintiff; Attorney- Benjamin Lucas, Esq. Deposition. (Premises Security-Personal Injury)

- *Albert Grimmie, as Personal Representative of Christina Victoria Grimmie vs. AEG Live SE and The Orlando Philharmonic Orchestra Olaza Foundation, Inc.:* For the Plaintiffs; Attorney- Benjamin Stranzl, Esq. Deposition (Premises Security-Wrongful Death).

- *Event Entertainment Group, Inc., Ultra Music Festival Corp., Ultra Enterprises, Inc. vs. Event Services America, Inc., D/B/A Contemporary Services (CSC) and Turnkey Production Solutions, LLC:* For the Defendant; Attorney- John McLuskey, Esq. Deposition (Premises Security-Personal Injury).

- *Juan Lopez Ramirez vs. Grupo Habita*: For the Plaintiff; Attorney- Benjamin Lucas, Esq. Deposition (Premises Security-Personal Injury).

- *Marino vs. City of St. Petersburg, Florida, Lone Ranger Management, LLC. D/B/A Sundial Security Services and Guardian Security of Tampa*: For the Plaintiff; Attorney- Ryan Hutchinson, Esq. Deposition (Premises Security, Use of Excessive Force- Personal Injury).

VI. <u>Compensation</u>
Per case evaluation/document review/report writing/investigation/consultation:
Non-Refundable Retainer: $4,000.00
Hourly Rate: $275/hour
Court Testimony/Deposition per hour: $300.00 (four hour minimum ($1,200.00) due prior to start of any deposition.
Expenses and Mileage Charges: Actual Cost

SUBMITTED, THIS 15th DAY OF April, 2022.

# Richard H. Masten

*Richard Masten*
Richard Masten (Apr 15, 2022 12:44 EDT)
_____
    RICHARD H. MASTEN

2940 S.W. 81st Way
Davie, Florida 33328
(954) 278-2438