

College of Medicine

Department of Pathology and Laboratory Medicine

May 20, 2022

Ms. Gail Bradford, Esq.
DEAN, RINGERS, MORGAN & LAWTON, P.A.
gbradford@drml-law.com
201 E. Pine St., Suite 1200|
Orlando, Florida 32801
Office: 407-422-4310, ext. 322|
Fax: 407-648-0233

RE:  Celestin, Rose Marie, as Next of Kin and Personal Representative of the Estate of JEAN SAMUEL CELESTIN, v. City of Ocoee et al.
    Case No,: 6:21-cv-00896-RBD-EJK
    Claim No,: FNU9958
    DOL: 04/11/2019

Dear Ms. Bradford:

Pursuant to your request, I have reviewed the following submitted materials with regard to the above-styled matter.

1. FDLE Investigative Report [0078-0274], including:

    a. Investigative Summary [0081-98]

    b. Initial Report [0100]

    c. CAD, Radio Traffic, and 911 Calls [0101-0107]

    d. Hospital response [0108]

    e. Officer interview summaries [0109-0123]

    f. Witness interview summaries [0124-0129]

    g. Neighborhood Canvas [0130]

    h. Evidence [0131-0135]

    i. Lt. Whitaker interview [0136]

    j. OPD and WPD Additional Agency documents (including CAD, Rose Celestin's handwritten statement, Windermere Incident Report, and OCPD Incident Reports [0137-0158]

    k. Disciplinary History [0159-0171]

    l.  Body Cam review [0171-0176]

    m. Crime Scene Activities (incl. forensic reports) [0177-0181]

    n. TASER downloads [0182- 0258]

Celestin, Rose Marie v City of Ocoee, et al.

   o. Autopsy Report [0260-0274]

2. Crime Scene Photos [0468-0655]

3. Medical Examiner's Report [0260-0274]

4. Autopsy Photos [0656-0739]

5. Audio of 9-1-1 radio traffic re: 322 Calliope Street [1255]

6. Officer Bode's First AXON bodycam [1892]

7. Officer Bode's Second AXON bodycam [1264]

8. Officer Bonner's First AXON bodycam [1893]

9. Officer Bonner's Second AXON bodycam [1265]

10. Officer Chiuchiarelli's AXON bodycam [1266] – Please note that the bulk of this almost 2-hour video is black.

11. Officer Chiuchiarelli's Second AXON bodycam video [1267]

12. Corporal Price's AXON bodycam [1268]

13. Officer Hebel's AXON bodycam video [1269]

14. Officer Ogletree's AXON bodycam video [1270]

15. Body cam video showing the beginning of CPR (18:07 in length) [PL000958]

16. Body cam video of CPR (14:03 in length) [PL000959]

17. Body cam video of officers assisting getting Celestin on backboard [PL000960]

18. Body cam video of officers standing at rear of ambulance [PL00961]

19. Deposition of Plaintiff Rose Marie Celestin (mother) taken November 22, 2021, with exhibits and Errata
20. Deposition of Joanne Celestin Grace (sister) taken October 29, 2021, with exhibits and Errata
21. Deposition of Ofc. Joshua Bode taken November 23, 2021, with exhibits
22. Deposition of Ofc. Christopher Bonner taken December 3, 2021, with exhibits
23. Deposition of Ofc. Brian Harris taken December 7, 2021, with exhibits
24. Deposition of Ofc. Griffin Hebel taken December 16, 2021, with exhibits
25. Deposition of Detective Dominic Chiuchiarelli taken February 4, 2022, with exhibits
26. Plaintiff's Expert Witness Disclosures, certified 15 April 2021
27. Report of Plaintiff's Expert, Michael M. Baden, MD, forensic pathologist, 14 April 2022
28. Report of Plaintiff's Expert. Richard H. Masden, security and law enforcement consultant, 15 April 2022
29. Health Central Hospital Record, 4-12-2019

30. AED Report, 4-12-2019

31. Ocoee Fire Rescue Department Incident Report 2019-1901715  4-11-2019

Celestin, Rose Marie v City of Ocoee, et al.

