UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

CASE NO:  6:21-cv-00896-RBD-EJK

ROSE MARIE CELESTIN, as Next of
Kin and Personal Representative
of the Estate of JEAN SAMUEL
CELESTIN, deceased,
     Plaintiff,
vs.

CITY OF OCOEE, Officer JOSHUA BODE,
individually, Officer CHRISTOPHER
BONNER, individually, Officer
DOMINIC CHIUCHIARELLI, individually,
Officer BRIAN HARRIS, individually,
TOWN OF WINDERMERE, and Officer
GRIFFIN HEBEL, individually,
     Defendants.
_____/


**Expert Opinion Report: John G. Peters, Jr., CTC, CLS, Ph.D.**
209 South Stephanie Street ✦ Suite B249 ✦ Henderson, Nevada 89012
Telephone: 717.538.5940


     I, John G. Peters, Jr., Ph.D., hereby submit my report that contains a complete statement of opinions to be expressed and the bases and reasons therefor; the data and other information I considered in forming the opinions; the exhibits or list of references I used as a summary of or support for the opinions; my qualifications, including a list of all publications authored within the preceding ten years; the compensation to be paid for the study and testimony time; and a listing of any other cases in which I have testified as an expert at trial or by deposition within the preceding four years.


*John G. Peters, Jr., Ph.D.*

John G. Peters, Jr., Ph.D.
May 20, 2022

**I.      CASE SPECIFIC DOCUMENTS REVIEWED/CONSIDERED**: See APPENDIX A.

**II.     FOCUS OF ANALYSIS**

Through counsel for unnamed Defendants City of Ocoee, Officer Joshua Bode, Officer Christopher Bonner, Officer Dominic Chiuchiarelli, Officer Brian Harris, Town of Windermere, and Officer Griffin Hebel, I am retained to provide expert opinions in the areas of law enforcement practices. I am not a party to this litigation, and I am over the age of twenty-one. A copy of my *Curriculum Vitae* is provided as an exhibit to Defendants' designation. My *Curriculum Vitae* identifies my education, professional experience, over 270 publications, and other training and experience. There are areas of my education, training, and experience that are truly relevant to issues identified and opinions developed in this matter.

My education includes being a *Certified Litigation Specialist®: Police* and *Corrections* by the Americans for Effective Law Enforcement (AELE), in addition to related certifications in corrections and campus law enforcement. I am also an experienced instructional designer and have developed and taught law enforcement programs across the United States. In addition to my extensive experience as an instructional designer and trainer, I also hold a CLEAR California Teaching Credential (Public Safety), and a *post-doctoral* Master of Arts degree in Education (Career and Technical). I have also earned the designation of *Public Safety Disability Specialist*, in addition to teaching and writing about human disabilities and the Americans With Disabilities Act.

Vocationally, I serve as president of the Henderson, Nevada-based Institute for the Prevention of In-custody Deaths, Inc., (IPICD), and its senior instructional designer. The IPICD provides a variety of Train-the-Trainer programs to law enforcement agencies across the globe. These training programs include but are not limited to: "Prevention and Management of Suicide," "Excited Delirium and Agitated Chaotic Events™ Instructor: Recognizing, Responding, Preventing, and Investigating Arrest-Related and Sudden, In-Custody Deaths Version 6.0;" "Use-of-Force Train-the-Trainer;" and "Arrest-Related and In-Custody Death Investigative Specialist™." Agitated Chaotic Events is a term developed by the IPICD to encompass a constellation of delirium-like, agitated behaviors where the underlying cause is unknown to first responders. The topics include, but are not limited to epilepsy, Hyponatremia, alcohol withdrawal, synthetic drugs, energy drinks, diabetes, autism, and others.

Annually, the IPICD hosts an international conference (2021 was the 16th one) that presents the latest scientific, legal, medical, and psychological research, in addition to street-proven tactics and programs used by law enforcement agencies to identify, prevent, and/or manage sudden in-custody and/or arrest-related deaths. In 2016, presentations included the latest information about Fentanyl and other widely used drugs and how fast they are spreading and killing individuals. The IPICD has also awarded unrestricted grants for the funding of scientific research (e.g., UCSD School of Medicine; University of Miami, Miller School of Medicine), including the conducting of in-house primary research on in-custody and arrest-related deaths topics. The IPICD has also awarded unrestricted grants to the University of California, San Diego, School of Medicine to conduct research that included the first scientific study on the safety of restraint chairs.

In 2014, the Singapore Prison Service had engaged my services to conduct training in Singapore and to evaluate several of its training programs. I also teach in the "Jail: Legal Issues" programs held in Las Vegas, Nevada, which are hosted by the AELE. Several correctional facilities have engaged me to review policies, procedures, and training, including, but not limited to jails in Texas, New Mexico, Idaho, Massachusetts, Pennsylvania, and California.

For more than 30 years I have taught crowd control, defensive tactics, tactical handcuffing, restraint techniques, including the use of a restraint chair and "The WRAP," impact tools (e.g., batons), and arrest techniques instructor- and user-level programs to thousands of law enforcement officers across the globe. I have authored more than 270 publications, including texts on defensive tactics and on tactical handcuffing: *Realistic Defensive Tactics* and *Tactical Handcuffing for Chain- and Hinged-Style Handcuffs*. I have taught several of these and other subjects across the State of Florida during the last 30 years.

I am also a graduate of the TASER M26™ and X26™ ECD Instructor programs who has taken a five-second TASER ECD exposure, the TASER Armorer program, the TASER Evidence Collection and Analysis Training program, the TASER X3™ ECD instructor program, the TASER XREP™ instructor program, the TASER X2™ instructor program, the TASER AXON™ instructor program, the TASER Evidence.com program, and have authored several articles about TASER ECD and related devices.

On February 1, 2020, the Americans for Effective Law Enforcement (AELE) Board of Directors appointed me Executive Director of AELE. In addition to my supervision of a part-time staff of three people, I manage the scheduling and presenters of AELE seminars. I also serve as instructional designer of AELE seminars, webinars, and online programs. These seminars have been approved in many states as certified training for police and other law enforcement personnel, as well as qualifying as Continued Legal Education credits for licensed attorneys.

Since 1982, I have been providing consulting and expert witness services to municipalities, attorneys, and others throughout the United States and Hong Kong. These services have included but are not limited to the review of municipal and/or law enforcement policies, procedures, rules, training, competency-based testing, supervision, internal investigations, and conducting of primary research on sexual harassment and sexual assault.

In addition to writing about and lecturing on law enforcement policy and procedures, use-of-force, force options, force training, force policies, force warnings, excited delirium, sudden in-custody death, investigations, and related topics, I am an AELE Certified Litigation Specialist in Police liability, and a faculty member teaching in its "Discipline and Internal Investigations for Law Enforcement, Public Safety and Corrections" and "Biometric, Psychological and Legal Aspects of Lethal and Less Lethal Force and the Management, Oversight, Monitoring, Investigation and Adjudication of the Use of Force" programs.

I have been a consultant to many correctional facilities, including, but not limited to the Harris County Jail, Houston, Texas (3rd largest jail in the United States). Additionally, I am an AELE Certified Litigation Specialist in Corrections Liability, and a faculty member who teaches

in its "Jail Legal Issues," "Internal Affairs," and "Managing Force" seminars. I have also been an invited speaker, on two occasions, at the American Jail Association International Training Conferences, and have been a contracted trainer for the American Jail Association. I have also consulted with the American Correctional Association. I have also conducted training for the California Sheriff's Association throughout California on several occasions and the Los Angeles County Sheriff's Department.

As a former law enforcement administrator, patrol officer, and deputy sheriff, I am familiar with the need for written policy, rules, and procedures, and the need to train officers about them. I was also President of a municipal Civil Service Commission, where I oversaw testing requirements for law enforcement officers and was involved with disciplinary actions involving law enforcement officers. Supervisory training is also a key ingredient to organizational effectiveness, as is having contemporary policies and procedures. I have written about these issues, conducted organizational diagnoses about management, training, policies and procedures, etc. in law enforcement and correctional organizations, and hold graduate degrees (Ph.D. and M.B.A.) in management.

I have conducted primary research on the efficacy and liquid impedance of Spit Restraint Devices, The WRAP Restraint System, the management of criminal investigations, and teach how to conduct criminal and internal investigations. I am a former criminal and internal investigator.

As a certified *Public Safety Disability Specialist,* I have instructed on various disability issues (e.g., Americans With Disabilities Act, wheelchairs, service animals, identifying and managing disabled individuals, etc.), and co-developed a seminar Wheelchair Instructor program and am co-author of the text *Wheelchair Officers' Field Guide*. I also instruct law enforcement officers about excited delirium, agitated chaotic events, mental illness, and de-escalation interventions across the United States. Since 2006, my training firm, Institute for the Prevention of In-custody Deaths, Inc., has held international conferences on disability, mental health, excited delirium, and arrest-related deaths issues and how to conduct investigations into arrest-related deaths.

## III.     RIGHT TO AMEND

I reserve the right to amend and/or supplement these preliminary opinions when additional information becomes available including but not limited to the deposition testimony of Defendants, Plaintiff, and/or witnesses who were at the scene. It is also my understanding discovery is ongoing and other witness testimony will be taken and deposition transcripts will be issued. Further, I also reserve the right to amend in response to expert disclosures of other parties, or if questions are asked of me that do not relate to information contained in this disclosure.

## IV.     OPINION STANDARDS

Expressed opinions are to a reasonable degree of scientific certainty and/or to a reasonable degree of professional certainty.

## V.      OPINION METHODOLOGY

The following opinions were developed using one or more qualitative and quantitative research methodologies, in addition to my education, training, experience, and literature review. These research methodologies may have included Historiography, Content Analysis, Phenomenology, Ethnography, Discourse Analysis, and Case Study. My methodology included comparing the actions of the Law Enforcement Officers (LEO) involved in this incident, against that which is generally accepted training and operational practices and procedures in the correctional profession.

The documents reviewed are classified in the social sciences as *archival records*. Graziano and Raulin (1997) define archival records as "records that already exist" (p. 135). Archival records are one type of unobtrusive measure available to researchers and/or experts. The review and analysis of archival records is an accepted research methodology in the social sciences and applies to law enforcement research. While not as exacting as *experimental research* where there are control and experimental groups, conducting interviews and examining archival records, plus conducting observations are methodologies that are used in the social sciences.

## VI.     EXECUTIVE SUMMARY OF PRELIMINARY OPINIONS

1.      **On April 11, 2019, the City of Ocoee, Florida had written policies and procedures in effect that were consistent with generally accepted national standards and recommended guidelines.**

2.      **The City of Ocoee trained Officers Joshua Bode, Christopher Bonner, Dominic Chiuchiarelli, and Brian Harris according to State of Florida and other generally accepted law enforcement standards.**

3.      **The Town of Windermere trained Officer Griffin Hebel (Officer Hebel) according to State of Florida and other generally accepted law enforcement standards.**

4.      **City of Ocoee Police Officers Bode, Bonner, Chiuchiarelli, and Harris were neither trained nor qualified to make a medical, psychological, and/or a disability diagnosis of individuals whom they encounter.**

5.      **The City of Ocoee's police officer hiring practices met or exceeded nationally standards, recommendations, and/or guidelines.**

6.      **On April 11, 2019 Town of Ocoee police officers were unable to scroll up or down through the Computer Aid Dispatch in their patrol cars mobile digital terminals for safety reasons.**

7.     City of Ocoee Police Officers Bode, Bonner, Chiuchiarelli, Harris and Town of Windermere Officer Hebel followed nationally recognized threat assessment guidelines prior to his use of verbal and empty hand force options, which is consistent with generally accepted officer safety practices.

8.     Mr. Celestin *actively resisted* the officers and was the fuel for the pacing of driving the uncertain, rapidly evolving, and tense confrontation.

9.     Officers Bode, Bonner, Chiuchiarelli, Harris, and Hebel attempted varied force options to get Mr. Celestin to cooperate with them and stop his active, aggressive, and deadly force resistance, but they were ineffective because of Mr. Celestin escalated the pacing of the situation.

10.     Mr. Celestin demonstrated his active, aggressive, and/or deadly force resistance to the officers based upon his continued and escalated active physical resistance and they responded appropriately given the totality of the circumstances and without need to consider Mr. Celestin's alleged disability.

11.     The force used by Officers Bode, Bonner, Chiuchiarelli, Harris, and Hebel on Mr. Celestin in attempts to capture, control, and restraint him were consistent with national training standards, national guidelines, national force standards, City of Ocoee and Town of Windermere "Use of Force" policies given the totality of circumstances created by Mr. Celestin.

12.     Mr. Celestin's behavioral symptoms matched those law enforcement officers are trained in to identify a possible state of excited delirium, also known as hyperactive delirium.

13.     Mouth-to-mouth resuscitation is optional in contemporary first aid training.

14.     Officers Bode, Bonner, and/or Chiuchiarelli did attempt to use Crisis Intervention techniques but the active and aggressive resistance offered by Mr. Celestin negated their efforts.

15.     Repositioning a person onto the side may hinder breathing assessment.

16.     The City of Ocoee and the Town of Windermere appropriately investigated the in-custody death of Mr. Celestin, which is within the scope of generally accepted internal investigation practices, CALEA guidelines, and Ocoee Police Department *General Order #4.2 Use of Force*.

## VII.    DISCUSSION of OPINIONS

My opinions are presented in three categories: *Pre-Incident*, *Incident*, and *Post-Incident*. *Pre-Incident Opinions* are those opinions that focus on events that took place prior to the instant matter. *Incident Opinions* are those opinions that focus on the actions of the parties during the incident under review. *Post-Incident* opinions focus on events that took place after force was used on Mr. Celestin.

**1.    On April 11, 2019, the City of Ocoee, Florida had written policies and procedures in effect that were consistent with generally accepted national standards and recommended guidelines.**

[NOTE: It is my understanding the Town of Windermere is having its policies and procedures evaluated by another police practices expert. Therefore, I will not be offering an analysis of those policies and procedures.]

My content analysis[1] of several Ocoee Police Department written policies and procedures that were in place on April 11, 2019 and applicable to the instant matter showed they had meet national law enforcement standards, recommendations, and/or guidelines for the development of policies and procedures. Table 1 shows the applicable policies I have reviewed:

Table 1  Ocoee Police Department Policies Reviewed

| General Order # | SUBJECT | BATES STAMP |
|---|---|---|
| *General Order #4.2* | Use of Force | CELE 3890 |
| *General Order #8.0* | Baker Act and Marchman Act | CELE 3778 |
| *General Order #11.1* | Conduct and Disciplinary Process | CELE 7051 |
| *General Order #14* | Training | CELE 3877 |
| *General Order #31.0* | Restraint Devices | CELE 3873 |
| *General Order #40.2* | Firearms and Ammunition | CELE 3842 |
| *General Order #41.0* | Prohibition of Biased Policing | CELE 3870 |
| *General Order #41.2* | Conducted Electrical Weapon (CEW) | CELE 3787 |

A foundational requirement of any law enforcement agency, like the Ocoee Police Department, is to have in place a set of clearly written rules, regulations, and procedures that guide employees in the lawful performance of their specific duties – especially in those areas in which it is foreseeable that they will likely be called upon to properly balance the Constitutional rights of citizens whom they encounter, with their proper performance of assigned duties. It is equally important that these rules, regulations, and procedures prescribe a process for handling issues which arise when confronting certain situations. It is also of equal importance that these rules, regulations and procedures set forth in stark terms the discipline which will be promptly imposed for infractions of the same – including progressively more severe discipline if there is an effort to conceal rather than to disclose such violations.

---

[1] Detailed and systematic examination of the contents of a particular body of material . . . for the purpose of identifying patterns, themes, or biases within the material" (Leedy and Ormond, 2001, p. 114).
Dr. Peters Opinion Report: Celestin v. City of Ocoee, et al.
©2022. A.R.R.

Contemporary and knowledgeable governmental entity and agency administrators should know and understand the need for written policy and procedures, for officers interacting with the public, suspects, and/or arrestees. The Commission on Accreditation for Law Enforcement Agencies (CALEA) stated that a law enforcement agency (including correctional facilities) "should establish a formal written directive system to provide employees with a clear understanding of the constraints and expectations relating to the performance of their duties" (CALEA, January 1999, p. 12-2). CALEA Standard 12.2, "Written Directives" lists, at a minimum, what a written directive system must include.

Similarly, the International Association of Chiefs of Police (IACP) *A Police Chief's Desk Reference* (2004), Chief W. Dwayne Orrick noted that policy and procedure manuals and directives "provides staff with the guidance necessary to perform department operations" (p. 139).

Plitt (2006) defined a policy as "a general statement of philosophy, principles and objectives in a given area. Policies tell what the department wants to accomplish and why. Policy provides the framework within more specific guidance can be provided in the form of procedures and rules" (Plitt, p. 42-3).

"Rules are much more specific. They leave less room for the exercise of discretion and decision-making by the rank-and-file officer. Rules spell out what must be done or not done in specific situations. Rules are intended to mandate specific behaviors. Rules help to make the department's response as uniform as possible to specific situations" (Plitt, 2006, p. 42-3).

Examples of the thoroughness and completeness of the Ocoee Police Department policies and procedures include the many definitions, training requirements, and recommended responses to resistance. The following select definition are contained within the "Use of Force" policy:

- Active Resistance (CELE 3891)
- Deadly Force (CELE 3891)
- Imminent Threat (CELE 3893)
- Less-lethal Force (CELE 3893)
- Objective Reasonableness (CELE 3893)
- Pain Compliance (CELE 3893)
- Physical Control (CELE 3894)
- Restraint Devices (CELE 3894)
- Takedowns (CELE 3894)
- Totality of Circumstances (CELE 3894).
- Use of Force (CELE 3895)
- Weapons (CELE 3895).

Section IV. A: Training directs officers that "Sworn members must successfully complete the Florida Police Standards and Training Commission approved course, or its equivalent, prior to assignment in any capacity in which a sworn member is allowed to carry a firearm or in any position to make an arrest" (Bates Stamp, CELE 3897). Other requirements and recommendations are contained in this section, too.

Section VIII focuses upon "Recommended Response to Resistance and Aggression Guidelines" that also directs police officers and limits their discretion (Bates Stamp, CELE 3904). This section lists and defines subject resistance and aggression as follows:

- Passive Resistance
- Active Resistance
- Aggressive Resistance
- Deadly Force Resistance (CELE 3905).

My content analysis of these categories of resistance and their respective definition found they are consistent with national, local, and training categories and definitions, particularly within the State of Florida.

The Ocoee Police Department "Restraint Devices" policy and procedures contains a similar format that being with "Purpose," "Policy," and "Definitions" (Bates Stamp, CELE 3873). This *General Order* defines "Mechanical Restraint" (CELE 3873) and authorizes officers to use "Other Mechanical Restraint Devices" such as "hobbles" (CELE 3875.

Because an officer's use of force is *subjective* because the officer decided on the force option and how it is applied based on the totality of the circumstances, it is customary across the United States for governmental entities through their respective law enforcement agencies to provide guidance through policies and procedures, which simultaneously limit officer discretion on using force. In contrast, using force that is "objectively reasonable" is not *subjective*, but is an evaluation of the force after it was used.

Based upon my education, training, and experience, my content analysis of the aforementioned Ocoee Police Department policies and procedures (*General Orders*) that were in place on April 11, 2019 were consistent with generally accepted national standards and recommended guidelines.

2. **The City of Ocoee trained Officers Joshua Bode, Christopher Bonner, Dominic Chiuchiarelli, and Brian Harris according to State of Florida and other generally accepted law enforcement standards.**

My content analysis of the training records of City of Ocoee Police Officer Joshua Bode (Officer Bode), Christopher Bonner (Officer Bonner), Dominic Chiuchiarelli (Officer Chiuchiarelli) and Brian Harris (Officer Harris) showed they had received hundreds of hours of law enforcement training. Each officer had completed the State of Florida basic training police academy requirement of 770 hours (Bode, Bates Stamp, CELE 4327; Bonner, CELE 4901; Chiuchiarelli, CELE 6476; and Harris, CELE 5131).

In addition to the State of Florida basic training requirement, each officer also received in-service training in a variety of job-related subjects by the City of Ocoee. The Officers' respective training files contained hundreds of pages showing their academy and in-service training (Bode (CELE 4326-4404); Bonner (CELE 4735-4901); Chiuchiarelli (CELE 6476-

6653); Harris (CELE 5071-5193). Select in-service training courses are shown in Table 2 for the officers.

Table 2  Select In-service Training Completed by Officers Bode, Bonner, Chiuchiarelli, and Harris

| OFFICER | IN-SERVICE TRAINING | BATES STAMP |
|---|---|---|
| Bode | Crisis Intervention; TASER[2]; Controlling Violent Combatants (CVC); Advanced Training Certificate (ATC) | TASER (numerous); CVC (CELE 4329); ATC (CELE 4401, 4402); CIT (post incident) (Bode deposition, 233:23) |
| Bonner | Field Training Officer (FTO); Line Supervisor; Crisis Intervention (CIT); CPR; TASER | FTO (4/12/2013); Line Supv. (9/22/2017); TASER (numerous); CIT (CELE 4738); CPR (CELE 4750) |
| Chiuchiarelli | Field Training Officer (FTO); Line Supervisor; Instructor; Crisis Intervention (CIT); TASER | FTO, Line Supv, Instructor (CELE 6478); CIT (CELE 6479); TASER (numerous) |
| Harris | Suicide Awareness; DT & Arm Bar Takedowns. | Suicide Awareness (CELE 5072); DT & Takedown (CELE 5073). |

I have taught law enforcement instructor and other informative programs across the State of Florida to law enforcement officers, and I am familiar with the requirements to be a Florida law enforcement officer. Based upon my education, training and experience, the City of Ocoee trained Officers Bode, Bonner, Chiuchiarelli, and Harris consistent with the standards established by the State of Florida and according to City of Ocoee in-service training standards.