32. Ocoee Fire Department Patient Care Report 4-12-2019

Specifically, you ask my opinion regarding this investigation with specific reference to the proximate cause of death and manner of death of Mr. Jean Samuel Celestin [JC]. In addition, there are other issues concerning the interpretations of the pathological [= relating to or caused by disease or trauma] findings reported at autopsy, the pathophysiological [= functional changes associated with or resulting from disease or injury] observations recorded clinically, and the circumstantial/investigative facts. Opinions on these issues are outlined herein.

The prevailing standard of proof, regarding expert medical opinions is "reasonable degree of medical probability" [some use "reasonable medical certainty"]. Investigative questions in forensic matters rely on the standard of "reasonable investigative probability." All such standards essentially mean the opinions are based on the probability of "more likely than not" or 50% + 1. These are the standards I invoke in this case.

Part of the provided review materials consists of various video reproductions wherein JC has conversational or physical interaction with various law enforcement officials and family members prior to intervention by emergency medical staff and hospital personnel. The totality of such putative evidence, in my opinion, is of insufficient quality in many segments to facilitate any cogent conclusions or opinions with reasonable medical and investigative probability about (a) the proximate cause of death [natural disease or injury or combination of both that started the pathophysiological changes—brief or prolonged—incompatible with life] and (b) the manner of death [the circumstances under which death occurred and designated by the medicolegal official on the certificate of death as follows: natural, homicide, accident, suicide or undetermined]. I add that it is imprudent and an overreach for any death investigator to determine cause and manner of death primarily—even though background information and autopsy/laboratory data may be reviewed and considered as relevant to some degree—on the basis of reviewing the videos in this particular investigation.

The medical examiner's office was notified in view of the sudden and unexpected death of Jean Samuel Celestin on April 12, 2019. Dr. Jesse C. Giles, MD, a veteran forensic pathologist, conducted a complete medicolegal autopsy [*vide* Ref. 8: Forensic Pathology Standards, Standard B3.3 (death associated with police action), StandardB4, Forensic Autopsy Performance, p 10] expeditiously on April 12, 2018. Body fluids, including blood collected at the hospital during resuscitation, and liver tissue were collected and submitted to the reference toxicology laboratory, Steward Reference Laboratory. As indicated also in this reference, this practice was in accord with autopsy standards established by the National Association of Medical Examiners [NAME]. The autopsy and subsequent report are in accord with the standards of the profession.

The NAME Forensic Autopsy Practice Standards neither delineate nor specify nor require "routine steps" for the performance of the forensic autopsy for in-custody/police use of force cases. All steps in the prosecution for this or any other type of death rest in the sole discretion of the forensic pathologist: "The forensic pathologist determines the need for special dissections or additional testing." [B4,4, p. 10]. A layer-by-layer dissection of the front neck is required in all cases [F2,2], and there is no indication that this was not accomplished. Photography of negative findings, such

Celestin, Rose Marie v City of Ocoee, et al.

as the higher neck structures (larynx, cartilages, hyoid bone), which were examined directly at autopsy, is also discretionary with the forensic pathologist, and would not have added to the correlative interpretation of cause and manner in this case. Photography here was at least adequate to afford any reviewing forensic pathologist experts the necessary information to draw reasonable conclusions in this regard [cause and manner of death] as well. As to the cogency of the autopsy summary, it is just that: a summary. Regardless of the nature of the death investigation, no forensic pathologist includes all collected background data [some of which can be quite voluminous] in the summarizing statement. Some highly regarded medical examiners/forensic pathologists [e.g., the late Dr. Joseph Davis of Miami] indeed recommend that no or very little summaries be included in the formal autopsy report. What the forensic pathologist reviewed is contained in the case file folder of the forensic pathologist and investigators. It is not reasonable to infer that detailed witness and video data relevant to this investigation was not evaluated by Dr. Giles before signing off on the autopsy. With regard to manner of death determination, it is clear that the actions of law enforcement officials had no substantial bearing on the cause of death, and therefore whether any intended to kill JC is irrelevant. The hallmark of forensic death investigation is indeed to evaluate background [scene, history], physical findings at autopsy, and appropriate laboratory studies and conduct the interpretative correlative deduction and abduction to reach the crux of the exercise, namely, to determine the proximate cause [contributory causes] and manner of death, and so certify. My opinion, upon examination of the materials listed above, is that Dr. Giles conducted a reasonable investigation and produced a fundamentally good autopsy report.