**3. The Town of Windermere trained Officer Griffin Hebel (Officer Hebel) according to State of Florida and other generally accepted law enforcement standards.**

My content analysis of Officer Hebel's training records showed he graduated from a 770-hour police academy in Florida. In addition to the State of Florida basic training requirement, Officer Hebel also received in-service training in a variety of job-related subjects by the Town of Windermere (Hebel deposition, p. 112).

**4. City of Ocoee Police Officers Bode, Bonner,  Chiuchiarelli, and Harris were neither trained nor qualified to make a medical, psychological, and/or a disability diagnosis of individuals whom they encounter.**

---

[2] Per Florida Statute §943.1717, law enforcement officers must be trained on "dart-firing stun gun" with required annual retraining.

Dr. Peters Opinion Report: Celestin v. City of Ocoee, et al.
©2022. A.R.R.

City of Ocoee Police Officers Bode, Bonner, Chiuchiarelli, and Harris were not trained to medically, psychologically, and/or diagnose disabilities with individuals whom they encounter is outside the scope of their training and their essential job requirements, other than providing first aid. Based upon my education, experience, and training, I know most peace officers are neither trained nor qualified to make a mental health and/or psychological diagnoses of individuals like Mr. Celestin who had mental health issues. At best, officers attempt to match manifested behavioral cues to what they saw or heard in training, and then often make split-second decisions about force options, requesting back-up officers, etc.

Most law enforcement officers identify dangerous behavioral cues and must make split-second decisions about force options, including the use of deadly force, in responding to the person's actions. Writing in *The Tactical Edge: Surviving High Risk Patrol*, Remsberg (1986) advised officers when engaging individuals who appear to be on hallucinogens that "pain compliance will probably have no effect [on them] whatsoever. Only measures that cause the subject an actual *physical dysfunction*, thus preventing him from further resistance or attack, offer much hope. Even then, your success with physical control may ultimately depend on whether you can overwhelm your adversary with sheer numbers . . . If you are alone and cornered against someone made superhumanly powerful by chemicals, deadly force may be your only practical defense option. That's sometimes the case with *mentally ill* subjects, too" (p. 449).

Based upon my education, experience, and training, I know most peace officers are neither trained nor qualified to make a mental health and/or disability diagnosis of individuals like Mr. Celestin. The officers who engaged Mr. Celestin had no knowledge at the time whether his aggressive behaviors were caused solely by mental health issues or by other substances he may have taken, or any emotional distress he was under at the time they encountered him, and/or how these variables may impact his decision-making and behaviors. To suggest otherwise is outside the scope of their training and their essential job requirements, other than providing first aid.

5. **The City of Ocoee's police officer hiring practices met or exceeded nationally standards, recommendations, and/or guidelines.**

The City of Ocoee had a formal application process for the hiring of its police officers, which included a qualification test, background investigation, and physical requirements. The following information that was given to police officer applicants is an example.

**TO: ALL APPLICANTS**

Applicants for initial appointment testing must receive a passing score on such written or oral applications as prescribed by the Police Department. Those applicants who fail the examination will be prohibited from retaking the examination for a period of six (6) months. If an individual does not pass the second administration of the examination, he/she would be prohibited from retaking the examination for a period of one (1) year. A waiting period of no less than one year will apply between the third and any subsequent administration of the examination. Different versions of the examination will be given each time the examination is administered, but this does not affect the waiting period between examinations.

Any individuals convicted of a felony or whose history indicates unfitness for duty and/or applicants who were untruthful during the initial application process shall be ineligible for hire with the Ocoee Police Department as required in Florida State Statute 943.13.

(Bates Stamp, CELE 1588).

The police officer selection process was also defined and available to police officer applicants.

**POLICE RECRUIT SELECTION PROCESS**

Thank you for your interest in the upcoming Police Recruit Examination. There are a number of processing steps and tests applicants must undergo and pass before they will be considered for hire. They include but are not limited to:

1. Assessment/Comprehension Test

2. Oral Review Board

3. Voice Stress Analysis

4. Background Investigation/including Criminal History

5. Psychological Evaluation

6. Motor Vehicle Background Check (MVR Report)

7. Employment Eligibility Verification (Form I-9)

8. Veterans' Preference

(Bates Stamp, CELE 1589).

City of Ocoee police officer hiring standards were also provided to applicants. These are shown below and are consistent with national police officer hiring practices.

**OCOEE POLICE DEPARTMENT HIRING STANDARDS**

I. **AGE**
Applicant must be at least 19 years old.

II. **CITIZENSHIP**
Applicant must be a citizen of the United States.

III. **EDUCATION**
Applicant must have an Associate's degree or the equivalent of sixty (60) credit hours from an accredited university.

IV. **DRIVER'S LICENSE**
Applicant must have a valid Florida driver's license and must not have more than seven (7) points on his/her current driving record within the past three (3) years. An individual may apply for the position of police officer 36 months from the date of conviction for D.U.I. An individual charged with D.U.I. may apply anytime after the charges are dropped or the individual is found not guilty.

V. **MILITARY SERVICE RECORD**
Applicant will be disqualified if he/she has received a dishonorable discharge from any of the Armed Forces of the United States.

VI. **CRIMINAL HISTORY CONDUCT**
Applicant must not have been convicted of a felony or of a misdemeanor involving perjury or false statement. Any person who, after July 1, 1981, pleads guilty or *nolo contendere* to or is found guilty of a felony or of a misdemeanor involving perjury or a false statement shall not be eligible for employment or appointment as an officer, notwithstanding suspension of sentence or withholding of adjudication. Applicants will be disqualified for any charges involving moral turpitude, as outlined in FDLE guidelines.

VII. **FALSE INFORMATION**
Applicant will be disqualified if the applicant provides any false oral or written information during his/her consideration for employment.

VIII. **WRITTEN AND ORAL EXAM**
Applicant must receive a passing score of 80% on the written exam. The applicant must receive a combined score of 150 total points between the oral and written exams before consideration for employment.

IX. **MEDICAL AND PSYCHOLOGICAL EXAMS**
Applicant must pass physical examination, psychological examination, drug test and voice stress analysis administered by a licensed practitioner.

(Bates Stamp, CELE 1590).

My content analysis of then police applicant Dominic Dean Chiuchiarelli's confirmed the City of Ocoee followed its police officer hiring practices and standards, which are consistent with national police officer hiring practices. Based on my education, training, and experience as a former Massachusetts law enforcement administrator where I was in the hiring process for police officer applicants, and former President of a Pennsylvania Civil Service Commission, where I oversaw testing requirements for law enforcement officer applicants, the City of Ocoee established hiring practices and standards that are consistent with national and State of Florida hiring standards, recommendations, and guidelines.

6. **On April 11, 2019 Town of Ocoee police officers were unable to scroll up or down through the Computer Aid Dispatch in their patrol cars mobile digital terminals for safety reasons.**

It is well known in the United States that marked police cars are different than civilian cars because they usually have different motors and/or different suspension systems, they have mobile computing terminals (MCT's), two-way radios, switches to activate a siren, a public address system, spotlights, emergency lights, and often have barriers between the front and back seats. This is one reason why police officers must be specifically trained to operate police cars, even though they have a driver license.

The Call History Report (Bates Stamp, CELE 0023, PL000277) information for the Celestin event was broadcast through the Computer Aid Dispatch system and appeared on the MCT in the police car of Officers Bode, Bonner, Chiuchiarelli, and Harris (Nylander deposition, 94:13), however Officer Bode testified that this report "is more of a public records kind of thing. I don't typically see this" (Bode deposition, 30:7-8). . However, for obvious safety reasons, officers could not scroll up and down on the MCT screen when the car was in motion (94:19-21). Disabling the scrolling function was a prophylactic measure to minimize officers from engaging in distracted driving (94:23). This is quite a common officer safety and citizen safety practice. However, when the police car stops and is not in motion, officers can scroll up and down on the MCT (95:8). I know from person experience there may not be time for officers to review the MCT when responding to a call as they need to get out of the car and respond to the call.

Officer Bode testified that the domestic disturbance call he received about Mr. Celestin was "dispatched over the radio" (Bode deposition, 23: 6) while he was driving in a "radio motor patrol vehicle" (23:18). He also testified that "not every single call note is dispatched over the radio" (34:20-21). Similarly, Officer Bode could not recall if the entry "ADV her brother is psychofrenic" was dispatched over the radio and did not recall if he looked at his MCT and read the entry (37:2-3; 6-7; 10). In short, anything that is said over the police radio by Dispatchers is shown on the MCT, but what goes through the MCT is not always said by Dispatchers to police officers (39: 10).

Based on my education, training, and experience, it is very difficult and dangerous to read lines on an MCT while driving. Dispatchers may not verbally tell officers what is on every entry on the MCT, and there is often a time gap when the entry is made from when information is received from the caller by the 9-1-1 Call Taker. In this matter, Officer Bode met face-to-face with Mr. Celestin's mother and sister prior to contacting Mr. Celestin, where he obtained more specific information about the incident. Officer Bode testified that regardless of what was dispatched to him verbally and/or through the MCT, he did not determine that a crime existed because he knew, "based on my training and experience, that I still need to make contact with the other half, you know, Jean Celestin, to get his side of the story before we make any kind of decision" (Bode deposition, 43:11-17). I know from personal experience that sometimes Dispatchers simply repeat what a caller tells them, which may or may not be accurate.

**7.    City of Ocoee Police Officers Bode, Bonner, Chiuchiarelli, Harris and Town of Windermere Officer Hebel  followed nationally recognized threat assessment guidelines prior to his use of verbal and empty hand force options, which is consistent with generally accepted officer safety practices.**

Officers Bode, Bonner, Chiuchiarelli, Harris, and Hebel followed *threat assessment* guidelines that are taught throughout the United States. In the widely-adopted and widely-accepted law enforcement officer safety textbook, *The Tactical Edge: Surviving High-Risk Patrol,* it instructs officers "when you answer any call or approach any street situation, three terms—*the triad of Tactical Thinking*—should be at the forefront of your conscious thought: problem area; area of responsibility; and focus point" (Remsberg, 1986, p. 55). Remsberg defined *problem area* as "any *PERSON, OBJECT,* or *SITE that may produce a HAZARD to you*" (p. 55). Based upon my education, training, and experience, Mr. Celestin met the criterion of

being a problem area and Officers Bode and Bonner properly identified this potential threat in their initial assessment of the situation as did Officers Chiuchiarelli, Harris, and Hebel, when they arrived at the scene later. Threat assessment is important to use by law enforcement officers because it may save their life. Per Federal Bureau of Investigation (FBI) statistical data, there "106 law enforcement officers were killed in line-of-duty incidents in 2018" (https://www.fbi.gov/news/pressrel/press-releases/fbi-releases-2018-statistics-on-law-enforcement-officers-killed-in-the-line-of-duty).

Remsberg (1986) wrote that officers are taught "good tactical thinking begins with assessing your potential dangers" (p. 55). Well-trained officers are taught that when they approach any street situation, they need to identify three things: problem area, area of responsibility, and focus point (p. 55). The *problem area* is defined, in this case, as any person or object that my produce a hazard to the officers (p. 55).

The *area of responsibility* is defined as "an exact location within a problem area from which an attack could emanate" (Remsberg, 1986, p. 56). When assessing the area of responsibility, law enforcement officers, like Officers Bode, Bonner, Chiuchiarelli, Harris, and Hebel, will identify the potential hazards in the situation, identify how to control those hazards, and identify if (s)he can control those hazards (p. 57).

The *focus point* is a "clear and present threat that must be immediately controlled to protect" the officers or others (Remsberg, 1986, p. 58).

Based upon my education, training, and experience, Officers Bode, Bonner, Chiuchiarelli, Harris, and Hebel appropriately determined that Mr. Celestin became a threat to them and responded per their training and experience.

8. **Mr. Celestin *actively resisted* the officers and was the fuel for the pacing of driving the uncertain, rapidly evolving, and tense confrontation.**

Mr. Celestin intentionally and deliberately transitioned from a "YES" (cooperative) individual, to a "NO" (actively uncooperative) individual (Remsberg, 1986, pp. 434-435). The officer safety concept of "YES" and "NO" individuals has been taught in police academies and seminars to law enforcement officers for more than three decades. Based upon my education, training, and experience, Mr. Tubby's responded appropriately when he opened the front door of the house and spoke with officers. He escalated the confrontation and engaged in *active, aggressive, and deadly force resistance* after attempting to close the front door, by grabbing a long knife, by removing the TASER probes from his chest area, by running from the officers, and by struggling with them. Per Ocoee Police Department *General Order #4.2 Use of Force*, <u>active resistance</u> is defined as:

"Physically evasive movements directed toward a member such as bracing, tensing, pushing, or pulling to prevent the member from establishing control over the subject. Examples include, but are not limited to, "'bowing up,' making a fist, and/or taking a fighting stance" (Bates Stamp, CELE 3891).
<u>Aggressive resistance</u> is defined as:

"Slight to moderate physical harm. The subject makes physically evasive movements to defeat a member's attempt to control. This may be in the form of bracing, tensing, attempting to push/pull away, not allowing the member to get close to him/her, or exhibits other pre-attack indicators" (Bates Stamp, CELE 3905).

Deadly Force Resistance is defined as:

"Great bodily harm. The subject makes overt, hostile, attacking movements with or without a weapon with the apparent intent and apparent ability to cause death or great bodily harm to the member of others" (Bates Stamp, CELE 3905).

Based upon my education, training, and experience, Mr. Celestin heard the officer's verbal commands and if he had complied with officers' verbal commands and control alternatives instead of resisting them, the event ends at that point in time. Instead, Mr. Celestin became the adversary escalating the situation that created a totality of the circumstances that are tense, rapidly evolving, and uncertain. . Mr. Celestin was the fuel driving this event and his continued non-cooperation, displaying, and holding of a long knife (see photo1below), erratic behavior, and active physical resistance caused Officers Bode, Bonner, Chiuchiarelli, Harris, and Hebel to fear for their safety.

Photo 1 Knife Displayed and Held by Mr. Celestin



(Bates Stamp, CELE 0520).

9. **Officers Bode, Bonner, Chiuchiarelli, Harris, and Hebel attempted varied force options to get Mr. Celestin to cooperate with them and stop his active, aggressive, and deadly force resistance, but they were ineffective because of Mr. Celestin escalated the pacing of the situation.**

After City of Ocoee Officers Bode and Bonner arrived at the Celestin residence, Mr. Celestin opened the door to speak with officers that made him appear to be cooperative, but then he attempted to close the door, displayed a long knife, and actively, aggressively interacted with the officers. Mr. Celestin had escalated the pacing of the event and the imminent threat when he had displayed a knife. Thereafter, Mr. Celestin ran at Officer Chiuchiarelli, knocking his body worn camera off as he disobeyed commands and fled from officers, and actively physical resisted the officers attempts to handcuff him.

Based upon my education, training, and experience, Officers Bode, Bonner, Chiuchiarelli, Harris, and Hebel had attempted to use various *force options* when interacting with Mr. Celestin. *Force options* are different than *force standards* with the latter being established by the U.S. Constitution and/or state statutes. Force options include, but are not limited to:

- Officer presence (in uniform),
- Verbal commands,
- Empty hand tactics (wrist locks and takedowns),
- CEW (TASER®),
- Batons, and
- Firearms.

Force options that were attempted on Mr. Celestin included Officer Presence (i.e. badges were displayed and officers were in uniform; CEW in probe mode; CEW in drive stun mode; empty hands; handcuffing; and hobbling (Bates Stamp, CELE 0083-0084).

Officer presence and verbal commands were not effective in stopping Mr. Celestin's aggressive behavior. Had Mr. Celestin cooperated with the officers' directives instead of resisting their commands and then escalating the situation, this situation would have ended when the officers used verbal commands. Mr. Celestin, who was the fuel driving this event, continued his verbal challenges, and escalated the threat when he displayed a long knife, attempted to flee, and physically resisted the Officers' efforts to capture, control, and restrain him.

Based upon my education, training, and experience, Mr. Celestin's behaviors intentionally escalated the situation creating a tense, uncertain, and rapidly evolving totality of circumstances. Although Officers Bode, Bonner, Chiuchiarelli, Harris, and Hebel attempted to transition the situation and their response, Mr. Celestin demonstrated his threat to them by his behavior and actions.

> **10.      Mr. Celestin demonstrated his active, aggressive, and/or deadly force resistance to the officers based upon his continued and escalated active physical resistance and they responded appropriately given the totality of the circumstances and without need to consider Mr. Celestin's alleged disability.**

Plaintiff claims that Mr. Celestin was disabled according to the Americans With Disabilities Act (ADA) and therefore the officers should have not used the force they used to capture, control, and restrain him. Based upon my education, training, and experience, the officers reacted according to their training based upon the totality of the circumstances. The officers' uses of force will be discussed in Opinion #11.

Having taught law enforcement officers about ADA and the parameters of their approach and initial questions, Plaintiff has not produced evidence that Mr. Celestin had qualified as being disabled per the ADA and that responding officers would have known about his alleged disability. Further, based upon my experience, training, and education, the totality of the circumstances did not require the police officers to make a diagnosis or determination of Mr. Celestin's alleged disability according to the standards of the ADA. For example, a person's use

of an assistive device, be it a walker or a Cochlear implant, does not stop an individual from being a deadly threat to others.

Mr. Celestin's reported and perceived aggressive and violent behaviors by Officers Bode, Bonner, Chiuchiarelli, Harris, and Hebel included:

- Punched his Mother and sister in the face (CELE 0023; PL000277);
- Warned that he may be violent towards the officers (CELE 0023; PL000277);
- Refused to come outside of the house to speak with officers (CELE 0084)
- Attempted to close front door after speaking with officers (CELE 0084);
- Held and displayed a large, long knife (CELE 0084)
- Removed TASER probes that were shot into his frontal area (CELE 0084)
- Reached into his right pocket after being verbal commands (CELE 0084);
- Charged toward Officer Bode in an attempt to flee (CELE 0084);
- Pushed Officer Bonner backwards in an attempt to flee (CELE 0084);
- Refused to comply with verbal commands, even after saying "Ok, Ok" (CELE 0084);
- Ran into Officer Chiuchiarelli, causing his body-worn camera to be knocked to the ground;
- Stood up and ran after TASER probe deployment in an attempt to flee (CELE 0084);
- Following a takedown onto the ground, demonstrated active and/or aggressive resistance by flailing his arms (CELE 0084);
- While on the ground, demonstrated active and/or aggressive resistance by kicking his feet (CELE 0084);
- While on the ground, demonstrated active and/or aggressive resistance by pulling his arm away from officers when handcuffing it was attempted (CELE 0084);
- While on the ground, demonstrated active and/or aggressive resistance by struggling with officers (CELE 0084); and
- Escalated the totality of the circumstances through his resistive behaviors.

As a "Public Safety Disability Specialist" and co-author of a wheelchair instructor training program and a text for law enforcement officers, the literature has shown that truly "disabled" individuals can be a deadly threat to others including law enforcement officers. Specifically, two Riverside, California peace officers were shot and killed by a disabled individual who was in a wheelchair (Peters & Coleman, 2017, p. 27).

Law enforcement officers know from their training subjects may have disguised weapons (TV remote), improvised weapons (TV remote), or identifiable weapons such as a knife as Mr. Celestin held. Many trainers and authors, including myself, teach and/or write about the dangers of disguised or improvised weapons often called "street weapons." Nowicki and Ramsey (1991) warned, officers should be extremely cautious when observing any item on or about a person's body. None of the police officers knew if Mr. Celestin had more knives, a firearm, and/or disguised weapon on his body or in his clothing.

Based upon my education, training, and experience, after City of Ocoee police officers and Town of Windermere Officer Hebel confronted a resisting Mr. Celestin, they should have known from their training this was an exigent circumstance with which they had to take immediate action. The behaviors and force options used by the three officers, in my opinion, did not intentionally discriminate against Mr. Celestin, nor show him disparate treatment. Rather, they exercised a lot of restraint given his escalation of the situation, which, when confronted by a subject who threatens to stab them and is holding an edged weapon, would have been justified in using deadly force against such a subject holding a knife. Using a TASER X-2 to capture and temporarily control Mr. Celestin was an accommodation given the circumstances that justified the use of deadly force against a person who was showing active and physical resistance, coupled with holding a deadly weapon.

11. **The force used by Officers Bode, Bonner, Chiuchiarelli, Harris, and Hebel on Mr. Celestin in attempts to capture, control, and restraint him were consistent with national training standards, national guidelines, national force standards, City of Ocoee and Town of Windermere "Use of Force" policies given the totality of circumstances created by Mr. Celestin.**

Based upon my experience, training, and education, the force used by Officers Bode, Bonner, Chiuchiarelli, Harris, and Hebel to capture, control, and control an actively and aggressively resisting Mr. Celestin were consistent with national and City of Ocoee and Town of Windermere force standards, recommendations, and guidelines. Trained and experienced LEOs, like Officers Bode, Bonner, Chiuchiarelli, Harris, and Hebel, should know the national standard and/or state standard(s) regarding the use of force from their training. As an experienced use-of-force instructor, the national standard regarding the use of deadly and non-deadly force is one of objectively reasonable force, under the United States Constitution's Fourth Amendment, based upon the totality of the circumstances known to the officer at the time the force was used (Graham v Connor, 109 S. Ct. 1865 (1989)).