In my opinion, the principal findings at autopsy were as follows:

- Near-morbid Obesity [Body Mass Index = 38.1 kilograms per square meter
- Hypoxic Encephalopathy [= damage to cells in the central nervous system (the brain and spinal cord) from inadequate oxygen], acute [Brain unfixed weight: 1,390 gm]
- Embedded CEW probes ["TASER"] and probe impact marks, skin and subcutis multifocal
- Cardiomegaly [enlarged heart; unfixed weight = 400 gm] with postmortem photographic evidence of left ventricular hypertrophy
- Pulmonary Edema [combined lung weight: 1,040 gm]
- Aspiration of gastric contents
- Blunt force injuries [scrapes, bruises] of skin, patchy
- CPR-related [chest compression] injuries: bilateral anterior rib fractures [right: 3 &4; left: 2-6] and liver laceration with small [75 mL] hemoperitoneum [blood in abdominal cavity]

Pertinent negative findings consisted of the following:

- No other internal blunt force injuries, including neck structures [larynx, hyoid bone, cartilages] and the central nervous system, save some changes from resuscitation
- No petechiae [clusters of pinpoint hemorrhages, frequently indicative of asphyxia (deprivation of oxygen) from some cause] anywhere, including the skin of the face and the surface of the eyes/inner linings of the eyelids [palpebral and bulbar conjunctivae]

Celestin, Rose Marie v City of Ocoee, et al.

Toxicological studies [analytical results] were basically noncontributory and reported on May 9, 2019, as follows:

- Hospital Blood [drawn at hospital after pronouncement of death]:

    Caffeine and Metabolite: Positive

    Barbiturates: Indeterminate

- Autopsy Blood Caffeine: Positive

- Vitreous Humor Chemistries:

    Creatinine: 0.48 mg/dL -

    Sodium: 154 mEq/L

    Potassium: 7.5 mEq/L

    Chloride: 132 mEq/L

    Glucose: 85.7 mg/dL

    Urea Nitrogen: 13 mg/dL

Dr. Giles concluded that JC's cause of death was "Sudden cardiorespiratory arrest during subdual and restraint. Contributory: Recurrent depression with psychotic features, mild cardiac hypertrophy, obesity."

Dr. Giles summarized as follows:

> "This is an acute excited delirium type death in the setting of psychotic mental illness, obesity and heart disease without the involvement of illicit drugs and with the physiologic stress of an active struggle with police subdual, including conducted electrical weapon discharges, and police restraint including prone hobbling. As this death came about during a struggle between the decedent and other people, the manner of death opinion of 'Homicide' is appropriate."

My opinion is that this formulation is sound to a reasonable degree of medical and investigative probability. There has been criticism of the term "excited delirium" [ExD] because its use is generally limited to medical examiners and emergency medicine physicians whose patients die before a complete workup is completed that would allow for a more specific diagnosis. Whether one uses the term or not, ExD-related behavior and medical conditions are well-recognized.