Officers Bode, Bonner, Chiuchiarelli, Harris, and Hebel should have known from their force training that their force will be analyzed under the 4th Amendment of the United States Constitution when they are attempting to capture and control an actively resisting person such as Mr. Celestin0. They also know from their training that there are four critical issues they must answer: [1] the severity of the crime at issue; [2] whether the suspect poses an immediate threat to the safety of officers and others; [3] whether the suspect is actively resisting arrest or attempting to evade arrest by flight; and [4] whether they were forced to make split-second judgments in circumstances that were tense, uncertain, and rapidly evolving (Graham v. Connor, 109 S. Ct. 1865 (1989)).

When peace officers are required to deploy force, there is always the possibility of someone being injured, including one or more peace officers. However, injury alone does not provide support for a claim of excessive force. Mesloh, Henych, and Wolf (2008) found in their study on force used by law enforcement officers that "the injuries of both officers and suspects rose correspondingly with the length of the confrontations" (p. 89). They also found that an officer's use of "decisive force early on in the active suspect-officer confrontations appears to be the solution in ending conflict quickly. . ." (p. 89), otherwise there may exist a force deficit

where the officer uses ". . . less force than may be justifiable or necessary to subdue the suspect and end the confrontation" (p. 89).

Table 3 identifies the *force options* used by Officers Bode, Bonner, Chiuchiarelli, Harris, and Hebel, their effectiveness, and approximate timeframe during the event when the varied *force options* were used by the officers in their attempts to capture, control, and restrain an actively and aggressively resisting Mr. Celestin.

Table 3 Force Options use by Officers, Effectiveness, and Approximate Timeframe

| FORCE OPTION | USED BY | EFFECTIVE | TIMEFRAME |
|---|---|---|---|
| Officer Presence | Officers Bode, Bonner, Chiuchiarelli, Harris, and Hebel | No. | Initial contact with Mr. Celestin, during verbal discourse with him, and throughout the event until he was restrained. |
| Verbal Commands | Officers Bode, Bonner, Chiuchiarelli, and Harris | No. Verbal commands were ineffective because Mr. Celestin continued his active and aggressive resistance toward the officers, attempted to flee, and attempted to avoid being captured, controlled, and restrained. | Initial contact with Mr. Celestin, during verbal discourse with him, and throughout the event until he stopped actively and aggressively resisting the officers. |
| CEW (TASER) | Officers Bode, Bonner, and Chiuchiarelli | No: First probe deployment; Yes: The second probe deployment; Unknown on the drive stun applications. | When Mr. Celestin attempted to close the front door on officers; when he attempted to flee from them; when he actively and aggressively resisted them on the ground. |
| Empty Hand Control | Officers Bode, Bonner, | Physically holding him on the ground | Initial physical attempts to subdue |

| (includes handcuffing) | Chiuchiarelli, Harris, and Hebel | partially worked; applying an expanded baton across Mr. Celestin's shoulders appeared to have worked; handcuffing eventually worked; application of a hobble stopped Mr. Celestin's kicking. | Mr. Celestin following the first TASER probe deployment failed; Following the second TASER probe deployment, officers were able to hold down a struggling and actively and aggressively struggling Mr. Celestin; Physical control of Mr. Celestin was obtained following hobble application. |
|---|---|---|---|

(Bates Stamp, CELE 0083-0084 [for summary of event])

Recall, Mr. Celestin had transitioned from being a "YES" person (initially cooperative by opening the door) to a "NO" person (actively uncooperative) after Officers Bode and Bonner made personal and verbal contact with him (Remsberg, 1986, pp. 434-435). Based upon my education, training, and experience, following his deliberate transition to a "NO" person, Mr. Celestin's behaviors consistently demonstrated non-compliance with the law and with officers' instructions.

Based upon my education, training, experience, and content analysis of the video footage, Incident Reports, investigative reports, and other produced documents, the force used to capture, control, and restrain Mr. Celestin by Officers Bode, Bonner, Chiuchiarelli, Harris, and Hebel was not only consistent with their training, but also consistent with national, state, and agency "Use of Force" policies. In the instant matter, the *force options* used by Officers Bode, Bonner, Chiuchiarelli, Harris, and Hebel on Mr. Celestin conformed to the three considerations, and one element that law enforcement officers are taught during their use-of-force training: (1) Was Mr. Celestin an immediate threat to him and/or others, including himself?; (2) Was Mr. Celestin actively resisting seizure and/or arrest or attempting to evade arrest by flight?; (3) What was the crime Mr. Celestin was in the process of committing?; and Were the totality of the circumstances tense, uncertain, and rapidly evolving?

**Consideration #1: Is Mr. Celestin an immediate threat to Officers Bode and Bonner and/or others, including himself?**

Yes, because he actively and aggressively resisted officers' verbal commands to exit the house, drop the long knife, and attempted to flee, which demonstrated active, aggressive, and deadly force resistance. Per Town of Ocoee's Police Department *General Order #4.2 Use of*

*Force*, <u>active resistance</u> is defined as "Physically evasive movements directed toward a member such as bracing, tensing, pushing, or pulling to prevent the member from establishing control over the subject. Examples include, but are not limited to, "'bowing up,' making a fist, and/or taking a fighting stance" (Bates Stamp, CELE 3891).

Per this *General* Order, <u>Aggressive resistance</u> is when "the subject makes physically evasive movements to defeat a member's attempt to control. This may be in the form of bracing, tensing, attempting to push/pull away, not allowing the member to get close to his/her, or exhibits other pre-attack indicators" (Bates Stamp, CELE 3905).

Similarly, <u>Deadly Force Resistance</u> is when "the subject makes overt, hostile, attacking movements with or without a weapon with the apparent intent and apparent ability to cause death or great bodily harm to the member of others" (Bates Stamp, CELE 3905).

As the event progressed and Officers Harris, Chiuchiarelli, and Hebel arrived at the Celestin residence, law enforcement officers like them decide on appropriate force options to capture, control, and/or restrain individuals predicated upon both *actual* and *perceived threat* of the individual's behavioral cues. In the instant matter, officers used several force options that are consistent with force policy and national training: Officer Presence (i.e., they were in uniforms), Verbal Commands, Empty Hand Techniques, and CEW (TASER).

Officer presence and verbal commands were ultimately ineffective with Mr. Celestin who in the beginning spoke to the officers, but then deliberately choose to ignore such commands, and transitioned into a "NO" person. Had Mr. Celestin complied with the law enforcement officers' verbal commands and not grabbed and held a long knife coupled with his attempts to flee the area, this situation most likely would have ended when the officers used verbal commands. Mr. Celestin was the fuel driving this event into high gear, continuing his active resistance, active aggression, and/or aggravated active aggression that caused the officers to fear for his safety and the safety of others.

Remsberg (1986) identified several variables that officers must consider when confronting a suspect. These include:

- Nature of the offense,
- Others who may be present,
- Behavior of the suspect and others, and
- Weapons (pp. 274-276).

<u>De-escalation attempts by officers</u>: Initially Officers Bode and Bonner attempted to communicate with Mr. Celestin using *officer presence and verbal commands*. Officer Bode's body-worn camera video footage and audio showed Mr. Celestin asking the two officers if they were "real" officers and then asked to see their certification (see Officer Bode's body-worn camera footage).

After seeing Mr. Celestin closing the door and holding a TV channel changer and a knife (see Photo 2), Officer Bode deployed his TASER in probe mode, striking Mr. Celestin in the

upper body, but it was ineffective. The TASER deployment in probe mode was also a de-escalation attempt because Mr. Celestin was holding a deadly weapon. Instead of using a deadly force option, Officer Bode decided to use a non-deadly force option: TASER.

Photo 2  Channel Changer and Knife Held and Displayed by Mr. Celestin



(Bates Stamp, CELE 0520)

After Mr. Celestin attempted to flee and without knowing if he had any more weapons on him, Officer Bonner deployed his TASER in probe mode that took the fleeing Mr. Celestin to the ground. However, Mr. Celestin began to resist the officers actively and aggressively. In an attempt to de-escalate the situation, officers used their *officer presence and verbal commands* but Mr. Celestin continued to struggle with them and not cooperate.

Based upon the totality of the circumstances and officer safety training, it was appropriate for the officers to perceive Mr. Celestin as a deadly threat to himself, to the other officers and to others. Officers are instructed "[a] suspect's hands, as always, should be the focus of your attention, especially those you can't see . . . *His eyes can't kill you, but his hands might*" (Adams, McTernan, & Remsberg, 1980, p. 240).

Immediate threat to officers and others:    The actual behavior and/or perceived behaviors of Mr. Celestin demonstrated to Officers Bode, Bonner, Harris, and Chiuchiarelli that he was an immediate threat.  Per Stoughton, Noble, and Alpert (2020), "An officer's perception that an imminent threat exists is reasonable when the officer has reason to believe that an individual has the ability, opportunity, and intent to cause harm" (Stoughton, Noble, & Alpert, 2020, Retrieved on May 30, 2020 from https://www.amazon.com/Evaluating-Police-Uses-Force-Stoughton/dp/1479814652).

Per Stoughton, Noble, and Alpert (2020), **"Ability** means the individual's physical capacity to cause an identifiable type of harm . . . the individual must be capable of taking an action that would cause some particular and identified type of physical harm" (Retrieved on May 30, 2020 from https://www.amazon.com/Evaluating-Police-Uses-Force-Stoughton/dp/1479814652). Mr. Celestin demonstrated his **ability** when he failed to comply with

officers' verbal commands, when he armed himself with a knife, when he actively and aggressively resisted the officers. Mr. Celestin also showed Officers Bode and Bonner Officer his ability to threaten them and close the *reactionary gap* [discussed below]. Mr. Celestin showed he has not only the "ability" but also had the **delivery system** to inflict great bodily harm on himself, the officers who were present, and/or to others.

"**Opportunity** refers to the environment and situation, specifically with regard to an individual's proximity to the potential target or targets . . . There is no set distance at which an individual does nor does not have the opportunity to physically injure an officer; that determination depends on the relevant harms and the facts and circumstances of each case . . . Articulating opportunity requires officers to explain how the individual could cause an identifiable harm to a specific target at the relevant time. Relevant observations include, but are not limited to:

- The physical proximity of the subject to potential targets
- The nature of harm (e.g., an individual may be so far away as not have the opportunity to attack with a knife while still retaining the opportunity to attack with a firearm)
- The subject's apparent physical condition and speed at which they could close distance
- The reactionary gap (the amount of time that it will take or an officer to react to an individual's actions); and
- The officer's ability under the circumstances to reduce or eliminate the opportunity for violent attack" (Stoughton, Noble, & Alpert, 2020, Retrieved on May 30, 2020 from https://www.amazon.com/Evaluating-Police-Uses-Force-Stoughton/dp/1479814652).

Reactionary Gap: The "gap" in time between identifying the threat, processing it, and then reacting to it is referred to in law enforcement as the "Reactionary Gap." *Reactionary gap* is the "distance you must keep between you and the suspect in order for you to respond to any sudden threat" (Murgado, 2013, Retrieved from https://www.policemag.com/340985/closing-the-gap).

Per Martinelli (2014), "The reactionary gap is a human factors formula that compares action vs. reaction. In humans, sudden action is usually faster than a defensive response or reaction. The closer an assailant is to an officer the less time an officer must defensively react to any aggressive action the assailant makes" (Retrieved from https://www.policemag.com/341203/revisiting-the-21-foot-rule) . Grossi (2013) used the term *police proxemics* to help explain this important law enforcement survival and safety concept. He wrote, "police proxemics" [is] defined as the distance between an officer and the threat posed by certain weapons" (Retrieved from https://www.policeone.com/Officer-Safety/articles/6258834-The-reactionary-gap-Reminders-on-threats-and-distances/).

Officers Bode, Bonner, Harris, and Chiuchiarelli realized Mr. Celestin had the ability, had the opportunity, and had the intent to cause great bodily harm to himself, to them, and/or to others. The uses of non-deadly force options were consistent with the totality of the circumstances.

<u>TASER Probe Discharge #1</u>: Although it was <u>ineffective</u>, it was a de-escalation attempt to cause neuromuscular incapacitation (NMI) to Mr. Celestin so Officers Bode and Bonner could capture, control, and restrain him. Mr. Celestin was able to remove the probes from his body in some manner, which caused the TASER discharge in probe mode to be ineffective. Admittedly, TASER control weapons can be dangerous and produce injuries if shot into the eyes, breasts, genitals, or used in a flammable environment. None of those issues were involved in this matter, and none of the TASER deployments by Officers Bode, Bonner, and Chiuchiarelli were inconsistent with training.

<u>TASER Probe Discharge #2</u>: After fleeing through the front door of the residence (see Photo 3), a second TASER deployment by Officer Bonner in probe mode struck Mr. Celestin in the back area, apparently caused NMI, taking him to the ground. This enabled officers in their attempts to control and restrain Mr. Celestin.

Photo 3  Front Door Area of the Celestin Residence



(Bates Stamp, CELE 0521).

<u>Empty Hand Control</u>:  Officers Bode, Bonner, Hebel, and Chiuchiarelli attempted to use empty hand control to control and restrain Mr. Celestin who is in a prone position on the ground. The prone position is commonly taught to law enforcement officers because the ground acts as a "third hand" to help support the grounded individual. When a person is prone (face down) or supine (face up) on the ground, the person cannot fall, thereby giving the person "perfect balance" that helps law enforcement officers in their attempts to control and restrain the individual, in this case, Mr. Celestin.

<u>Prone Positioning</u>:  Plaintiff's police practices expert, Richard H. Masten (Mr. Masten) opined that taking Mr. Celestin to the ground was "improper, excessive, and unwarranted" (Masten, Opinion Report, April 15, 2022, no page number). Mr. Masten's *ipsi dixit* claim that without more substance is the equivalent of a net opinion.[3] It is apparent that Mr. Masten is not a Defensive Tactics, Arrest Control, and/or a Restraint Instructor, because redirecting a person to

---

[3] "A net opinion summarizes an expert's opinions and conclusions without explaining the facts or reasoning the expert used to reach those ends" (Ryskamp, 20201, p. 1).

the ground is safer for the officers and also the individual who the officers are attempting to capture, control, and restrain.

Another Mr. Masten's *ipsi dixit* opinion is that use of a prone position with pressure on the back can cause "positional asphyxia and death" (Masten, Opinion Report, April 15, 2022, no page number). Mr. Masten did not cite to any sources for this opinion, like his other opinions, thereby making it another net opinion.

Similarly, Plaintiff's medical expert, Michael Baden, M.D., offered his positional asphyxia opinion supposedly supported by a 1995 position paper on "Positional Asphyxia" (Baden, Opinion Report, April 14, 2022, p. 7). However, that paper and the seminal research on positional asphyxia and hogtying contained methodological and statistical errors that made the findings impotent.

During the 1980s and 1990s, researchers hypothesized that restraint methods were the alleged cause of individuals dying after being captured and controlled by law enforcement officers. "It was alleged that the restraint method used by the officer(s) a subject's death could be attributed to positional asphyxia; postural asphyxia; mechanical asphyxia; compressional asphyxia; or restraint asphyxia" (Reay, 1993; Reay, 1996; Reay, 1997; Reay, Stilwell, & Arnold, 1992; Peters, 1989; National Institute of Justice, 1995; O'Halloran & Lewman, 1993).

"The first scientific study conducted on hypothesized death from positional asphyxia as a proposed rare outcome associated with law enforcement restraint techniques was conducted by Reay, Howard, Fligner, and Ward (1988) where they studied 10 healthy individuals who were placed into a hogtied, or prone maximal restraint (PMR) position. After the subjects were exercised using a stationary cross-country ski machine and their heart rates were elevated to approximately 120 beats per minute, the researchers noted a decline in peripheral oxygen saturation: 85% to 90% measured by pulse oximeter in these subjects during exercise (Ross & Chan, 2006, p. 45). Using a one-tailed statistical *t-test*, the researchers found "statistically significant physiological differences between the group in a hogtied position versus the group in the sitting position after the period of exercise" (p. 45) (Peters & Berman, 2013, p. 44). Unfortunately, there were many inherent problems in the research design, including the use of the wrong statistical test, which lead to incorrect data interpretation.

Karch (2009) noted, "More recently the whole concept of positional asphyxia has been reviewed, and the underlying hypothesis (that death may occur simply as a result of restraint in a prone position) tested, as required by the scientific method. The results of these controlled clinical studies have discredited the theory" (pp. 139-140).

"Chan, Vilke, Neuman, and Clausen (1997) conducted a study to determine "whether the 'hobble' or 'hogtie' restraint position results in clinical relevant respiratory dysfunction" (p. 578). In short, *clinical significance* is defined as "practical importance" (Peters, 2009, p. 419). Chan, et al. found in their study of healthy subjects, "the restraint position resulted in a restrictive pulmonary function pattern but did not result in clinically relevant changes in oxygenation or ventilation" (p. 578).

"Chan, Vilke, and Neuman (1998) investigated the effects of the hogtie position on

respiratory and pulmonary function and concluded that the hogtie position by itself does not cause respiratory compromise to the point of asphyxiation and that other factors are responsible for the sudden deaths of individuals placed into this position (p. 201). Chan, et al. found that there were no changes in arterial blood gas oxygen or carbon dioxide between the control and experimental groups (Ross & Chan, 2006, p. 47). In short, the researchers found that the combination of the hogtie position and heavy exercise had no functional effect at all on ventilation (p. 47).

"In 1999 Schmidt, Snowden, and Clin duplicated the study of Reay, et al. using 18 volunteers (Ross and Chan, 2006, p. 47). Upon conclusion of their study, Schmidt, et al. found no differences of heart rate or oxygen saturation between the control and experimental groups.

"Chan, Vilke, Clause, Clark, Schmidt, Snowden, and Neuman (2002) conducted a study that examined pepper spray and also the hobble restraint position. Similar to the hogtie position but with a more relaxed knee position (90 degrees vs. taut) they found similar results to an earlier study by Chan, et al (Ross & Chan, 2006, p. 48).

Another research study with which I reviewed and approved the research methodology was conducted by Sloane, Chan, Vilke, Castillo, Kolkhorst, and Newman (2013) on the ventilatory effects of the prone maximal restraint (PMR) position on obese human subjects, defined as having a Body Mass Index (BMI) greater than 30. The authors' pilot study (n = 10) found that obese individuals showed no clinically significant differences in cardiovascular and respiratory measures following heavy exertion when compared seated, prone, and in the PMR positions. [Note: This study was funded by an unrestricted grant from the Institute for the Prevention of In-custody Deaths, Inc.]

"Other studies have also been conducted on hogtying often duplicating Reay, et al. and failed to find that hogtying and/or the prone position caused asphyxiation (see Roeglia; Parkes (2000)). Regarding prone ventilation issues, Neuman (2006) reports that "it is now common practice that when gas exchange is severely impaired because of lung disease, critically ill patients are ventilated in the prone rather than in the supine position (see, Mure, Martling, & Lindahl, 1997; Douglas, Rehder, Beynen, Sessler, & Marsh, (1977); Albert, 1997; Langer, Mascheroni, Marcolin, & Gattinoni, 1988; Mure, Glenny, Domino, & Hlastala, 1998) (Peters & Berman, 2013, pp.47-48).

Ross and Hazlett (2016) conducted a retrospective analysis of individuals who were placed in a prone position following arrest and found "85 percent of the subjects were male (n=920) and the average age was 37. During the confrontation the arrestee's condition appeared consistent with alcohol intoxication (26%) or other chemical substance (18%), psychological distress (22%), and/or mental distress and chemical substance (18%) accounted for 84 percent of the arrestees (n=915). An arrestee's condition was observed as either sober or undetermined by the officer in 16 percent of the incidents (n=175). Officers reported encountering arrestee defensive resistance in 71 percent of the incidents (n=775). In 25 percent of the incidents the officer encountered active resistance and in 4 percent of the incidents the individual displayed aggravated active resistance. In 44 percent of the incidents the person escalated the resistance

from defensive to active resistance (n= 480). On average four officers responded to the incident (85%; n=920)" (Ross & Hazeltt, 2016, p. 3).

Ross' and Hazlett's findings, which parallel other studies, "contradict the hypothesis that placing a violent subject in the prone position and applying weight to the back of the subject is dangerous creating a situation of "positional, restraint, compressional, mechanical, or traumatic asphyxiation" (Ross & Hazlett, 2016, p. 7). The researchers' concluded, "[p]lacing violent arrestees in the prone position was shown to be a safe method of control and restraint and is the preferred position for restraining combative arrestees" (p. 10).

The tables shown in **Exhibit I** "Prone Restraint Mortality" clearly show the safety of prone restraint used by law enforcement officers based upon scientifically sound methodological studies. Dr. Baden cited to no scientific studies to support his positional asphyxia opinion.

TASER Drive Stun: Officer Chiuchiarelli told Mr. Celestin that if he kept resisting, Officer Chiuchiarelli would drive stun him with a TASER (Chiuchiarelli deposition, 76:25; Harris deposition, 45:6-9). Officer Chiuchiarelli testified that his intent was to gain "pain compliance" (Chiuchiarelli deposition, 76:25). Describing how a drive stun is applied to a person. Officer Chiuchiarelli testified "basically you're pressing against their body and it just affects the area that your're driving the TASER into their body, that area where you're affecting, trying to affect" (78:6). He applied a drive stun to Mr. Celestin for approximately 5 seconds (81:12). Officer Chiuchiarelli applied the drive stun because the officers "were trying to get handcuffs on him [Mr. Celestin] and he was resisting" (81:21-22). The drive stun along with the previous TASER deployment by Officer Chiuchiarelli was "ineffective" on Mr. Celestin (93:1).