- Excited delirium is considered a relatively uncommon health condition characterized by severe agitation, aggression, distress, and is often fatal. Elevated temperature is not a necessary component of the diagnosis. **In many [comment: not all] cases of excited delirium, individuals will have displayed noticeable increases in body temperature (fever)**, utilized drugs that altered dopaminergic functioning, and exhibit overtly bizarre

Celestin, Rose Marie v City of Ocoee, et al.

behavior. (emphasis added) Features of excited delirium exhibited by JC during the reported and videoed interaction with law enforcement include the following:
1. Acute psychotic behavior
2. Violent agitation
3. Altered mental status-delirium [acutely disturbed state of mind]
4. bizarre behaviors
5. incoherent speech [screaming and shouting]
6. extreme exertion and hyperactivity
7. combativeness

- The physiologic stress of [a] the sustained struggle with law enforcement, [b] the near-morbid obesity, [c] his abnormally enlarged heart, and [d] his persistent psychotic state all combined to produce a catecholamine surge and overload [catecholamine (stressors) = any of a group of sympathomimetic amines (including dopamine, epinephrine, and norepinephrine); catecholamines play an important role in the body's physiological response to stress. Their release at sympathetic nerve endings increases the rate and force of muscular contraction of the heart, thereby increasing cardiac output; constricts peripheral blood vessels, resulting in elevated blood pressure.] to put his heart beyond its capacity to function and support life. The predominant theory of the underlying etiology of excited delirium is an excess of catecholamines (such as adrenaline) or sympathetic nerve stimulation during the excited period. However, a syndrome, by definition, is a collection of signs and symptoms, not a specific disease. People with multiple conditions may present in this manner, including drug-induced psychosis, serotonin syndrome, diabetic ketoacidosis, **paranoid schizophrenia,** and others [bold added].

- Moreover, a substantial number of scientific investigators conducting controlled laboratory studies on the creation of breathing difficulties during vigorous physical restraint [hobble, prone] conclude that such impairment is negligible [*vide* ref. 7]. Vilke opines that this and other studies ". . . lend further credence to the theory that factors outside of restraint alone lead to morbidity and mortality." [*vide* ref. 9]

- PREMATURE DEATH RELATING TO OBESITY: Individuals with a BMI greater than 30 have a 50–100% increased risk for death from all causes compared to a BMI of 20–25. Most of these deaths are as a result of cardiovascular causes. Sudden Cardiac Death Sudden and unexpected death in morbid (stage III BMI) OB presents at a rate 40 times greater than that of age-controlled lean persons. Sudden death is here defined as death occurring within 6 hours of the onset of symptoms previously determined to be medically stable, or the unwitnessed death of a person who had been medically stable within 24 hours before.

- Those who maintain that prone positioning invariably hampers ventilation of obese subjects must perforce explain which such a position has been adopted clinically for many years to in fact improve breathing. Prone positioning improves oxygenation and decreases mortality in patients with acute respiratory distress syndrome. This applies to patients who have a body-mass index of more than 30 and for whom the prone position is necessary for a prolonged period [*vide* refs. 15, 16].

Celestin, Rose Marie v City of Ocoee, et al.

In my opinion the cause of death is not positional or mechanical asphyxia. The anatomical evidence is lacking in this case that the various pressures and forces applied by law enforcement officials were sufficient to cause suffocation or mechanical asphyxia. In cases of asphyxia such as mechanical [positional] and suffocation, the lungs are usually edematous and heavy and petechiae are present on the eyes, skin of face, and lining of the mouth. None were present at autopsy.

In summary, on the basis of all information [historical, pathological, laboratory] developed in this investigation, I agree with the medical examiner, Dr. Giles that the proximate cause of death is properly formulated descriptively, namely "Sudden cardiorespiratory arrest during subdual and restraint." Contributory factors in this case consist of: "Recurrent depression with psychotic features, mild cardiac hypertrophy, obesity."

The initial opinion of the autopsying forensic pathologist is altogether medically and scientifically based.

Should new information, which is relevant and material to this investigation, emerge, I reserve the right to additional review and amendment to the opinions expressed herein.