Mr. Masten, Plaintiff's police practices expert, opined "The use of the Taser (sic) in this case exceeded known safety limits (15 total seconds), but again failed to reference any scientific sources for his *ipsi dixit* opinion (Masten, Opinion Report, April 15, 2022, no page number). It appears Mr. Masten is not a TASER Instructor and further he appears to be unfamiliar with the TASER deployment literature in general, and specifically on individuals who are mentally ill.

During a 72-month period of time, Ho, Dawes, Johnson, Lundin, and Miner (2007) found that there were 10, 608 reports of ECD usage, and of these reported uses, 2,452 (23.1%) uses were on mentally ill subjects (p. 780). In another case study of a Florida law enforcement agency's ECD usage, my own statistical analysis showed that approximately 33% of the reported ECD usages were on mentally ill subjects (Peters, 2007). "The mentally ill represents a significant portion of subjects upon whom CEWs [ECDs] are used" (Ho, et al., 2007, p. 780).

"Conducted energy weapons [ECDs] are considered to be nonlethal weapons under the definition set forth by the United States Department of Defense" (Ho, et al., 2007, p. 783). The International Law Enforcement Forum published its findings in 2006 that "of note also was the sense from many of the group members that police use of CEOs (ECDs] to gain compliance of subjects who are suffering from mental health problems (e.g., schizophrenia) has found broad support among mental health groups (The Schizophrenic Society of Canada, The Schizophrenic Association in the UK, and the National Institute of Mental Health in the US were all mentioned)" (Hughes, 2006, p. 39).

Although some opponents of ECD use on mentally unstable people may cite a lack of safety data, "it is fair to say that there are medical studies in the literature that do not implicate [ECD] devices as a cause of any of the known or accepted methods of sudden death" (Ho, et al., 2007, p. 783). In retrospective studies regarding ECD deployment and sudden death, Bozeman (2007) found that 99.7% of 962 subjects had no injuries or mild injuries only. No deaths were attributed to ECDs. Ho, et al. (2006) studied 162 custodial deaths and found none immediately following ECD application, thus eliminating ventricular fibrillation as a possible factor.

Regarding prospective studies, Ho, et al (2007) studied 25 subjects who were exposed to 15 second ECD X26 discharge and found no observed changes as read by a blinded cardiologist. Vilke, et al. 2007) found no arrhythmias or interval or morphology changes in a study of 32 volunteers where an ECD was applied for 5 seconds of shorter in duration.

Dr. Baden, Plaintiff's medical expert, attempts to mislead the reader when writing in his opinion report that Douglas Zipes, M.D. concluded, "Taser electronic control devices can cause cardiac arrest in humans" (Baden, Opinion Report, April 14, 2022, p. 9). I have reviewed Dr. Zipes' retrospective study that is not experimental and heard him speak when I invited him to my training firm's international conference. Dr. Zipes ONLY reviewed the TASER X26 electronic control weapon, not the TASER CEWs that were used in this matter. Dr. Zipes' conclusions do not apply the TASER CEWs used by the officers who interacted with Mr. Celestin.

Expandable Baton Use: During the struggle with Mr. Celestin after he was prone on the ground, Officer Bonner applied his department-issued Armament Systems and Procedures, Inc. (ASP) expandable baton across Mr. Celestin's upper back to hold him down (Bonner deposition, 108:14). The application, which lasted less than two minutes per video footage, was to "equal pressure across his back to help me hold him down" (109:9-10). Officer Bonner testified that he "was holding him [Mr. Celestin] down and trying to meet his resistance with my own strength" (110:12-13).

Mr. Masten continued to offer his *ipsi dixit* claim that without more substance is the equivalent of a net opinion[4] that "the training for ASP baton use is confined to weapon strikes and the body zones of targeting" (Masten, Opinion Report, April 15, 2022, no page number). This is absolutely incorrect. ASP baton training also includes the use of takedowns, armlocks, and come-along. I have been teaching these techniques for a couple of decades with the ASP baton, and they are shown in the informational video I wrote and produced on the ASP expandable baton.

Having taught hundreds of law enforcement officers how to use expandable batons, including writing and producing an informational video on the ASP expandable baton, when a subject is strong and resisting, placing an extended baton across a person's upper back is another way to help control the individual. Batons are often placed across an individual's ankles to keep them from kicking and across wrists and arms to keep them from moving. Officer Bonner only kept the baton on Mr. Celestin's upper back area until he was handcuffed.

---

[4] "A net opinion summarizes an expert's opinions and conclusions without explaining the facts or reasoning the expert used to reach those ends" (Ryskamp, 20201, p. 1).

<u>Hobble Application</u>: Officer Hebel was issued and trained in the uses of a hobble in March 2019 (Hebel deposition, 99:7-8). He told Officers Bode, Bonner, Harris, and Chiuchiarelli that he had a hobble in his police car and could retrieve it (Hebel deposition, 81:20-21). He had suggested applying a hobble on Mr. Celestin because he was kicking (82:3). The hobble was applied to Mr. Celestin's ankles area, cinched the loop down so it was not loose, and then it was looped through the handcuffs that had been applied to Mr. Celestin's wrists (103:6; 104:2-4; 105:7; 106:17-18).

As shown in  Photo 4, which is a still frame from Officer Hebel's body-worn camera video footage, the hobble strap appears to be at least 12 inches in length. This application does not meet the definition of hogtying.

Photo 4  Hobble Strap Length



 Source: Officer Hebel body-worn camera video, approximate time code 03:34.

The Tenth Circuit in *Cruz v. City of Laramie* clearly defined the term and application of hogtie:

> The conduct at issue involves the tying of the decedent's arms behind his back, binding his ankles together, securing his ankles to his wrists, and then placing him face down on the ground. We note that while sister circuits may characterize the hog-tie restraint somewhat differently, we understand such to involve the binding of the ankles to the wrists, behind the back, with 12 inches or less of separation.

(*Cruz v. City of Laramie,* 2001)

The origin of using a "hog tie" for prisoner control is described by Hisatomi in 1888 when he published a text on how police officers can restrain prisoners. Recently re-published after English translation in 2015, the text consists of illustrations to assist the reader. The restraint method depicted and described by Hisatomi **was not** used by officers on Mr. Celestin.



(Hisatomi, 2015, p. 95)

Applegate (1976) wrote a training text aimed at military and police where he defined, described and depicted what he referred to as "hog tie" restraint.

The hog tie, an extremely effective method, is initiated from the arm lock, with your opponent face down on the ground and his forearm bent up behind the back in a painful position . . . With a rope, tie his wrists together. Take one end of the cord, run it around his neck, and tie it to his pinioned wrists. There should be enough pressure on the cord to force his hands up high toward his shoulder blades. Cross his ankles and, after doubling his legs up behind him, tie them with the Other end of the cord, so that they remain in position. Any struggle to free himself will result in strangulation . . . . (Applegate, 1976, p. 241)
Photo 3 depicts the hog tie method described by Colonel Applegate.



(Applegate, 1976, p. 241)

Mr. Celestin was not placed into the position described by Colonel Applegate (see Hebel body-worn camera video). In fact, Mr. Celestin was not hog-tied by Officer Hebel, only hobbled.

As a restraint instructor trainer who has taught hundreds of officers' restraint methods and techniques, as an author, and as a researcher, it was appropriate to place Mr. Celestin on his stomach for restraint purposes.

**Consideration #2: Did Mr. Celestin actively resist officers on the scene?**

Yes, as previously discussed about Mr. Celestin's active and aggressive resistance shown the officers.

**Consideration #3: What crime(s) had been committed by Mr. Celestin?**

Several, including punching his sister and his mother (battery), resisting law enforcement officers' verbal commands, resisting officers, and/or displaying a deadly weapon at officers.

**Was the totality of the circumstances tense, uncertain, and rapidly evolving?**

Yes.

Based upon my education, training, and experience, the totality of the circumstances was tense, uncertain, and rapidly evolving because Mr. Celestin's continued his active resistance, active aggression, failure to follow officers' commands, arming himself with a knife. Mr. Celestin posed an ***immediate threat*** of serious physical harm to the officers who were struggling with him.

**Element: Were the circumstances surrounding the capture, control, and restraint of Mr. Celestin on April 11, 2019 tense, uncertain, and rapidly evolving?**

Yes. Mr. Celestin increased the pacing of the event when he demonstrated several levels of resistance, including "psychological intimidation, verbal noncompliance, defensive resistance, passive resistance, active resistance, and/or aggressive resistance." The continuous refusal by Mr. Celestin to follow the verbal commands of Ocoee Police Department officers created a very tense, uncertain, and rapidly evolving situation.

> **12.    Mr. Celestin's behavioral symptoms matched those law enforcement officers are trained in to identify a possible state of excited delirium, also known as hyperactive delirium.**

As an author of several articles about excited delirium and sudden death, the author of several training aids including instructor- and user-level workbooks and presentations about excited delirium and sudden death, and the author of an internationally recognized training program on these topics, in my professional opinion, Mr. Celestin's behavioral dues exhibited one or more of the behavioral cues that are consistent with an individual being in an excited delirium or hyperactive delirium state.

Excited delirium is a *descriptive phrase* that historically has not been a recognized medical or psychiatric condition or diagnosis (Peters, 2005, p. 12). The term "excited delirium" is not new, as it can be found as early as 1798. I participated in a global literature review of the first use of the term "excited delirium" and similar terms. **Exhibit II** identifies our findings by year, term, and reference between the dates of 1650 and 1999. **Exhibit III** continues our findings from 2000 to present. The term was re-introduced into the medical literature by Dr. David Fishbain and popularized in the early 1980s by Doctors Fishbain and Wetli.

Contrary to Dr. Baden, Plaintiff's medical expert, who opined the American Medical Association (AMA) had "denounced . . . the controversial diagnosis" (Baden, Opinion Report, April 14, 2022, p. 6), an AMA Resolution (401, A-08) focusing on the use of TASER electronic control devices noted:

> "Excited Delirium. Although not a validated diagnostic entity in either the International Classification of Diseases or the *Diagnostic and Statistical Manual of Mental Disorders*, 'excited delirium' is a widely-accepted entity In forensic pathology and is cited by medical examiners to explain the Sudden in-custody deaths of individuals who are combative and in a highly agitated state. Excited delirium is broadly defined as a state of agitation, excitability, paranoia, aggression, and apparent immunity to pain, often associated with stimulant use and certain psychiatric disorders. The signs and symptoms typically ascribed to 'excited delirium' include bizarre behavior, hyperactivity, hyperthermia, confusion, great strength, sweating and removal of clothing, and imperviousness to pain. Speculation about triggering factors include sudden and intense activation of the sympathetic nervous system, with hyperthermia, and/or acidosis, which could trigger life-threatening arrhythmias in susceptible individuals" (Robinowitz, p. 6).

The AMA Resolution also cited Link and Estes noting "important variables confounding TASER-related deaths 'cannot be fully investigated in retrospective reviews, registries, or reproduced in clinical investigations" (Robinowitz, p. 9). "The 'influence of confounding clinical factors such as excited delirium, physical restraint techniques, underlying cardiovascular disease, hyperadrenergic states, metabolic derangements, or the influencd of alcohol, stimulants, or other drugs remains unknown in epidemiologic investigations, and uncontrollable in clinical investigations'" (p. 9).

Behavioral cues include, but are not limited to extreme agitation, violent or bizarre behavior, running wildly, screaming, incoherent speech, naked or stripping off clothing, disorientation about place, time, purpose, and even him-herself, superhuman strength, diminished sense of pain, violent resistance during control and restraint, delusions of grandeur, easily distracted, lack of focus, scattered ideas about things, acute onset, and/or makes people feel uncomfortable (Peters, 2006; Peters, 2005, pp. 25-27; Larson, 2006).

Dr. Baden, Plaintiff's medical expert, attempts to mislead the trier-of-fact by only citing negative publicity and non-peer reviewed reports about the legitimacy of the phenomenon of

excited delirium (see pages 6 and 7 of his opinion report). As the reader can see from Exhibits II and III, the term excited delirium was not "coined in the 1980s" as stated by the Physicians for Human Rights (p. 3) and is not "racist" and does have scientific origins, contrary to the paper Dr. Baden cited.

The AMA Resolution clearly stated, "the sudden in-custody deaths of individuals who are combative and in a highly agitated state have been attributed to the presence of 'excited delirium.' The latter is . . . more generally accepted entity in forensic pathology" (Executive Summary). At the very least the Medical Examiner community has embraced the legitimacy of excited delirium, the scientific research conducted by Deborah Mash, Ph.D., and two papers published by the American College of Emergency Physicians are absent from Dr. Baden's biased opinion report that is full of *ipsi dixit* opinions. Both of these papers confirm the legitimacy of the phenomenon of excited delirium, with the most recent ACEP paper (2021) placing it within Hyperactive Delirium that is both a medical and psychological diagnosis.

**13.    Mouth-to-mouth resuscitation is optional in contemporary first aid training.**

When I requalified for my CPR certification, no longer is mouth-to-mouth resuscitation required, but is optional. First responders widely know this. NBC News broadcast the change in 2008: "You can skip the mouth-to-mouth breathing and just press on the chest to save a life.

"In a major change, the American Heart Association said Monday that hands-only CPR — rapid, deep presses on the victim's chest until help arrives — works just as well as standard CPR for sudden cardiac arrest in adults" (https://www.nbcnews.com/health/health-news/no-mouth-mouth-required-new-cpr-rules-flna1c9463305).

Again, Mr. Masten offered his *ipsi dixit* claim about first responders being required to perform mouth to mouth resuscitation. "they [the officers] failed to perform rescue breaths . . . the Officers still failed to administer any ventilations" (Masten, Opinion Report, April15, 2022, not page numbered).

**14.    Officers Bode, Bonner, and/or Chiuchiarelli did attempt to use Crisis Intervention techniques but the active and aggressive resistance offered by Mr. Celestin negated their efforts.**

As previous discussed in Opinion #2, Officers Bonner and Chiuchiarelli did receive 40-hours of Crisis Intervention training. As an instructor who has trained law enforcement officers across the United States in "Handling Emotionally Disturbed Persons," there are three primary tenets of Crisis Intervention Training: attempt to calm the individual, attempt to contain the individual, and attempt to communicate with the individual.

Officers Bode and Bonner did communicate with Mr. Celestin but could not contain him when he charged at them, and then fled through the yard. His fleeing from the residence and attempt to flee through the yard also negated their attempts to confine him.

Without citing any reference to his *ipsi dixit* opinion that "Officers responding to the call involving Mr. Celestin had not been properly trained for crisis intervention, and the Ocoee Police Department did not require crisis intervention training for its Officers" (Masten, Opinion Report, April 15, 2022, not page numbered). This contradicts the training records of Officers Bonner, and Chiuchiarelli who had received 40-hours of Crisis Intervention training.

Based upon my education, training, and experience, sometimes it is not possible to effectively use Crisis Intervention training because the targeted individual will not be cooperative. Officers Bode, Bonner, and Chiuchiarelli did communicate with Mr. Celestin, and attempted to calm and contain him but were unsuccessful.

### 15.    Repositioning a person onto the side may hinder breathing assessment.

This is not a medical opinion, but one based upon my teaching about the "Recovery Position" that is predicated upon the scientific literature. Practically, repositioning a person into the Recovery Position may worsen a person's preexisting medical condition. Palermo, Cattadori, Bussotti, Apostolo, Contini, and Agostoni (2005) found in their study that repositioning a person who is in the prone position into the lateral decubitus position (Recovery Position) is poorly tolerated by heart failure patients (p. 1511).

While it is generally recommended that a person be repositioned onto the side following handcuffing and/or hobbling, based upon scientific research, this is, at best, a strong recommendation and not a requirement.

### 16.    The City of Ocoee and the Town of Windermere appropriately investigated the in-custody death of Mr.  Celestin, which is within the scope of generally accepted internal investigation practices, CALEA guidelines, and Ocoee Police Department *General Order #4.2 Use of Force*.

Per the Florida Department of Law Enforcement (FDLE), "On April 12, 2019, the Ocoee Police Department and Windermere Police Department requested the Florida Department of Law Enforcement (FDLE) conduct an investigation into the use of force by Ocoee Officers Dominic Chiuchiarelli, Joshua Bode, and Christopher Bonner, and Windermere Officer Griffin Hebel against Jean Samuel Celestin. Celestin was later pronounced deceased. The incident took place at 322 Calliope Street, Ocoee, Florida (Ocoee Case #19OFF001691)" (Bates Stamp, CELE 0100).

There were two investigations conducted into the Celestin in-custody death: one criminal investigation conducted by the FDLE (Bates Stamp, CELE 0078-0274), and one internal investigation conducted by the City of Ocoee (CELE 5489-5509). Based upon my education, training, and experience, these two investigations conform to contemporary law enforcement in-custody death investigation.

Reiter (2006) wrote "agency-initiated complaints come in different forms.  Most commonly found complaints are those initiated by a supervisor for some breach of rules and regulations.  Other times it might be knowledge that comes to the agency without an actual

complaint from the aggrieved party. . ." (p. 1.9). Reiter also notes that the "complaint process must be as foolproof as possible" (Chapter 2, p. 2.1). The widely-adopted text (now in its third edition) by Reiter who is former Assistant Chief of Police for the Los Angeles (CA) Police Department, outlined and discussed in very detailed form how the investigation should be conducted, who should be assigned to conduct it, what information should be identified and sought, and how the investigation can be used for disciplinary purposes.

The International Association of Chiefs of Police (IACP) has issued guidelines for the investigation of employee misconduct and has also authored a model policy regarding such investigations (IACP, "Investigation of Employee Misconduct: Model Policy", July 2001). Regarding the disposition of a citizen complaint, the IACP recommends that: "The primary investigative authority for the investigation (i.e., subject employee's supervisor and commander or OPS) shall review the complaint report and investigate findings once deemed complete. This authority will compile a report of findings and provide a disposition recommendation for each charge as follows:

a.  *Sustained*: Evidence sufficient to prove allegations.

b.  *Not sustained*: Insufficient evidence to either prove or disprove allegations.

c.  *Exonerated*: Incident occurred but was lawful.

d.  *Unfounded*: Allegation is false or not factual or the employee was not involved (p. 3).

Regarding complaint processing, the CALEA standard manual notes "a written directive requires the agency to investigate all complaints against the agency or employees of the agency" (CALEA, Standard 52.2.1, p. 52-2). The CALEA standards manual notes "the integrity of the agency depends on the personal integrity and discipline of each employee" (p. 52-1).

On April 12, 2019,the Medical Examiner performed an autopsy on Mr. Celestin, by Associate Medical Examiner Jesse Giles (Bates Stamp, CELE 0259).

Based on my education, training, and experience coupled with my training as an In-custody Death Forensic Analyst, the investigation was extensive, thorough, and consistent with generally accepted law enforcement practices.

**Legal Opinions of Plaintiff's Police Expert**

Mr. Masten, Plaintiff's police expert, has offered one or more legal opinions when he opined "The deployment of the Taser (sic), when five Officers were there and there was no flight risk, was excessive and not necessary. At all times lower uses of force were reasonable . . ." and usurped the Trier of Fact when he wrote ". . . the physical pain compliance measures exerted upon him [Mr. Celestin] (Taser (sic) application, hobble restraint, ASP baton pressure application) were . . . excessive" (Masten, Opinion Report, April 15, 2022, no numbered pages). It is my understanding that experts can neither offer legal opinions nor opine on the ultimate

issue, and therefore I reserve the right to provide a supplemental report should the Court allow Mr. Masten's opinions.

## VIII.   DEMONSTRATIVE EVIDENCE and EXHIBITS

I reserve the right to use demonstrative evidence and Exhibits I, II, and III at trial to illustrate the facts and my opinions expressed above. The exhibits, testimony aids, or list of references used as a summary of, support for, and/or graphic depiction or illustrative description, summary, or synopsis, for the information, statements, summaries, and opinions in this report specifically include, but are not limited to, each (or any compilation, synopsis, summary, demonstrative, illustration, or graphic) pleading, document, statement, deposition, diagram, photograph/image, report, citation, reference, paper, book, illustration, graphic, chart, drawing, diagram, table, PowerPoint® slide, set, or deck, picture, image, and/or video in this report, referenced or cited in this report, or included in any of the references to this report. These may be utilized as exhibits, explanatory, or demonstrative aids to support deposition and/or trial testimony, or for any other purpose. These exhibits specifically include any illustrative evidence such as visual presentation of computer-generated slides and visual images projected onto a screen, charts, graphs, or illustrations created to better illustrate the aforementioned exhibits. I reserve the right to create, use, utilize PowerPoint or other graphics or illustrations, or compilations, as exhibits at deposition, trial, or for any other purpose after submission of this report.

## IX.   **COMPENSATION:** See APPENDIX B.

## X.   **CV and PUBLICATIONS**: My Curriculum Vitae and list of publications are in APPENDIX C.

## XI.   **CASE LISTINGS**: Over the past four years I have testified as an expert at trial are shown in APPENDIX D.

**REFERENCES**

Adams, R. J., McTernan, T. M., & Remsberg, C. (1980). *Street survival: Tactics for armed encounters*. Evanston, IL: Calibre Press.

American College of Emergency Physicians. (2021, June 23). ACEP Task Force Report on Hyperactive Delirium with Severe Agitation in Emergency Settings. Author.

American College of Emergency Physicians. (2009, September 10). White Paper Report on Excited Delirium Syndrome. Author.

Applegate, R. (1976). **Kill or get killed**. Boulder, CO: Paladin Press.