REFERENCES:
1. Hunsaker JC, Shields LBE. Death in abnormal positions: physical restraint. In Madea B, editor: Handbook of Forensic Medicine, 2nd edition. 2021, Wiley. In press.
2. Hunsaker JC, Crook S, Shields LBE. Excited delirium. In Madea B, editor: Asphyxiation, Suffocation, and Neck Pressure Deaths. 2020, Boca Raton, FL, CRC Press, Taylor & Francis, pp. 311-315.
3. Excited Delirium Syndrome: Causes, Symptoms, Treatment - Mental Health Daily. https://mentalhealthdaily.com/2015/04/22/excited-delirium-syndrome-causes-symptoms-treatment . Accessed 4 Jun 2021.
4. Hanzlick, R., Hunsaker III, J.C., Davis, G.J. A Guide for Manner of Death Classification. 1st ed. National Association of Medical Examiners®, Feb 2002.
5. Forensic Pathology Autopsy Standards. National Association of Medical Examiners. Approved 2005.
6. Baselt R (ed.). Disposition of Toxic Drugs and Chemicals in Man. 10th ed. Biomedical Publications, Seal Beach, California (USA), 2014.
7. Michalewicz BA, Chan TC, Vilke GM, Levy SS, Neuman TS, Kolkhorst FW. Ventilatory and metabolic demands during aggressive physical restraint in healthy adults. J Forensic Sci. 2007;52:171–175.
8. Vilke GM. Restraint physiology: A review of the literature. J Forensic Leg Med.2020;75:https://doi.org/10.1016/j.jflm.2020.102056 [accessed 11 April 2022].
9. Physicians for Human Rights issued a 95-page report in March 2022 entitled "'Excited Delirium' and Deaths in Police Custody - The Deadly Impact of a Baseless Diagnosis".
10. Spitz and Fisher's Medicolegal Investigation of Death, "Guidelines for the Application of Pathology to Crime Investigation," 5th Ed., edited by Werner U. Spitz and Francisco J. Diaz, 641-645: 2020.

Celestin, Rose Marie v City of Ocoee, et al.

11. Zipes DP. Sudden cardiac arrest and death following application of shocks from Taser electronic control device. Circulation. 2012:125:2417-2422
12. Zipes DP. Taser electronic control devices can cause cardiac arrest in humans. Circulation. 2014:129:101-111.
13. Samuel E, Williams RB, Ferrell RB. Excited delirium: Consideration of selected medical and psychiatric issues. Neuropsychiatric Dis Treat. 2009;5:61-66.
14. REPORT 2 OF THE COUNCIL ON SCIENCE AND PUBLIC HEALTH (June 2021) Use of Drugs to Chemically Restrain Agitated Individuals Outside of Hospital Settings (Reference Committee E). [2021 AMA position-paper on out-of-hosp use of drugs for agitation -excited delirium.pdf](#)  Accessed 19 May 2022.
15. Hao D, Low S. DiFenza R, et al. Prone Positioning of Intubated Patients with an Elevated Body-Mass Index. N Engl J Med 2022; 386:e3.
16. Guerin G, Reignier J, Richard J-G. Prone Positioning in Severe Acute Respiratory Distress Syndrome. N Engl J Med 2013;368:2159-68.
17. Strömmer EMF, Leith W, Zeegers MP, Freeman MD. The role of restraint in fatal excited delirium: a research synthesis and pooled analysis. Forensic Sci Med Pathol. 2020;16(4):680-692.
18. Duflou J, Virmani R, Rabin I, Burke A, Farb A, Smialek J. Sudden death as a result of heart disease in morbid obesity. Am Heart J 1995;130:306–313.
19. Powell-Wiley TM, Poirier P, Burke LE, et al. Obesity and Cardiovascular Disease: A Scientific Statement from the American Heart Association. Circulation. 2021 May 25; 143(21): e984–e1010.
20. Di Maio TG, Di Maio VJ. Excited delirium syndrome cause of death and prevention. 2006, Boca Raton: CRC Press, Taylor & Francis.

Yours faithfully,

John C Hunsaker III, MD, JD, MA
Forensic Pathologist
Kentucky Associate Chief Medical Examiner (ret)
Professor of Pathology and Laboratory Medicine Emeritus
john.hunsakeriii@uky.edu
502 321-0238