Byrd v. Clark, 783 F. 2d 1002 (11th Cir. 1986).

Chan, T. C., Vilke, G. M., Neuman, T., & Clausen, J. L. (1997). Restraint position and positional asphyxia. *Annals of Emergency medicine, 30(5)*, 578-586.

Commission on Accreditation for Law Enforcement Agencies. (2001, November). *Standards for law enforcement agencies (4th ed.)*. Fairfax, VA: Author.

Cruz v City of Laramie, 239 F. 3d. 1183, 2001 U.S. App. Lexis 2243 (2001).

Douglas, W. W., Rehder, K., Beynen, F.M., Sessler, A.D., & Marsh, H.M. (1977). Improved oxygenation in patients with acute respiratory failure: the prone position. *ARRD, 115*, 559-566.

Davis, E., & Whyde, A. (2018, October). Contacts Between Police and the Public, 2015. Washington, DC: U.S. Department of Justice.

DeGue, A., Fowler, K. A., & Calkins, C. (2016). Deaths Due to Use of Lethal Force by Law Enforcement. *Am J. Prev Med, 51* (5 Suppl 3), S173-S187.

Eith, C., & Durose, H.R. (2011, October). Contacts Between Police and the Public, 2008. Washington, DC: U.S. Department of Justice.

Graham v. Connor, 109 S. Ct. 1865 (1989).

Graziano, A. M., & Raulin, M. L. (2000). *Research methods: A process of inquiry* (4th ed.). Boston: Allyn and Bacon.

Griggs v. Duke Power Co, 401 U.S. 424 (1971).

Grossi, D. (2013, June 3). The reactionary gap: Reminders on threats and distances. Retrieve from https://www.policeone.com/Officer-Safety/articles/6258834-The-reactionary-gap-Reminders-on-threats-and-distances/

Hisatomi, T. (2015). *The police officer's essential illustrated guide kenpo*. San Bernardino: CA.

Ho, J. D., Lapine, A., Joing, S., Reardon, R., & Dawes, D. (2008). Confirmation of respiration during trapezial conducted electrical weapon application. *Acad Emerg Med, 15(4)*, [in-press].

Ho, J.D., Dawes, D. M., Johnson, M.A., Lundin, E.J., & Miner, J.R. (2007). Impact of conducted electrical weapons in a mentally ill population: a brief report. *Amer Jour Emerg Med (25)*, 780-785.

Ho, J. D., Dawes, D., Bultman, L. L., et al. (2007). Respiratory effect of prolonged electrical weapon application on human volunteers. *Acad Emerg Med, 14(3)*, 197-201.

Ho, J.D., Miner, J. R., Lakireddy, D.R., Bultma, L.L., & Heegard, W.G. (2006). Cardiovascular and physiologic effects of conducted electrical weapon discharge in resting adults. *Acad. Emergency Medicine*.

Ho, J. D., Miner, J. R., Heegaard, W. G., & Reardon, R. F. (   ). Deaths in American Police Custody: A 12 Month Surveillance Study.


International Association of Chiefs of Police. (2002, July). *Investigation of Employee Misconduct: Model Policy*. Alexandria, VA: Author.

Karch, S. B. (2016). The problem with police-related cardiac arrest. Las Vegas: Institute for the Prevention of In-custody Deaths, Inc.


Karch, S. B., & Drummer, O. H. (2016). *Pathology of drug abuse* (5th ed.). New York: CRC Press.

Leedy, P. D., & Ormrod, J. E. (2001). *Practical research: Planning and design* (7th ed.). Upper Saddle River, NJ: Merrill Prentice Hall.

Martinelli, R. (2014). Revisiting the 21-Foot Rule. Retrieved from https://www.policemag.com/341203/revisiting-the-21-foot-rule)

Mesloh, C., Henych, M., & Wolf, R. (1008). *Less lethal weapon effectiveness, use of force, and suspect & officer injuries: A five-year analysis*. Washington, D.C.: United States Department of Justice.

Mure, M., Glenny, R. W., Domino, K. B., & Hlastala, M. P. (1998). Pulmonary gas exchange improves in the prone position with abdominal distention. *American Journal of Respiratory Critical Care Medicine, 157*, 1785-1790.

Mure, M., Martling, C.R., & Lindahl, S.G.E. (1997). Dramatic effect on oxygenation in patients with severe acute lung insufficiency treated in the prone position. *Critical Care Medicine 25(9)*, 1539-1544.

Murgado, A. (2013, June 10). Closing the Gap. Retrieved from
https://www.policemag.com/340985/closing-the-gap

Nowicki, E. J., & Ramsey, D. A. (1991). Street weapons. WI: Performance Dimensions
Publishing.

O'Halloran, R. L., & Lewman, L.V. (1993). Restraint asphyxiation in excited delirium. *The American Journal of Forensic Medicine and Pathology, 14(4)*, 289-295.

Palermo, P., Cattadori, G., Bussotti, M., Apostolo, A., Contini, M., and Agostoni, P. (2005). Lateral decubitus position generates discomfort and worsens lung function in chronic heart failure. *Chest,128*(3), 1511-1516.

Reay, D. T. (1996, May). Suspect restraint and sudden death. *FBI Law Enforcement Bulletin*, 22-25).

Reay, D. T., Flinger, C. L., Stilwell, A. D., & Arnold, J. (1992). Positional asphyxia during law enforcement transport. *The American Journal of Forensic Medicine and Pathology, 13(2)*, 90-97.

Reay, D. T., Howard, J.D., Gligner, C. L., & Ward, R.J. (1988). Effects of positional restraint on oxygen saturation and heart rate following exercise. *American Journal of Forensic Medicine and Pathology, 9(1)*, 16-18).

Remsberg, C. (1986). *The tactical edge: Surviving high-risk patrol*. Northbrook, IL: Calibre Press.

Robinowitz, C. B. (2009, June). American Medical Association Report 6 of the Council on Science and Public Health (A-09): Use of TASERS® by Law Enforcement Agencies. American Medical Association.

Stoughton, S. W., Noble, J. J., & Alpert, G. P. (2020). *Evaluating police uses of force*. New York: New York University Press. Retrieved on May 30, 2020 from https://www.amazon.com/Evaluating-Police-Uses-Force-Stoughton-dp/1479814652).

West's Florida Statutes Annotated. (2006, June 26). 943.1717 Use of dart-firing stun guns. Thomas Reuters.

**EXHIBIT I**

## Prone Restraint Mortality – Field Studies
([Non-Firearm] Law Enforcement Temporal Arrest-Related Deaths [ARDs])
(Information/Disclosure Bundle)
Contributors: Michael Brave, JD; Steven Karch, MD; Sebastian N. Kunz, MD; Richard M. Luceri, MD, FAHA, FACC;
Darrell Ross, PhD; Gary M. Vilke, M.D., FACEP, FAAEM
[© Copyright by all contributors individually and equally. A.R.R.]

*Table 1 Prone Restraint Mortality Epidemiological Studies.*

| Paper Year | Paper's Lead Author | Contacts CFS[5] | Criminal Arrests | Restrained Prone | Deaths From Prone |
|---|---|---|---|---|---|
| 2019 | Ross [1] (detention) | | | | |
| 2017 | Lasoff [2] | 524,427 | | 1535 | 0 |
| 2016 | Ross [3] (and 2018 [4]) | 876,503 | 110,173 | 1085 | 0 |
| 2015 | Hall [5] (incl. 2012 [6]) | 3,250,000 | | 2000 | 0 |
| 2012 | Hall [6] (incl. in 2015 [5]) | 1,566,908 | | 537 | 0 |
| **Totals** | | **4,650,930** | | **4620** | **0** |

**PowerPoint® Slide:**

# Prone Restraint / Mortality Field Study Numbers

| Year | Lead Author | Contacts CFS | Criminal Arrests | Restrained Prone | Deaths From Prone |
|---|---|---|---|---|---|
| 2017 | Lasoff | 524,427 | | 1535 | 0 |
| 2016 | Ross (and 2018) | 876,503 | 110,173 | 1085 | 0 |
| 2015 | Hall (incl. 2012) | 3,250,000 | | 2000 | 0 |
| 2012 | Hall (Incl. in 2015) | 1,566,908 | | 537 | 0 |
| **Totals** | | **4,650,930** | | **4620** | **0** |

**4,650,930** Contacts, Calls for Service (CFS). Subject Encounters
**4620** Subjects prone restrained
**0** Deaths caused by prone restraint

---

[5] "CFS" Calls for Service.
Dr. Peters Opinion Report: Celestin v. City of Ocoee, et al.
©2022. A.R.R.

[1]  D. Ross, "Examining the liability issues associated with prone restraint deaths in detention," *Forensic Res Criminol Int J,* vol. 7, no. 3, pp. 109-118, 2019.

[2]  D. Lasoff, C. Hall, W. Bozeman, T. Chan, E. Castillo, and G. Vilke, "Proning: outcomes of use of force followed with prone restraint," *J Forensic Med,* vol. 2, no. 2, pp. 1-3, 2017.

[3]  D. Ross and M. Hazlett, "A prospective analysis of the outcomes of violent prone restraint incidents in policing," *Forensic Res Criminol Int J,* vol. 2, no. 1, p. 00040, 2016.

[4]  D. Ross and M. Hazlett, "Assessing the symptoms associated with excited delirium syndrome and the use of conducted energy weapons," *Forensic Research & Criminology International Journal,* vol. 6, pp. 187-196, 2018.

[5]  C. Hall *et al.*, "Restraint in police use of force events: Examining sudden in custody death for prone and not-prone positions," *Journal of Forensic and Legal Medicine,* 2015.

[6]  C. A. Hall, A. M. McHale, A. S. Kader, L. C. Stewart, C. S. MacCarthy, and G. H. Fick, "Incidence and outcome of prone positioning following police use of force in a prospective, consecutive cohort of subjects," (in eng), *J Forensic Leg Med,* vol. 19, no. 2, pp. 83-9, Feb 2012.

# EXHIBIT II

| 014 December 2020 | "Excited Delirium" and Other Terms and References History (1650–1999) |
|---|---|
| | Contributors: Michael Brave, JD; Steven Karch, MD; Sebastian N. Kunz, MD; Richard M. Luceri, MD, FAHA, FACC; |
| | Darrell Ross, PhD; John G. Peters, Jr., Ph.D.; Gary M. Vilke, M.D., FACEP, FAAEM; Chris W. Lawrence [© Copyright by all contributors individually and equally. A.R.R.] |

| Ref | Year | Term | Reference |
|---|---|---|---|
| | 1650 | "seized by mania" | "1650" Case cited in Dewhurst, K. (1981). Willis' Oxford Casebook. Oxford: Sandford Publications:<br>"July 5, 1650. For the wife of H. Bolt of Eaton<br>A countrywoman, aged about 45, for long melancholic, was seized by mania on the 29th of June; so much so that it was necessary to bind her with chains and ropes to keep her in bed. On the fifth day ½ pint of blood was drawn from the basilica vein. At bedtime she took 2 grains of laudanum in a decoction of barley with an infusion of poppy flowers dissolved in a sweetened cardiac syrup. She slept about 3 hours that night. Early in the morning she had 3 stools from the enema administered the day before. About noon she slept again. In the evening I visited her. She was now shouting wildly, now singing, now weeping. She breathed rapidly, drawing the breath in with a hiss, her lips being drawn inwards. I prescribed a liniment of Vigo's ointment with (....) smeared on a rosecake to be applied to her forehead and temples and a poultice of gently cooked water-hemlock to be put on the region of the spleen; and also repeated draughts of a cardiac julep. The next night she died." |
| | 1798 | delirium excited | [England] Ferriar, J. (1798), Illustrations of Sterne, with other essays and verses. London, England: Cadell and Davies. |
| | 1832 | excited delirium | Religious pamphlets: Volume 32, January 1, 1832. |
| | 1832 | | [France] Calmeil, L. F. (1832). *Dictionnaire de médecine; ou, répertoire général des sciences médicales considérées sous le rapport théorique et pratique* (2nd ed.). Paris: Béchet. |
| | 1835 | excited delirium | [England] Forbes, J, Tweedie, A, Conolly, J. (1835), Cyclopaedia of Practical Medicine; page 595, Comprising Treatises on the Nature and Treatment of Diseases, Materia Medica and Therapeutics, Medical Jurisprudence, etc. etc. London: Sherwood, Gilbert, and Piper, and Baldwin and Cradock, Paternoster-Row; Whittaker, Treacher, and Co. |
| | 1835 | excited delirium | Fay, W., Sermon. (1835) Sermon Delivered at the Funeral of the Rev. Benjamin B. Wisner, D.D. Boston: Crocker and Brewster. |
| | 1836 | excited delirium | The Missionary Herald: Containing the Proceedings at Large of the American Board of Commissioners for Foreign Missions, With a General View of Other Benevolent Operations for the year 1836, Vol. XXXII. page 120. Boston. |
| | 1840 | excited delirium | [England] 1840 London Medical Gazette: Or, Journal of Practical Medicine, page 818. |
| | 1841 | excited delirium | [England] The Asiatic Journal and Monthly Register for British and Foreign India, China, and Australasia. Vol. XXXVI-New Series. September-December 1841. London: Wm. H. Allen and Co. |
| | 1845 | | [France] Moreau, J. J. (1845). *Du hachisch et de l'aliénation mentale: études psychologiques*. Paris: Fortin Masson. |
| | 1848 | excited delirium | [England] London Medical Gazette: Or, Journal of Practical Medicine, 1848. |
| | 1848 | excited delirium | [England] Yeoman, T.H., 1848, Dr. Yeoman on Consumption of the lungs, or decline: the causes, symptoms, and rational treatment. With the means of prevention. London: Sampson Low. |
| | 1849 | "intense maniacal excitement," and "intense nervous commotion" | Bell, L.V.: On a form of disease resembling mania and fever. *Am. J. Insan.*, 6:97–127, October, 1849. |
| | 1852 | excited delirium | The Lancet, January 3, 1852, Volume 1, page 2. |

| Ref | Year | Term | Reference |
|---|---|---|---|
| | 1853 | excited delirium | Graham's Magazine, Volume 43, page 417. |
| | 1857 | excited delirium | [Ireland] Dublin Hospital Gazette, Volume 4, No. 5. page 65. |
| | 1862 | | [Book] Berthier, P. (1862). Report on Practical Medicine and Pathology. In E. Montgomery, C. H. Jones, T. Windsor, G. Hewitt, & B. Sanderson (Eds.), *A Year-Book of Medicine, Surgery, and their Allied Sciences, for 1862*. London: New Sydenham Society. |
| | 1863 | excited delirium | Dr. Grally Hewitt. (1963) A Year-Book of Medicine, Surgery, and Their Allied Sciences, New Sydenham Society. Page 98. |
| | 1866 | excited delirium | [England] British and Foreign Medico-Chirurgical Review (July, 1866), No. LXXV, page 147. |
| | 1867 | excited delirium | Wilhelm Griesinger, Charles A. Lockhart Robertson, James Rutherford, *Mental Pathology and Therapeutics*, 1867, page 296. |
| | 1868 | excited delirium | Chicago Medical Examiner, Volume 9, page 481. |
| | 1869 | excited delirium | Hudson, Alfred. Lectures, Study of Fever. Page 272. |
| | 1872 | | Davis, N. S. (1872). Cases of Cerebro-Spinal Disease in this City During the Months of February, March and April, 1872. Remarks on Treatment of the Same. *The Medical Examiner*, 8(6), 97-101. |
| | 1872 | excited delirium | The Richmond and Louisville Medical Journal. Volume 13 (1872), Page 650. |
| | 1873 | excited delirium | [Canada] The Canada Medical Record, a Monthly Journal of Medicine and Surgery, Editor: Francis Wayland Campbell, M.A., M.D., L.R.C.P. London. Volume 1, page 1. |
| | 1873 | excited delirium | William Pirrie. (1873) The Principles and Practices of Surgery. Page 357. |
| | 1881 | excited delirium | Bartholow, R. (1881). On the antagonism between medicines and between remedies and diseases: being the Cartwright Lectures for the Year 1880, page 37. New York: D. Appleton and Company. |
| | 1881 | excited delirium | Mahomed, F.A. (1881, Nov. 25). Transactions of Societies, Clinical Society of London. The Medical Press & Circular A Weekly Journal of Medicine and Medical Affairs, Om July to December 1881. Volume 83, 472. |
| | 1881 | excited delirium | Edward Swift Dunster, Frank Pierce Foster, James Bradbridge Hunter. (1881) International Record of Medicine and General Practice Clinics. Page 58. |
| | 1882 | excited delirium | Wilheim Griesinger, Charles A. Lockhart Robertson, James Rutherford. (1882) Mental Pathology and Therapeutics. Page 208. |
| | 1882 | excited delirium | [England] Transactions of the Clinical Society of London. (1882). Page 64. |
| | 1882 | excited delirium | Ringer, Sydney. (1882) A Handbook of Therapeutics. Page 625 |
| | 1885 | | Goodlee, R. J. (1885). A Case of Obturator Hernia. [December 20, 2011]. *Louisville Medical News*, 20(5), 77-78. |
| | 1886 | | [Book] Gowers, W. R. (1886). General and Functional Diseases: Chorea. In *A Manual of Diseases of the Nervous System* (Vol. 2, pp. 546-564). London: Churchill. |
| | 1889 | excited delirium | Sydney Ringer, A Handbook of Therapeutics, 1889, page 450. |
| | 1891 | excited delirium | The Transactions of the New York Academy of Medicine. (1891) Page 230. |
| | 1893 | acute delirium | Bianchi and Piccinino: Sulla origine infetira di una forma di delirio acuto. Annali di Neurologia, 1893.<br>[Bianchi and Piccinino: On the infectious origin of a form of acute delirium. Annals of Neurology, 1893.] |
| | 1895 | excited delirium | M.V. Ball, M.D., Acute Cocaine Poisoning. Proceedings of the Philadelphia County Medical Society. (October 9, 1895) Philadelphia County Medical Society. page 282. |
| | 1895 | excited delirium | The North Carolina Medical Journal, (1895) Volumes 35-36, page 298. |
| | 1896 | excited delirium | The Philadelphia Polyclinic, 1895, Volume 4, page 477. |
| | 1896 | excited delirium | The Quarterly Journal of Inebriety, (1896) Volume 18, page 71. |
| | 1896 | excited delirium | St. Louis Medical and Surgical Journal, (1896) Volume 69, page 336. |
| | 1897 | | [Book] Blandford, G. F. (1897). Insanity. In T. L. Stedman (Ed.), *Twentieth Century Practice: An International Encyclopedia of Modern Medical Science by Leading Authorities of Europe and America* (Mental Diseases, Childhood, And Old Age ed., Vol. 12 pp. 1-254). New York: William Wood and Company. |
| | 1914 | | Brinton, J. H. (1914). The Battle of Belmont: Tragedies of the Wounded. In *Personal Memoirs of John H. Brinton, Major and Surgeon U.S.V.*, 1861-1865 (pp. 71-86). New York: Neale Publishing Company. |

| Ref | Year | Term | Reference |
|---|---|---|---|
| | 1920 | hysterical fever | Campbell, A. W., & Dowling, N. (1920). A case of nervous or hysterical fever. *Medical Journal of Australia*, 1(8), 171-172. |
| | 1922 | | Editor. (1922). Brain Diagnosis. [December 20, 2011]. *The Medical Standard*, 45(3), 26. |
| | 1922 | | [Book] Feer, E., & Sedgwick, J. P. (1922). *Text-Book of Pediatrics* (J. P. Sedgwick & C. A. Scherer, Trans.). Philadelphia: Lippincott. |
| | 1923 | | Robertson, W. G. A. (1923). Sudden deaths from trivial causes. *Practitioner*, 111, 110-124. |
| | 1925 | | *Transactions of the Medical Association of the State of Alabama, 263.* |
| | 1927 | acute delirium | Claude, H., and Cuel, J,: Clinical and pathological observations in three cases of acute delirium. *L'Encephale*, 8:628, September, 1927. |
| | 1933 | manic-depressive exhaustion | Derby, I. M. (1933). Manic-depressive "exhaustion" deaths. *Psychiatric Quarterly*, 7(3), 436–449. |
| | 1933 | | Andrus, E. C., & Padget, P. (1933). Delirium Associated with Myocardial Insufficiency. *Transactions of the American Clinical and Climatological Association*, 49, 100-120. |
| | 1934 | | Kraines, S. H. (1934). Bell's Mania. [February 15, 2007]. *American Journal of Psychiatry*, 91(1), 29-40. doi:10.1176/appi.ajp.91.1.29. |
| | 1934 | | Davidson, G. M.: Concerning the cause of death in certain psychoses. *Am. J. Psychiat.*, 91:41, 1934. |
| | 1935 | acute psychoses | Stefan, H. (1935). Natural death as a result of great excitement in acute psychoses without actual anatomically demonstrable cause. *Ztschr. fd ges. Neurol. u. Psych*, 152. |
| | 1938 | | Shulack, N. R. (1938). Sudden "exhaustive" death in excited patients. *Psychiatric Quarterly*, 12(2), 282-293. |
| | 1939 | acute manic-depressive psychosis | Larson, C. P. (1939). Fatal cases of acute manic-depressive psychosis. *American Journal of Psychiatry*, 95(4), 971–982. |
| | 1939 | | Thompson, W. A. (1939). A theory for the cause of deaths in acutely disturbed mental patients. *Psychiatric Quarterly*, 13(3), 503–513. |
| | 1941 | | [Book] Brahdy, L., & Kahn, S. (1941). *Trauma and Disease* (2nd. ed.). Philadelphia: Lea & Febiger. |
| | 1944 | | Shulack, N. R. (1944). Sudden "exhaustive" death in excited patients. *The Psychiatric Quarterly*, 18(1), 3–12. |
| | 1944 | | Humphrey, G. (1944). *. *Bulletin of the Canadian Psychological Association* 4, 37. |
| | 1946 | delirium acutum | Hermann, K., & Lund, O. (1946). ON DELIRIUM ACUTUM: with Special Reference to Biochemical Changes. *Acta Psychiatrica Scandinavica*, 21(1-3), 329–348. |
| | 1947 | acute exhaustive psychoses | Adland, M. L. (1947). Review, case studies, therapy, and interpretation of the acute exhaustive psychoses. *Psychiatric Quarterly*, 21(1), 38–69. |
| | 1949 | | [Book] Hull, E., & Perrodin, C. M. (1949). *Medical Nursing* (4th ed.). Philadelphia: Davis. |
| | 1949 | | King, J. T. (1949). *Digitalis Delirium. Transactions of the American Clinical and Climatological Association*, 61, 65-83. |
| | 1951 | | Howard, L. (1951). Herman Melville: *A Biography*. Los Angeles, CA: University of California Press. |
| | 1951 | | Enos Jr, W. F., & Hansen, J. L. (1951). Violent or clinically unexplained deaths. United States Armed Forces medical journal, 2(10), 1569. |
| | 1952 | acute delirious mania | Jarvie, H. F., & Hood, M. C. (1952). Acute delirious mania. *American Journal of Psychiatry*, 108(10), 758–763. |
| | 1953 | Acute fatal psychosis | Bom, F. (1953). Om akute dødelige psykosers neuro-histologi og fysiologi. *Nordisk Psykiatrisk Medlemsblad*, 7(1), 71–81. [On the neurohistology and physiology of acute fatal psychoses.] |
| | 1954 | | *Bulletin of Hygiene, 29.* |
| | 1954 | delirium acutum | Lingjaerde, O. (1954). Delirium acutum. *Archiv für Psychiatrie und Nervenkrankheiten*, 192(6), 599–612. |
| | 1959 | | [Book] Emerson Jr., C. P., & Bragdon, J. S. (1959). *Essentials of Medicine: The Art and the Science of Medical Nursing* (18th ed.). Philadelphia: Lippincott |

| Ref | Year | Term | Reference |
|---|---|---|---|
| | 1967 | | [Book] Beaumont, G. E. (1967). *Medicine: Essentials for Practitioners and Students* (9 ed.). London: Churchill. |
| | 1973 | | Morrison, J. R. (1973). Catatonia: Retarded and Excited Types. *Archives of General Psychiatry*, 28(1), 39-41. |
| | 1975 | | [Book] Brunner, L. S., & Suddarth, D. S. (1975). *Textbook of Medical-Surgical Nursing* (3d. ed.). |
| | 1975 | | Post RM (1975). Cocaine Psychoses: A continuum model. *American Journal Psychiatry*, 3 (132): 225–230. |
| | 1979 | | Wetli, C. V., & Wright, R. K. (1979). Death caused by recreational cocaine use. *Jama*, 241(23), 2519–2522. |
| | 1981 | | Dewhurst, K. (1981). Willis' Oxford Casebook. Oxford: Sandford Publications. Citing the case of: "July 5, 1650. For the wife of H. Bolt of Eaton" |
| | 1981 | excited delirium | Fishbain, D. A., & Wetli, C. V. (1981). Cocaine intoxication, delirium, and death in a body packer. *Annals of emergency medicine*, 10(10), 531–532. |
| | 1985 | excited delirium | Wetli, C. V., & Fishbain, D. A. (1985). Cocaine-induced psychosis and sudden death in recreational cocaine users. *Journal of Forensic Science*, 30(3), 873–880. |
| | 1987 | | Wetli CV. Fatal cocaine intoxication. *Am J Forensic Med Pathol Mar*, 1987;8(1):1–2. |
| | 1989 | | Cregler, L. L. (1989). Adverse health consequences of cocaine abuse. *Journal of the National Medical Association*, 81(1), 27. |
| | 1990 | excited delirium | Brody, S. L. (1990). Violence associated with acute cocaine use in patients admitted to a medical emergency department. NIDA research monograph, 103, 44–59. |
| | 1991 | | Hearn, W.L., Flynn, D.D., Hime, G.W., Rose, S., Cofino, J.C., Mantero-Atienza, E. Wetli, C.V. and Mash, D.C.: Cocaethylene: A Unique Cocaine Metabolite Displays High Affinity for the Dopamine Transporter, *J Neurochemistry* 56(2):698-701, 1991. |
| | 1993 | excited delirium | O'Halloran RL, Lewman LV. Restraint asphyxiation in excited delirium. *Am J Forensic Med Pathol*. 1993;14(4):289–295. |
| | 1995 | excited delirium | Raval, M., & Wetli, C. (1995). Sudden death from cocaine-induced excited delirium: an analysis of 45 cases. *Am J Clin Pathol*, 104(3), 329. |
| | 1996 | excited delirium | Wetli, C.V., Mash, D., and Karch, S.B.: Cocaine-Associated Agitated Delirium and the Neuroleptic Malignant Syndrome *Am J Emerg. Med*. 14:425–428, 1996.14:425-428, 1996. |
| | 1996 | excited delirium | [IACP] Excited Delirium, Official Resolution, Police Psychological Section, International Association of Chiefs of Police, Inc. 103rd Annual Conference, Phoenix, Arizona. |
| | 1997 | excited delirium | Ruttenber AJ, Lawler-Heavner J, Yin M, Wetli CV, Hearn WL, Mash DC. Fatal excited delirium following cocaine use: epidemiologic findings provide new evidence for mechanisms of cocaine toxicity. *J Forensic Sci*, 1997;42:25–31. |
| | 1998 | excited delirium | [Canada] Pollanen MS, Chiasson DA, Cairns JT, Young JG. Unexpected death related to restraint for excited delirium: a retrospective study of deaths in police custody and in the community. *CMAJ*. 1998;158(12):1603–1607. |
| | 1998 | excited delirium | Giesler, M. C., & Shen, W. W. (1998). Cocaine addiction: theory, research, and treatment. *Jama The Journal of the American Medical Association*, 279(6), 479-480. |
| | 1998 | excited delirium | Ross DL. Factors associated with excited delirium deaths in police custody. *Mod Pathol*, 1998;11:1127–37. |
| | 1999 | excited delirium | Ruttenber AJ, McAnally HB, Wetli CV. Cocaine-associated rhabdomyolysis and excited delirium: different stages of the same syndrome. *Am J Forensic Med Pathol*. 1999 Jun;20(2):120–7. |

**EXHIBIT III**

| 11 April 2022 | "Excited Delirium" and Other Terms and References History (Present – January 1, 2000) Contributors: Michael Brave, JD; Steven Karch, MD; Sebastian N. Kunz, MD; Richard M. Luceri, MD, FAHA, FACC; Darrell Ross, PhD; John G. Peters, Jr., Ph.D.; Gary M. Vilke, M.D., FACEP, FAAEM; Chris W. Lawrence [© Copyright by all contributors individually and equally. A.R.R.] |
|---|---|

| Ref | Year | Term | Reference |
|---|---|---|---|
| | 2021 | | |
| | | excited delirium | Janofsky, J. S. Medical Director's Report: Excited Delirium, Ketamine Use and Death During Police Restraint. *American Academy of Psychiatry and the Law Newsletter*. Pages 4-5, Fall 2021. |
| | | excited delirium syndrome [ExDS] | [German ExDS case series] Hölzle, P., Frank, A., Hörmann, S., Pajonk, F. G., & Förstl, H. (2021). Excited Delirium Syndrome (ExDS): emergence and emergency management. *Deutsche medizinische Wochenschrift* [German Medical Weekly] (1946), 146(21), 1421-1426. Epub 2021 Oct 20. PMID: 34670285. |
| | | excited delirium | Kliem, V. (Oct. 12, 2021) Sidestepping the Excited Delirium Debate. *Force Science News*. Force Science Institute. |
| | | Hyperactive Delirium with Severe Agitation, excited delirium, excited delirium syndrome, ExDS | [ACEP Position Paper] Hatten, B.W. et al. (June 23, 2021). American College of Emergency Physicians (ACEP) Task Force Report on Hyperactive Delirium with Severe Agitation in Emergency Setting. |
| | | excited delirium | [Book Section] Excited Delirium Syndrome [ExDS], pgs 437-441 (plus references), Chapter 19 Sudden Death during or Immediately after a Struggle. DiMaio, V.J.M. and Molina, D.K. (2022) (3rd Edition) DiMaio's Forensic Pathology, Practical Aspects of Criminal and Forensic Investigations Series. CRC Press, Taylor & Francis Group. |
| | | excited delirium | Solano JJ, Clayton LM, Parks DJ, Polley SE, Hughes PG, Hennekens CH, Shih RD, Alter SM. Prehospital Ketamine Administration for Excited Delirium with Illicit Substance Co-Ingestion and Subsequent Intubation in the Emergency Department. *Prehosp Disaster Med*. 2021 Sep 23:1-5. |
| | | excited delirium | Simon Baldwin, Brittany Blaskovits, Christine Hall, Chris Lawrence & Craig Bennell (2021): Adverse outcomes in non-fatal use of force encounters involving excited delirium syndrome, *Police Practice and Research*, 2022;23(3):322-336. DOI: 10.1080/15614263.2021.1958682. |
| | | excited delirium | Fernandez, A. R., Bourn, S. S., Crowe, R. P., Bronsky, E. S., Scheppke, K. A., Antevy, P., & Myers, J. B. (2021). Out-of-Hospital Ketamine: Indications for Use, Patient Outcomes, and Associated Mortality. *Annals of Emergency Medicine*. |
| | | excited delirium | Taxel, S. CE Article: Excited Delirium—A Case Review. *EMSworld* May 29, 2021. |
| | | excited delirium | Steinberg, A. (2021). Prone restraint cardiac arrest: A comprehensive review of the scientific literature and an explanation of the physiology. *Med Sci Law*. 2021 Feb 25;25802420988370. doi: 10.1177/0025802420988370. Online ahead of print. |
| | | excited delirium | Baliatsas C, Gerbecks J, Dückers MLA, Yzermans CJ. Human Health Risks of Conducted Electrical Weapon Exposure: A Systematic Review. *JAMA Netw Open*. 2021 Feb 1;4(2):e2037209. |
| | | excited delirium | Armour, R. Chemical sedation of excited delirium in the pre-hospital setting. *Br Paramed J*. 2020 Mar 1;4(4):34-39. |
| | | excited delirium | Mayo, K., & Byju, A. (2021). "Excited Delirium:" Diagnostic Contradictions and Structural Racism. *ISMMS Journal of Science and Medicine*, 1(1). |

Dr. Peters Opinion Report: Celestin v. City of Ocoee, et al.
©2022. A.R.R.

| Ref | Year | Term | Reference |
|---|---|---|---|
| | | excited delirium | [Book Chapter] Wilson M.P., Vilke G.M. (2021) Excited Delirium Syndrome: Diagnosis and Treatment. Pages 167-176. In: Zun L.S., Nordstrom K., Wilson M.P. (eds) Behavioral Emergencies for Healthcare Providers. Springer, Cham. |
| | | | |
| | 2020 | excited delirium | Kim HK, Leonard JB, Corwell BN, Connors NJ. Safety and efficacy of pharmacologic agents used for rapid tranquilization of emergency department patients with acute agitation or excited delirium [published online ahead of print, 2020 Dec 16]. *Expert Opin Drug Saf*. 2020;10.1080/14740338.2021.1865911. doi:10.1080/14740338.2021.1865911 |
| | | acute behavioural disturbance (ABD) (excited delirium) | Stevenson, R., & Tracy, D. K. Acute behavioural disturbance: a physical emergency psychiatrists need to understand. *BJPsych Advances*, 2021;27(5):333-342.<br>- acute behavioural disturbance (ABD) (also known as acute behavioural disorder or excited delirium) |
| | | excited delirium | [Dutch] Dijkhuizen LG, Kubat B and Duijst WL. Sudden death during physical restraint by the Dutch police. *J Forensic Leg Med* 2020; 72: 101966. |
| | | excited delirium | Giachetti, A. D., Kahl, J. H., Zaney, M. E., Hime, G. W., & Boland, D. M. (2020). Method Validation of Seven Synthetic Cathinones by LC-MS/MS Analysis and the Prevalence of N-Ethylpentylone in Postmortem Casework. *Journal of analytical toxicology*, bkaa194. |
| | | acute behavioural disturbance | [Australia] Isoardi, K. Z., Parker, L. E., Page, C. B., Humphreys, M. A., Harris, K., Rashford, S., & Isbister, G. K. (2020). Ketamine as a rescue treatment for severe acute behavioural disturbance: A prospective prehospital study. *Emergency Medicine Australasia*. |
| | | excited delirium | [Iceland] S.N. Kunz, S. Þ´orðard´ottir, J.G. J´onasson. (2020). Arrest-related death on the basis of a drug-induced excited delirium syndrome. *Journal of Forensic and Legal Medicine* 77 (2021) 102091. |
| | | excited delirium | [Joint Position Statement] Kupas, D.F., Wydro, G.C., Tan, D.K., Lamin, R., Harrell IV, A.J., Want, A. (2020) Clinical Care and Restraint of Agitated or Combative Patients by Emergency Medical Services Practitioners. Position Statement of the National Association of EMS Physicians® (NAEMSP), the National Association of State EMS Officials (NASEMSO), National EMS Management Association (NEMSMA), National Association of Emergency Medical Technicians (NAEMT) and the American Paramedic Association (APA). |
| | | excited delirium | [Joint Position Statement] Morgan, M.M., Perina, D.G., Acquisto, N.M., Fallat, M.E., Gallagher, J.M., Brown, K.M., Ho, J., Burnett, A., Lairet, J., Rowe, D. and Gestring, M.L., 2020. Ketamine use in prehospital and hospital treatment of the acute trauma patient: A joint position statement. *Prehospital Emergency Care*, pp.1-5. |
| | | excited delirium | [Netherlands] van Wonderen, K., Jongbloed-de Hoon, M., Meinders, A. J., & Harmsze, A. Two cases of a prolonged excited delirium syndrome after chloromethcathinone ingestion. *Neth J Med*. 2020 Sep;78(5):300–302. PMID: 33093258. |
| | | excited delirium | [Book Chapter] Cardone, M. S., & Leung, C. G. (2020). Excited Delirium: "I'm So Excited... I Just Can't Hide It". In Case Studies in Emergency Medicine (pp. 213–220). Springer, Cham. |
| | | excited delirium | Kitch, B. B. (2020). Out-of-hospital ketamine: review of a growing trend in patient care. *Journal of the American College of Emergency Physicians Open*, 1(3), 183-189. |
| | | excited delirium | [Netherlands] Strömmer, E. M. F., Leith, W. M., Zeegers, M., & Freeman, M. D. The role of restraint in fatal Excited Delirium: A research synthesis and pooled analysis. |
| | | | Sloane C, Mash D, Chan TC, Kolkhourst F, Neuman T, Castillo EM, Lasoff D, Wardi G, Xie X, and Vilke, GM (2020). Assessment of stress markers in restrained individuals following physical stress with and without sham CED activation. *Journal of Forensic and Legal Medicine*, 74:1–6. |
| | | | Kroll, M.W., Brave, M.A. Defending Non-Firearm Arrest-Related Death Incidents. International Municipal Lawyers Association (IMLA). Conference Paper. IMLA 2020 Mid-Year Seminar, April 24–27, 2020, Washington, D.C. |
| | | excited delirium | Breedlove, W., Barna Worley, V. Excited Delirium and Use of Force by Police. ACJS [Academy of Criminal Justice Sciences] Today. Volume XLVI, Issue 3, pages 1–8. May 2020. |

| Ref | Year | Term | Reference |
|---|---|---|---|
| | | excited delirium | Ross, D.L., Brave, M. Assessing Use-of-Force Liability and Law Enforcement Response to the Naked Subject. *Law Enforcement Executive Forum*, March 2020, 20(1). |
| | | excited delirium | [Book Chapter] Hunsaker III, J.C., Crook, S.M., Shields, B.E. Chapter 32. Excited Delirium. Madea, B. (Ed.). (2020). Asphyxiation, Suffocation, and Neck Pressure Deaths. CRC Press. |
| | | excited delirium | [Dutch] Goudswaard) Goudswaard ML, van den Hondel KE, Reijnders UJL, et al. Getaserd [Tasered: medical consequences of the use of electric stun guns]. *Ned Tijdschr Geneeskd*. 2020;164:D4422. Published 2020 Jun 11. |
| | | excited delirium | [German] Kunz, S.N., Horn, J. & Krys, L. Exzitiertes Delir. *Rechtsmedizin* 30, 201–208 (2020). https://doi.org/10.1007/s00194-020-00395-z. |
| | | excited delirium | Zawilska, Jolanta B., Monika Kacela, and Piotr Adamowicz. "NBOMes–highly potent and toxic alternatives of LSD." *Frontiers in Neuroscience* 14 (2020). |
| | | excited delirium | [Book Chapter] Shepherd, R.T. Chapter 13: Deaths in Police Custody. Pages 469-493. January 2020, Clinical Forensic Medicine, A Physician's Guide. Editors: Stark, Margaret M. (Ed.). DOI: 10.1007/978-3-030-29462-5_8. |
| | | excited delirium | [Book Chapter] Beh, P.S.L., Stark, M.M. Chapter 7: Medical Issues Relevant to Restraint. January 2020, Clinical Forensic Medicine, A Physician's Guide. Editors: Stark, Margaret M. (Ed.). DOI: 10.1007/978-3-030-29462-5_8. |
| | | | |
| | 2019 | excited delirium | [Egypt] Jothee, Shatishraj, Mohamed Swarhib Shafie, and Faridah Mohd Nor. "Excited delirium syndrome from psychostimulant abuse can mimic a violent scene of death." *Egyptian Journal of Forensic Sciences* 9, no. 1 (2019): 64. |
| | | excited delirium | Baltzer Nielsen S, Stanislaus S, Saunamäki K, Grøndahl C, Banner J, Jørgensen MB. Can acute stress be fatal? A systematic cross-disciplinary review. *Stress*. 2019 May;22(3):286-294.<br><br>Excited delirium syndrome (ExDS), malignant catatonia, takotsubo cardiomyopathy (TCM), capture myopathy (CM) |
| | | excited delirium | Li, M., Martinelli, A.N., Oliver, W.D., Wilkerson, R.G. Evaluation of Ketamine for Excited Delirium Syndrome in the Adult Emergency Department. *J Emerg Med*. 2019 Nov 14. pii: S0736-4679(19)30802-9. doi: 10.1016/j.jemermed.2019.09.019. [Epub ahead of print]. |
| | | excited delirium | Sekhon, S., Fischer, M. A., and Marwaha, R. (2019). Excited (Agitated) Delirium. In StatPearls. Treasure Island (FL): StatPearls Publishing LLC. NCBI Bookshelf. A service of the National Library of Medicine, National Institutes of Health. |
| | | excited delirium | [German] Wellershoff, G. (2019). Fulminante Laktatazidose bei kokaininduziertem agitiertem Delir. *Der Notarzt*, 35(06), 329-334. [Cocaine-Induced Excited Delirium with Severe Lactic Acidosis, the Ambulance.] |
| | | excited delirium | [Poland] Sliwicka, Olga, Karolina Szatner, and Aleksandra Borowska–Solonynko. "Three postmortem case reports of the excited delirium syndrome–A short comparison." *Journal of Forensic and Legal Medicine* (2019). |
| | | excited delirium | Vilke GM, Mash DC, Pardo M, Bozeman W, Hall C, Sloane C, Wilson MP, Coyne CJ, Xie X and Castillo EM (2019). Excitation study: Unexplained in-custody deaths: Evaluating biomarkers of stress and agitation. *Journal of Forensic Legal Medicine*, 66: 100–106. |
| | | acute behavioural disturbance | [United Kingdom] Acute behavioural disturbance (ABD): guidelines on management in police custody. Faculty of Forensic & Legal Medicine. The Royal College of Emergency Medicine. Royal College of Physicians. April 2019. |
| | | excited delirium | Kroll M, Ho J, Vilke GM. 8 Facts About Excited Delirium Syndrome (ExDS) We Learned in 2018. 2019. PoliceOne.com. |
| | | | |
| | 2018 | excited delirium | Kroll, M.W., Hail, S.L., Kroll, R.M., Wetli, C.V., Criscione, J.C. Electrical weapons and excited delirium: shocks, stress, and serum serotonin, *Forensic Science, Medicine and Pathology*. Published online: 11 August 2018. https://doi.org/10.1007/s12024-018-0005-8. |
| | | acute behavioural disturbance | [United Kingdom ] Acute Behavioural Disturbance (ABD), RCEM Learning<br>Authors: Lauren Katherine Fraser, Alun Marc Henry, Nicola Moultrie / Editor: Johann Grundlingh / Reviewer: Stewart McMorran / Codes: A5 / Published: 05/09/2018 / Review Date: 05/09/2021. |

| Ref | Year | Term | Reference |
|---|---|---|---|
| | | excited delirium | Kunz, S. N. (1711). Excited delirium syndrome secondary to bupropion toxicity and amfetamine abuse: case report. *Reactions*, 19(21), 2018. |
| | | excited delirium | Baldwin, S., Hall, C., Blaskovits, B., Bennell, C., Lawrence, C., Semple, T. Excited delirium syndrome (ExDS): Situational factors and risks to officer safety in non-fatal use of force encounters. *International Journal of Law and Psychiatry* 60 (2018) 26–34. |
| | | excited delirium | Ross DL, Hazlett MH. Assessing the symptoms associated with excited delirium syndrome and the use of conducted energy weapons. *Forensic Res Criminol Int J.* 2018;6(3):187–196. DOI: 10.15406/frcij.2018.06.00206. |
| | | excited delirium | Bond, C., Morgenstern, J., Heitz, C., Milne, W.K. Hot off the Press: SGEM #218. Excited Delirium: A Systematic Review. *Acad Emerg Med.* 2018 Jun 1. doi: 10.1111/acem.13487. [Epub ahead of print.] |
| | | excited delirium | Kunz, S. N., S. Þórðardóttir, and R. Rúnarsdóttir. "Restraint-related asphyxia on the basis of a drug-induced excited delirium." *Forensic Science International* (2018). |
| | | | Atherton, Daniel, Daniel Dye, C. Andrew Robinson, and Rachel Beck. "n-Ethyl Pentylone-Related Deaths in Alabama." *Journal of forensic sciences* (2018). |
| | | excited delirium | Linder, L.M., Ross, C.A. and Weant, K.A., 2018. Ketamine for the acute management of excited delirium and agitation in the prehospital setting. *Pharmacotherapy*: The Journal of Human Pharmacology and Drug Therapy, 38(1), pp.139–151. |
| | | excited delirium | Corstens, Dirk. "Excited delirium syndrome after withdrawal from 10 days long recreationally used GHB." *Journal of forensic and legal medicine* 54 (2018): 74-75. |
| | | | |
| | 2017 | excited delirium | Gonin P, Beysard N, Yersin B, Carron PN. Excited Delirium: A Systematic Review. *Acad Emerg Med.* 2017. |
| | | excited delirium | [Position Paper][NAME] Mitchell Jr, R.A., Diaz, F., Goldfogel, G.A., Fajardo, M., Fiore, S.E., Henson, T.V., Jorden, M.A., Kelly, S., Luzi, S., Quinn, M. and Wolf, D.A., 2017. National Association of Medical Examiners Position Paper: Recommendations for the Definition, Investigation, Postmortem Examination, and Reporting of Deaths in Custody. *Academic forensic pathology*, 7(4), pp.604-618. |
| | | excited delirium | [Dutch] Roosens E, Mulier JP, Heylens G, De Fruyt J. [The use of dexmedetomidine in extreme agitation]. Tijdschrift voor psychiatrie. 2017;59(9):554-558. [Paper in Dutch.] |
| | | excited delirium | K. Nugent, M. A. Orellana-Barrios, and D. Buscemi, "Comprehensive Histological and Immunochemical Forensic Studies in Deaths Occurring in Custody," *International Scholarly Research Notices*, vol. 2017, 2017. |
| | | excited delirium | Kennedy DB, Savard DM. Delayed In-Custody Death Involving Excited Delirium. *Journal of correctional health care*: the official journal of the National Commission on Correctional Health Care. 2017:1078345817726085. |
| | | excited delirium | R. W. Byard, "Ongoing issues with the diagnosis of excited delirium," (in eng), *Forensic Sci Med Pathol*, Aug 03 2017. |
| | | excited delirium | [Book Chapter] Nakajima, Y., Vilke, G.M., Chapter 12: Use of Force in the Prehospital Environment, Zeller, S.L., Nordstrom, K.D. and Wilson, M.P. (eds.) (2017) The Diagnosis and Management of Agitation. |
| | | excited delirium | Baker, D. (2017). Making Sense of 'Excited Delirium' in Cases of Death after Police Contact. *Policing*: A Journal of Policy and Practice. |
| | | excited delirium | [Book Chapter] Coyne, C.J., Ly, B.T., Vilke, G.M. 2017. Chapter 9: Excited Delirium Syndrome (ExDS). Pages 187-200. Guidelines for Investigating Officer-Involved Shootings, Arrest-Related Deaths, and Deaths in Custody, edited by Darrell L. Ross and Gary M. Vilke, Routledge Taylor & Francis Group, New York, and London. |
| | | excited delirium | [Book Chapter] Ross, D.L., Brave, M., Kroll, M. 2017. Chapter 1: Arrest-Related Deaths, Emerging Questions, and Competing Expectations in Investigations. Pages 1-18. Guidelines for Investigating Officer-Involved Shootings, Arrest-Related Deaths, and Deaths in Custody, edited by Darrell L. Ross and Gary M. Vilke, Routledge Taylor & Francis Group, New York, and London. |
| | | excited delirium | [Book Chapter] Ross, D.L., Brave, M. 2017. Chapter 2: Vital Statistics and Arrest-Related Deaths. Pages 19-40. Guidelines for Investigating Officer-Involved Shootings, Arrest-Related Deaths, and Deaths in Custody, edited by Darrell L. Ross and Gary M. Vilke, Routledge Taylor & Francis Group, New York, and London. |

| Ref | Year | Term | Reference |
|---|---|---|---|
| | | excited delirium | [IACP] Excited Delirium, Model Policy, April 2017, International Association of Chiefs of Police. |
| | | excited delirium | [IACP] Excited Delirium, Concepts and Issues Paper, April 2017, IACP Law Enforcement Policy Center. |
| | | excited delirium | [IACP] Excited Delirium, Need to know ...., April 2017, IACP Law Enforcement Policy Center. |
| | | | |
| | 2016 | excited delirium | [Book Chapter] Vilke, G. M. and Payne-James, J. J. (2016) Excited Delirium Syndrome, in Current Practice in Forensic Medicine (eds J. A.M. Gall and J. J. Payne-James), John Wiley & Sons, Ltd, Chichester, UK. doi: 10.1002/9781118456026.ch6. |
| | | excited delirium | [Book Chapter] Karch, S.B., Drummer, O.H. (2016) Chapter 1.15. Excited Delirium Syndrome. Pages 121-133. Karch's Pathology of Drug Abuse Fifth Edition. CRC Press, Taylor & Francis Group, Boca Raton, London, New York. |
| | | excited delirium | Mash DC. (2016) Excited Delirium and Sudden Death: A Syndromal Disorder at the Extreme End of the Neuropsychiatric Continuum. *Front. Physiol.* 7:435. doi:10.3389/fphys.2016.00435. |
| | | excited delirium | [Review] Lipsedge M (2016). Excited delirium: A psychiatric review. *Medicine and the Law*, 56 (2):121–127. |
| | | excited delirium | Michaud A. Restraint related deaths and excited delirium syndrome in Ontario (2004-2011). *J Forensic Leg Med* 2016;41:30–5. |
| | | excited delirium | Klein, L., Driver, B., Moore, J., Fagerstrom, E., Parrill, C., Ho, J., & Miner, J. (2016). 219 Assessment of Stress Biomarkers in Agitated Emergency Department Patients Before and After Treatment. *Annals of Emergency Medicine*, 68(4), S85-S86. |
| | | excited delirium | Schiavone S, Riezzo I, Turillazzi E, Trabace L. Involvement of the NADPH oxidase NOX2-derived brain oxidative stress in an unusual fatal case of cocaine-related neurotoxicity associated with excited delirium syndrome. *J Clin Psychopharmacol* 2016;36:513–7. |
| | | acute behavioural disturbance | [United Kingdom] House, C, Gillings, M, Grundlingh, J, Aw-Yong, M. (2016) QUALITY IN EMERGENCY CARE COMMITTEE Guidelines for the Management of Excited Delirium / Acute Behavioural Disturbance (ABD). Independent Advisory Panel on Deaths in Custody. |
| | | excited delirium | Baldwin S, Hall C, Bennell C, Blaskovits B, Lawrence C, Distinguishing Features of Excited Delirium Syndrome in Non-Fatal Use of Force Encounters, *Journal of Forensic and Legal Medicine* (2016), doi: 10.1016/j.jflm.2016.03.006. |
| | | acute behavioural disturbance | [United Kingdom} Guidelines for the Management of Excited Delirium / Acute Behavioural Disturbance (ABD), Independent Advisory Panel on Deaths in Custody, Best Practice Guideline, the Royal College of Emergency Medicine. |
| | | excited delirium | Scaggs TR, Glass DM, Hutchcraft MG, Weir WB. Prehospital ketamine is a safe and effective treatment for excited delirium in a community hospital based EMS system. *Prehospital Disaster Med* 2016;31:563–9. |
| | | | |
| | 2015 | excited delirium | Gerold KB, Gibbons ME, Fisette RE, Jr. and Alves D. Review, clinical update, and practice guidelines for excited delirium syndrome. *Journal of special operations medicine*: a peer reviewed journal for SOF medical professionals. 2015;15:62–9. |
| | | agitated delirium | Plush T, Shakespeare W, Jacobs D, Ladi L, Sethi S, Gasperino J. Cocaine-induced agitated delirium: a case report and review. *J Intensive Care Med* 2015;30:49–57. |
| | | | |
| | 2014 | excited delirium | Strote, J., Walsh, M., Auerbach, D., Burns, T., & Maher, P. (2014). Medical conditions and restraint in patients experiencing excited delirium. *The American journal of emergency medicine*, 32(9), 1093-1096. |
| | | excited delirium | Vilke GM, Chan TC, Savaser D, Neuman T. Response to letter by Michaud Regarding Article, "Hemodynamic consequences of restraints in the prone position in excited delirium syndrome" *J Forens Legal Med* 2014;27:82–4. |
| | | excited delirium | Michaud A. Hemodynamic consequences of restraints in the prone position in excited delirium syndrome. *J Forensic Leg Med*. 2014;27:85–86. |
| | | excited delirium | Nielsen A (2014, Fall). Excited delirium syndrome and conducted electrical weapons. *Publications at Regis University--Theses*, Paper 215, 1–30. |

| Ref | Year | Term | Reference |
|---|---|---|---|
| | | excited delirium | Iwanicki JL, Barrett W, Saghafi O, et al. Prehospital ketamine for excited delirium in the setting of acute drug intoxication. In: *Toxicology Clinical*. New York, NY: Informa Healthcare, 2014:685–6. |
| | | excited delirium | Gill JR. The syndrome of excited delirium. *Forensic Sci Med Pathol*. 2014;10:223-8. |
| | | excited delirium | [Book Chapter] Wyant, R.T. (2014) Chapter 8: Arrest-Related Death, In-Custody Death, and Excited Delirium Syndrome. Pages 201-220. Wyant, R. Burns, T. (2014) Risk Management of Less Lethal Options: Evaluation, Deployment, Aftermath, and Forensics. Edited by John Allgire. CRC Press, Taylor & Francis Group. |
| | | excited delirium | Roach B, Echols K, Burnett, A (2014, July). Excited delirium and the dual response: Preventing in-custody deaths. *FBI Law Enforcement Bulletin*, 2–5. |
| | | excited delirium | [IACP] Excited Delirium, Model Policy, January 2014, International Association of Chiefs of Police. |
| | | excited delirium | [IACP] Excited Delirium, Concepts and Issues Paper, January 2014, IACP National Law Enforcement Policy Center. |
| | | | |
| | 2013 | excited delirium | Gordon C and Schmelzer M. Care of the patient in excited delirium. Journal of emergency nursing: *JEN*: official publication of the Emergency Department Nurses Association. 2013;39:190–6. |
| | | excited delirium | [Book Chapter] Wilson MP, Vilke GM. The patient with excited delirium in the emergency department. In Zun LS, Chepenik LG, Mallory MNS editors. Behavioral Emergencies: A handbook for emergency physicians. Cambridge: Cambridge University Press; 2013. |
| | | excited delirium | Ho JD, Smith SW, Nystrom PC, et al. Successful management of excited delirium syndrome with prehospital ketamine: two case examples. *Prehosp Emerg Care* 2013;17:274–9. |
| | | excited delirium | Hall, Christine Alison, Adam Shereef Kader, Anne Marie Danielle McHale, Lauren Stewart, Gordon Hilton Fick, and Gary Michael Vilke. "Frequency of signs of excited delirium syndrome in subjects undergoing police use of force: descriptive evaluation of a prospective, consecutive cohort." *Journal of forensic and legal medicine* 20, no. 2 (2013): 102–107. |
| | | excited delirium | Kuehn, B. M. (2013). "Bath salts" abuse. *JAMA*, 309(4), 333-333. |
| | | | |
| | 2012 | excited delirium | Vilke, G.M., Payne-James, J, Karch, S. Clinical practice: Excited delirium syndrome (ExDS): Redefining an old diagnosis. *Journal of Forensic and Legal Medicine*, April 2012, Volume 19, Issue 3, Pages 7-11. |
| | | excited delirium | Peters, Jr., J. G. "Excited Delirium: Fallacy or Reality?" (2012, August). *University of Phoenix Las Vegas Campus August Faculty Newsletter*, p. 2. |
| | | excited delirium | Vilke GM, Bozeman WP, Dawes DM, Demers G, Wilson MP. Excited delirium syndrome (ExDS): treatment options and considerations. *Journal of forensic and legal medicine*. 2012;19(3):117–21. |
| | | excited delirium | Penders TM, Gestring RE, Vilensky DA. Excited delirium following use of synthetic cathinones (bath salts). *Gen Hosp Psychiatry* 2012;34:647–50. |
| | | excited delirium | Vilke GM, DeBard ML, Chan TC, Ho JD, Dawes DM, Hall C, Curtis MD, Costello MW, Mash DC, Coffman SR, McMullen MJ, Metzger JC, Roberts JR, Sztajnkrcer MD, Henderson SO, Adler J, Czarnecki F, Heck J, Bozeman WP. Excited Delirium Syndrome (ExDS): Defining Based on a Review of the Literature. *J Emerg Med*. 2012;43(5):897–905. Epub 2011 Mar 24. |
| | | excited delirium | Johnston JA (2012, March). Stop the madness: Excited delirium syndrome does exist. *Blue Line Magazine*, 6–10. |
| | | excited delirium | Karch SB (2012). Possible strategies for the diagnosis of fatal excited delirium syndrome. *Academy Forensic Pathology*, 2 (3): 273–283. |
| | | excited delirium | [Canada] Excited Delirium Training Bulletin, Issue Number 112-versoin 1.0. Emergency Health Services Branch Ministry of Health and Long-Term Care. Ontario, Canada. |
| | | excited delirium | [IACP] Excited Delirium Syndrome, Training Key #671, International Association of Chiefs of Police. |

| Ref | Year | Term | Reference |
|---|---|---|---|
| | | | |
| | 2011 | excited delirium | [NIJ] Hughes, E.L. Special Panel Review of Excited Delirium, Less-Lethal Devices Technology Working Group, NIJ Weapons and Protective Systems Technologies Center, Penn State, a Criminal Justice Technology Center of Excellence, National Institute of Justice Cooperative Agreement Award No. 2010-IJ-CX-K005. |
| | | excited delirium | Vilke GM. Pathophysiologic changes due to TASER devices versus excited delirium: Potential relevance to deaths-in-custody (letter to the editor)? *J Forens and Legal Med*. 2011:18(6):291. Epub 2011 May 24. |
| | | excited delirium | F. Aiken, J. Duxbury, C. Dale, and I. Harbison, "Review of the medical theories and research relating to restraint related deaths," *Caring Solutions (UK), University of Central Lancashire*, 2011. |
| | | excited delirium | Jauchem, JR (2011, May). Pathophysiologic changes due to TASER devices versus excited delirium: Potential relevance to deaths in-custody? *Journal of Forensic Legal Medicine*, 18 (4):145–153. |
| | | excited delirium | Takeuchi A, Ahern TL, Henderson SO. Excited delirium. *West J Emerg Med*. 2011 Feb;12(1):77-83. PMID: 21691475; PMCID: PMC3088378. |
| | | | |
| | 2010 | excited delirium | Otahbachi M, Cevik C, Bagdure S, Nugent K. Excited delirium, restraints, and unexpected death: a review of pathogenesis. *Am J Forensic Med Pathol*. 2010;31(2):107–112. |
| | | agitated chaotic events™ (ACE) & excited delirium | Institute for the Prevention of In-Custody Deaths, Inc. (2010). IPICD 5th Annual Sudden Death, Excited Delirium & In-Custody Death Conference. Henderson, NV: Author. |
| | | agitated delirium | [Spain] Martın Cazorla F, Amaya S, Miguel I, et al. Muerte por sındrome de delirium agitado en Andalucıa. *Rev Esp Med Leg* 2010;36:62–7. |
| | | excited delirium agitated delirium | Excited-Agitated Delirium & Sudden In-Custody Death, Excited Delirium (ED), Agitated Delirium (AD), Acute Behavioral Disorder, Institute for the Prevention of In-Custody Deaths, Inc. (IPICD), Roll Call Mini-Poster™. |
| | | excited delirium | Strote, Jared, Erik Verzemnieks, Mimi Walsh, and H. Range Hutson. "Use of force by law enforcement: an evaluation of Safety and injury." *Journal of Trauma and Acute Care Surgery* 69, no. 5 (2010): 1288-1293. |
| | | excited delirium | Jauchem, JR (2010, Jan.). Deaths in-custody: Are some due to electronic control devices (including TASER devices) or excited delirium? *Journal of Forensic Legal Medicine*, 17 (1):1–7. |
| | | | |
| | 2009 | excited delirium | Hoffman L (2009, October). ACEP recognizes excited delirium syndrome. *Emergency Medicine News*, 1–2. |
| | | excited delirium | [ACEP] White Paper Report on Excited Delirium Syndrome, Report to the Council and Board of Directors on Excited Delirium at the Direction of Amended Resolution 21(08), American College of Emergency Physicians (ACEP) Excited Delirium Task Force. |
| | | excited delirium | [Canada] Report of the Panel of Mental Health and Medical Experts Review of Excited Delirium, Minister of Justice and Health, Nova Scotia, Canada. |
| | | excited delirium | [AMA] Carolyn B. Robinowitz, MD, Chair, Report 6 of the Council on Science and Public Health (A-09), Use of Tasers® [Conducted Electrical Devices (CEDs)] by Law Enforcement Agencies (Reference Committee D), American Medical Association. |
| | | excited delirium | Karch, S; Druid, H; and Wetli, CV: Brain Biomarkers for Identifying Excited Delirium as a Cause of Sudden Death. *Forensic Science International*, 190: e13–e19, 2009 |
| | | excited delirium | Grant JR, Southall PE, Mealey J, Scott SR, Fowler DR. Excited delirium deaths in custody past and present. *Am J Forensic Med Pathol*. 2009;30:1–5. |
| | | excited delirium | Samuel E, Williams RB, and Ferrell RB (2009). Excited delirium: Considerations of selected medical and psychiatric issues. *Neuropsychiatric Disease and Treatment*, 5: 61-66. |
| | | excited delirium | Mash DC, Duque L, Pablo J, Qin Y, Adi N, Hearn WL, et al. Brain biomarkers for identifying excited delirium as a cause of sudden death. *Forensic Sci Int*. 2009 Sept 10;190(1–3):13-9. |
| | | | |

| Ref | Year | Term | Reference |
|---|---|---|---|
| | **2008** | excited delirium | [Japan] Bunai Y, Akaza K, Jiang WX, Nagai A. Fatal hyperthermia associated with excited delirium during an arrest. *Leg Med* (Tokyo) 2008;10(6):306-9. |
| | | excited delirium | [Book Chapter] Gill JR. 2008 USA. The medicolegal evaluation of excited delirium. Pages 91-113. In Forensic Pathology Reviews. Vol 5. Tsokos M (ed). Humana Press. Level VII. |
| | | excited delirium | [Romanian] Dermengiu, D., Hostiuc, S., & Curcă, G. C. (2008). Electroshock weapons: physiologic and pathologic effects. *Rom J Leg Med*, 16(3), 187-193. |
| | | excited delirium | Ramirez, M. L., Moat, B., & Slovis, C. M. (2008). Tactical Emergency Medicine. *JAMA*, 300(2), 218-219. |
| | | | |
| | **2007** | acute agitated delirium | Roberts JR (2007). Acute agitated delirium from cocaine: A medical emergency. *Emergency Medicine News*, 18–20. |
| | | excited delirium | Peters, Jr., J. G. "Excited Delirium: What Every Chief Needs To Know." (2007, September-October). *Police & Security News*, Vol. 23, Issue 5. |
| | | | |
| | **2006** | excited delirium | Peters, Jr., J. G., & Brave, M.A. "Sudden Death, 'Excited Delirium,' and Issues of Force: Part IV: A Blueprint for Forensic Investigators." (2006, September-October). *Police & Security News*, Vol. 22, Issue 5, 104-108. |
| | | excited delirium | Peters, Jr., J. G. "Sudden death, 'excited delirium,' and issues of force: Part III: Behavioral Cues and  Response Plan for Sudden and In-Custody Deaths." (2006, July-August). *Police & Security News*, Vol. 22, Issue 4, 44-49. |
| | | excited delirium | Peters, Jr., J. G. Sudden death, 'excited delirium, and issues of force: Part II--TASER® and EMDs." (2006, May-June). *Police & Security News*, Vol. 22, Issue 3. |
| | | excited delirium | Peters, Jr., J.G. "Sudden death, 'excited' delirium, and issues of force: Part I." (2006, March-April). *Police & Security News*, Vol. 22, Issue 2, 104-107. |
| | | excited delirium | [Book Chapter] Wetli CV (2006). Excited delirium (chapter 7). In DL Ross and TC Chan (Ed.), Sudden deaths in-custody. Humana Press, 99–112, Totowa, NJ. |
| | | | Parent R (2006, April). Deaths during police intervention. *FBI Law Enforcement Bulletin*, 18-22. |
| | | excited delirium | [Book] Di Maio TG, Di Maio VJM. In: Excited delirium syndrome cause of death and prevention. 1st ed. Boca Raton, FL: Taylor & Francis Group; 2006. p. 1-60. |
| | | | |
| | **2005** | excited delirium | [Book Chapter] Wetli, CV and Natarajan, GA:  Death in Custody, United States of America. In Encyclopedia of Forensic and Legal Medicine, Vol. 2. pp 65–73, Payne-James, Byard, Corey and Henderson (eds.), Elsevier, Glasgow, 2005 (ISBN: 0-12-547970-0 {set}) |
| | | excited delirium | [Book Chapter] Wetli CV and Natarajan, GA:  Excited Delirium. In Encyclopedia of Forensic and Legal Medicine, Vol. 2. pp 276-288, Payne-James, Byard, Corey and Henderson (eds.), Elsevier, Glasgow, 2005 (ISBN: 0-12-547970-0 {set}) |
| | | excited delirium | Force Science News (2005, October). 10 training tips for handling excited delirium. Article #29: 1–9. |
| | | excited delirium | Sztajnkrycer MD, Baez AA. Cocaine, excited delirium and sudden unexpected death. *Emerg Med Serv.* 2005 Apr;34(4):77–81. PMID: 15900873. |
| | | | |
| | **2004** | excited delirium | [NAME] Stephens BG, Jentzen JM, Karch S, Wetli CV, Mash DC. National Association of Medical Examiners position paper on the certification of cocaine-related deaths. *Am J Forensic Med Pathol.* 2004;25(1):11–3. |
| | | | |
| | **2003** | excited delirium | Paquette, M. (2003). Excited delirium: does it exist?. *Perspectives in Psychiatric Care*, 39(3), 93. |
| | | | |
| | **2002** | agitated delirium | Vilke GM, Chan TC:  Agitated delirium and sudden death (Letter to the editor). *Prehosp Emerg Care* 2002;6(2):259–260. |
| | | | |
| | **2001** | excited delirium | Stratton SJ, Rogers C, Brickett K, Gruzinski G. Factors associated with sudden death of individuals requiring restraint for excited delirium. *Am J Emerg Med*, 2001;19:187–91. |
| | | excited delirium | Allam S, Noble JS. Cocaine-excited delirium and severe acidosis. *Anesthesia.* 2001 Apr;56(4):385–6. |

| Ref | Year | Term | Reference |
|---|---|---|---|
| | | excited delirium | Morrison A, Sadler D. Death of a psychiatric patient during physical restraint. Excited delirium--a case report. *Med Sci Law*. 2001;41(1):46–50. |
| | | agitated delirium | Park KS, Korn CS, Henderson SO.  Agitated delirium and sudden death: two case reports. *Prehosp Emerg Care*. 2001;5:214–6. |

# APPENDIX A

## CASE DOCUMENTS CONSIDERED and/or REVIEWED

### Celestin v. City of Ocoee, et al.

1.  Amended Complaint

2.  FDLE investigation including photographs and videos

3.  Ocoee Police Department evidence (including photographs and videos)

4.  Depo transcript of Joanne Celestin taken 10/29/21 with exhibits

5.  Depo transcript of Rose Celestin taken 11/22/21

6.  Depo transcript of Officer Bode taken 11/23/21 with exhibits

7.  Depo transcript of Officer Harris taken 12/07/21 with exhibits

8.  Plaintiff's Amended Complaint filed May 24, 2021

9.  FDLE Investigative Report [0078-0274], including:
    a.  Investigative Summary [0081-98]
    b.  Initial Report [0100]
    c.  CAD, Radio Traffic, and 911 Calls [0101-0107]
    d.  Hospital response [0108]
    e.  Officer interview summaries [0109-0123]
    f.  Witness interview summaries [0124-0129]
    g.  Neighborhood Canvas [0130]
    h.  Evidence [0131-0135]
    i.  Lt. Whitaker interview [0136]
    j.  OPD and WPD Additional Agency documents (including CAD, Rose Celestin's handwritten statement, Windermere Incident Report, and OCPD Incident Reports [0137-0158]
    k.  Disciplinary History [0159-0171]
    l.  Body Cam review [0171-0176]
    m.  Crime Scene Activities (incl. forensic reports) [0177-0181]
    n.  TASER downloads [0182- 0258]
    o.  Autopsy Report [0259-0274]

10. Ocoee Police Dept. Crime Scene Photos Evidence Audit Trail [0275-0467]

11. Crime Scene Photos [0468-0655]

12. Autopsy Photos [0656-0739]

13. Ocoee Fire Department Incident Report for date of incident regarding Jean Celestin [1237-1238]

14. Ocoee Fire Department Incident Report for date of incident regarding either Joanne Celestin or Officer Hebel [1239-1240]

15. Memorandum of Understanding between FDLE and Ocoee dated 02/16/2016 [1241-1243]

16. Audio of 9-1-1 call from Joanne Celestin [1254]

17. Audio of 9-1-1 radio traffic re: 322 Calliope Street [1255]

18. Video of Officer Bonner's 04/19/2019 interview by Wiles [1260]


19. Video of Officer Chiuchiarelli 04/19/2019 interview by Wiles [1263]

20. Officer Bode's First AXON bodycam [1892]

21. Officer Bode's Second AXON bodycam [1264]

22. Officer Bonner's First AXON bodycam [1893]

23. Officer Bonner's Second AXON bodycam [1265]

24. Officer Chiuchiarelli's AXON bodycam [1266]

25. Officer Chiuchiarelli's Second AXON bodycam video [1267]

26. Corporal Price's AXON bodycam [1268]

27. Officer Hebel's AXON bodycam video [1269]

28. Officer Ogletree's AXON bodycam video [1270]

29. Audio of Officer Temples interview 04/12/2019 by Hubbard [1271]

30. Audio of Officer Gerena interview 04/12/2019 by Hubbard [1272]

31. Audio of Peter Rohleder interview 04/15/2019 by Hubbard [1273]

32. Audio of Officer Harris interview 04/12/2019 by Wiles [1274]

33. Audio of Officer Ogletree interview 04/12/2019 by Wiles [1275]

34. Audio of Christopher Le interview 04/12/2019 by Watts [1276]

35. Audio of Javier Molina interview 04/12/2019 by Watts [1277]

36. Audio of Rose Celestin interview 04/12/2019 by Wiles [1278]

37. Audio of Officer Hebel interview 04/12/2019 by Wiles [1279]

38. Video of Officer Joshua Bode 04/19/19 interview by Wiles [1280]

39. Inter-Local Agreement for Police Dispatching Services between City of Winter Garden and City of Ocoee (eff. 10/01/18 – 09/30/19) [1290-1302]

40. Josh Bode employment records from City of Ocoee [1308-1415]

41. Chris Bonner employment records from City of Ocoee [1416-1561]

42. Dominic Chiuchiarelli employment records from City of Ocoee [1562-1754]

43. Brian Harris employment records from City of Ocoee [1755-1891]

44. Windermere Police Department Policies and Procedures Jan. 2019 [1895-2331]

45. City of Ocoee Fire Rescue's response to Subpoena Duces Tecum (medical and billing records regarding Jean Celestin) [2332-2355]

46. Windermere PD Response to Plaintiff's First Request to Produce [2356-3777] including, but not limited to:
    a. Hebel Application, employment file, training [2367-2513]
    b. E-mail from Chief Ogden re: incident [2514-2515]
    c. Use of Force training materials [2517-2539]
    d. OCSO Taser Task Force Report [2540-2580]
    e. Windermere PD Response to Resistance report [2589-2595]
    f. Hebel completed training records [2791-2866]
    g. Internal Investigation reports [2967-3029]
    h. Inter-Local Voluntary Cooperation Mutual Aid Agmt between Apopka, Belle Isle, Eatonville, Edgewood, Kissimmee, Maitland, Oakland, Ocoee, Orlando, UCF, St. Cloud, Windermere, Winter Garden, and Winter Park dated 11/22/2016 [3030-3036]
    i. Photos of Bonner [3275-3279]
    j. Photos of Bode [3280-3285]
    k. Photos of Harris [3286-3289]
    l. Photos of Chiuchiarelli [3290-3292]
    m. Photos of inside of Celestin door [3293-3294]
    n. Photos of front of house [3295-3296]
    o. Photos of Hebel [3297-3303]

      p.  Photos of Bode and Bonner Taser guns [3304-311]

      q.  Autopsy photos [3275-3303]

      r.  Windermere Policies and Procedures [3341-3777]

47.     Ocoee Police Department Policy regarding Baker Act and Marchman Act (effective 06/07/2017) [3778-3786]

48.     Ocoee Police Department Policy regarding Conducted Electrical Weapon (CEW) Taser (revised 05/13/2013) [3787-3842]

49.     Ocoee PD Policy regarding Firearms and Ammunition (revised 04/30/2014) [3843-3860]

50.     Ocoee PD Policy regarding Prohibition of Biased Policing (revised 2020) [3870-3872]

51.     Ocoee PD Policy regarding Restraint Devices (effective 11/10/2017) [3873-3876]

52.     Ocoee PD Policy regarding Training (effective 07/17/2015) [3877-3889]

53.     Ocoee PD Policy regarding Use of Force (revised 05/13/2013) [3890-3924]

54.     Audio of Iannuzzi interview of Officer Bode [3925]

55.     Audio of Iannuzzi interview of Officer Bonner [3926]

56.     Audio of Iannuzzi interview of Detective Chiuchiarelli [3927]

57.     Audio of Iannuzzi interview of Officer Harris [3928]

58.     Audio of Iannuzzi interview of Officer Hebel [3929]

59.     Audio of Iannuzzi interview of Mr. Le [3930]

60.     Audio of Iannuzzi interview of Mr. Molina [3931]

61.     Audio of Iannuzzi interview of Mr. Rohleder [3932]

62.     Ocoee PD Professional Standards Employee Incident Report form [5716-5717]

63.     Ocoee Offense Report w attachments [5718-5772]

64.     Officer Josh Bode Internal Affairs paperwork re: 2021PS-081 [3933-3965], which includes transcripts of his 04/19/19 interview by S.A. Wiles and 03/22/21 interview by Lt. Iannuzzi

65.     Officer Josh Bode Personnel File from Ocoee Police station [3966-4293]

66.     Officer Josh Bode Discipline file from Ocoee Police station [4319-4324]

67.     Officer Josh Bode Training file from Ocoee Police station [4325-4404]

68.     Officer Chris Bonner Internal Affairs paperwork (2021PS-081) [4405-4429], which includes transcripts of his 04/19/19 interview by S.A. Wiles and 03/25/21 interview by Lt. Iannuzzi

69.     Officer Chris Bonner Personnel File from Ocoee Police station [4430-4697]

70.     Officer Chris Bonner Discipline file from Ocoee Police station [4728-4734]

71.     Officer Chris Bonner Training file from Ocoee Police station [4735-4901]

72.     Officer Chris Bonner Use of Force report re: 02/19/2019 Maldonado incident [4902-4907]

73.     Officer Brian Harris Internal Affairs Paperwork (2021PS-081) [4908-4941], which includes transcripts of his 04/19/19 interview by S.A. Wiles and 03/18/21 interview by Lt. Iannuzzi

74.     Officer Brian Harris Personnel File from Ocoee Police station [4942-5070]

75.     Officer Brian Harris Training File from Ocoee Police station [5071-5193]

76.     Officer Griffin Hebel Internal Affairs paperwork (2021PS-081) [5194-5213], which includes transcripts of his 04/12/19 interview by S.A. Wiles and 03/15/21 interview by Lt. Iannuzzi

77.     Blue Team Use of Force Report (for Celestin incident) [5291-5298]

78.     Criminal Justice Standards and Training Commission) forms for Officer Bode, Officer Bonner, and Detective Chiuchiarelli [5483-5485]

79.     Ocoee PD Internal Affairs Incident Disposition Form (2021PS-081) [5486]

80.     Ocoee PD Internal Affairs Disposition Memo to Chief Plasencia [5487-5488]

81.     Ocoee PD Internal Affairs Investigative Report (2021PS-081) [5489-5509]

82.     Ocoee PD reports regarding Use of Hobble Restraints [5510-5667]

83.     Transcript of Det. Chiuchiarelli's 04/19/2019 interview by S.A. Wiles [6045-6053]

84.     Transcript of Officer Gerena's 04/12/2019 interview by S.A. Hubbard [6054-6060]

85. Ocoee PD Internal Affairs paperwork re Chris Le's statement [5668-5683]

86. Transcript of Mr. Le interview by Iannuzzi 03/16/2021 [6108-6112]

87. Transcript of Mr. Le interview by Watts 04/12/2019 [6113-6121]

88. Ocoee PD Internal Affairs paperwork re Molina's statement [5684-5695]

89. Transcript of Mr. Molina interview by Iannuzzi 03/17/2021 [6122-6126]

90. Transcript of Mr. Molina interview by Watts 04/12/2019 [6127-6134]

91. Transcript of Capt. Ogletree interview by Wiles 04/12/2019 [6135-6139]

92. Ocoee PD Internal Affairs paperwork re Peter Rohleder's statement [5696-5715]

93. Transcript of Mr. Rohleder interview by Hubbard 04/15/2019 [6140-6150]

94. Transcript of Mr. Rohleder interview by Iannuzzi 03/12/2019 [6151-6155]

95. Transcript of Rose Celestin interview by Wiles 04/12/2019 [6156-6196]

96. Transcript of Temples interview by Hubbard 04/12/2019 [6197-6202]

97. Det. Chiuchiarelli's Personnel file from Ocoee PD station [6218-6466]

98. Det. Chiuchiarelli's Discipline file from Ocoee PD station [6467-6475]

99. Det. Chiuchiarelli's Training file from Ocoee PD station [6476-6653]

100. Det. Chiuchiarelli's IA Interview paperwork from Ocoee PD station (2021PS-081) [6654-6677], which includes transcripts of his 03/22/2021 interview by Lt. Iannuzzi and 04/19/2019 interview by S. A. Wiles

101. Ocoee Personnel Rule 15.03 rev 2011 (re disciplinary offenses) [7047-7050]

102. Ocoee General Order 11.1 re conduct effective 11 02 2017 [7051-7070]

103. Taser x26 user Training slides effective Jan. 15, 2018 [8745-8905]

104. Taser 7 user and transition Training slides effective Jan. 14, 2019 (and current as of 01/06/2022) [8906-9065]

105. Body cam video showing the beginning of CPR (18:07 in length) [PL000958]

106. Body cam video of CPR (14:03 in length) [PL000959]

107.   Body cam video of officers assisting getting Celestin on backboard [PL000960]

108.   Body cam video of officers standing around rear of ambulance [PL00960]

109.   Jean Celestin medical records from Health Central Hospital

110.   Plaintiff's Expert Disclosures, including Masten and Baden reports

111.   Lieutenant Jack Davidson depo transcripts and exhibits (2 volumes),

112.   Lieutenant Mireya Iannuzzi depo transcript and exhibits,

113.   Captain Scott Nylander depo transcripts and exhibits (2 volumes); and

114.   Chief Saima Plasencia depo transcript.

# APPENDIX  B

## COMPENSATION

### Celestin v City of Ocoee, et al.

**Compensation**

The charges applicable to my expert fees charged in this case are as follows:

Document Review and Report Preparation: Flat fee of $7500 (received).

Deposition: $2000.00 per day or any portion thereof, if at my location (Las Vegas metro area) and pre-paid, plus travel, lodging, and per diem; $3000.00 outside the Las Vegas metro area, or not pre-paid, plus travel, lodging, and per diem.

 ZOOM or similar format0 depositions: $2000.00 per day.

On-site visits: $3000.00 per day, plus travel, lodging, and per diem.

Trial testimony: $2000.00 per day, or any portion thereof, in the Las Vegas metro area.
 $3000.00 per day, or any portion thereof, outside the Las Vegas area, plus travel, lodging, and per diem.

**APPENDIX  C**

**CURRICULUM VITAE**

See separate document.

# APPENDIX  D

## TESTIMONY

| 2018 | Deposition | Trial |
|------|:----------:|:-----:|
| James Neuroth v. Mendocino County, et al. United States District Court Northern District of California No. 3:15-cv-03226-RS Defense: Training; In-custody death; Policy & Procedures. | X | |
| Morgan Emmett v. Shannon Armstrong, et al. United States District Court for the District of Wyoming No. 14-CV-1012-J' Plaintiff: Training; Use of Force; Policy & Procedures; Supervision | X | |
| Dustin Burnikel v. Michael Fong, et al. United States District Court in and for The Southern District of Iowa No. 4:15-cv-00050 Defense: Use of Force; Policy & Procedures; Discipline | X | X |
| Edward Nash, Plenary Guardian of the Estate of Irene Nash v. Cook County, et al. Circuit Court of Cook County, Illinois No. 14 L 4174 Plaintiff: Correctional policy and procedure. | X | |
| State of Nebraska v. Scotty L. Payne District Court of Douglas County, NE No. CR-18-60 Defense: Use of Force; Policy & Procedures; Training; TASER® warnings. | | X |
| Anthony T. Brown, et al. v. City of Alexandria, et al. United States District Court, Western District Of Louisiana, Alexandria Division No. 1:17-cv-00798 Plaintiff: Use of Force; Training; Policy & | X | |

Procedures; Internal Investigation.

| | Deposition | Trial |
|---|---|---|
| State of Nevada v.<br>Valdez and Navarette<br>No. C-18-333098-1/2<br>District Court, Clark County, NV<br>Defense: Correctional Use of<br>Force; Policy | | X |

**2019**

| | Deposition | Trial |
|---|---|---|
| Louisiana Cleaning Systems, Inc., et al.<br>v. The City of Shreveport, et al.<br>United States District Court, Western<br>District of Louisiana<br>No: 16-cv-00014<br>Plaintiff: Policy, Procedure, Rules;<br>Internal Investigation; Discipline;<br>Training. | X | |
| Joseph A. Nelson, individually and as<br>Personal Representative of the Estate of<br>Joel A. Nelson v. Thurston County, et al.<br>United States District Court, Western District<br>Of Washington at Tacoma<br>No. 3:18-cv-05184-RBL<br>Plaintiff: Policy, Procedure, Rules;<br>Internal Investigation; Training; Use<br>of Force. | X | |
| Charlene Klein v. Officer Stephen Madison, et al.<br>United States District Court, Eastern District<br>of Pennsylvania<br>No. 17-04507<br>Plaintiff: Policy, Procedure, Rules; Internal<br>Investigation; Use of Force; Supervision. | | X |
| Harvey Garber, M.D. v. City of Boynton Beach,<br>et al.<br>United States District Court Southern District<br>Of Florida<br>No.18-CV-80576<br>Defense: Policy, Procedure, Rules; Use of Force;<br>Internal Investigation; Supervision | X | |

| | Deposition | Trial |
|---|---|---|
| Gulstan E. Silva, Jr. and Jessica Y. Haleck v. City and County of Honolulu, et al. United States District Court, District of Hawaii No. CV15-00436 HG/BMK Defense: Policy, Procedure, Rules; Use of Force; Internal Investigation; Electronic Control Weapon; OC Spray; Defensive Tactics; Restraints | | X |
| McCabe Harrison v. United States of America United States District Court for the Northern District of West Virginia No.: 1:18-cv-00129-IMK Plaintiff: In-custody Death; Training; Policies; Restraints. | X | |

| **2020** | **Deposition** | **Trial** |
|---|---|---|
| State of Nevada v. Griffith Evidentiary Hearing District Court Defendant: Choke hold | | X |
| Timothy Solloway, et al v. State of Louisiana, et al. State of Louisiana, Parish of Ouachita, 4th District Court No. 16-2128 Plaintiff: Policy, Procedure, Rules; Internal Investigation; Use of Force; Supervision | X | |
| Davon Johnson v. Las Vegas Metropolitan Police Dept., et al. United States District Court, District of Nevada No. 2:19-cv-01817-JCM-NJK Defense: Policy, Procedure, Rules; Training; Arrest; Use of Force | X | |
| Susan Doxtator, et al. v. Erik O'Brien, et al. United States District Court Eastern District of Wisconsin No. 1:19-cv-137-WCG Defense: Use of force; OC | X | |

Use; policy & procedures;
Training.

Margaret Agwomoh vs. Village        X
Of Dolton, et al.
Circuit Court of Cook County, IL
No. 18 L 2677
Plaintiff: Use of Force; Training

Odell Edwards vs. Roy Oliver, et al.     X
United States District Court for the
Northern District of Texas Dallas Division
No. 3:17-CV-1208
Plaintiff: Policy and procedures; Use of
Force; Internal Investigation

**2021**

Donald Hawkins vs. City of Prichard, et al.   X
Unites States District Court Southern
District of Alabama—Mobile Division
No. 1:19-cv-00992
Plaintiff: Use of Force; Training; Internal
Investigation.

Bobbie Allen Woods v. City of Hayward, et al.   X
United States District Court
Northern District of California
No. 19-cv-01350-JCS
Plaintiff:  Detention; Training; ADA.

Richard Lucibella v. Officer Richard Ermeri, et al.   X
United States District Court
Southern District of Florida
No. 9:20-cv-82156-AMC
Defense:  Training; Internal Affairs Investigation;
Arrest; Defensive Tactics

United States District Court                          X
For the District of Hawaii
No.: 19-00116 LEK-WRP
Defense: Sexual assault; Supervision; Policy;
Training; Internal Affairs Investigation.

Victor Perez vs. State of Nevada, et al.     X
U.S. District Court, District of Nevada

No. 2:15-cv-01572-APG-DJA
Defense: Deadly force; training;
Policy; competency-based testing.