UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

---

|  | : |  |
| --- | --- | --- |
| Rose Marie Celestin, | : | Case No. 6:21-cv-896-RBD-EJK |
| Plaintiff, | : | |
| vs. | : | |
| City of Ocoee, *et al.*, | : | Report of Kenneth R. Wallentine |
| Defendants. | : | |

---

The following report of Kenneth R. Wallentine is submitted after reviewing the following documents, pleadings, records, and reports:

Plaintiff's Complaint

Griffin Hebel's Answer

Town of Windemere's Answer

Protective Order

Windemere Police Department policy manual

Photographs of incident scene

Autopsy records and photographs

911 call audio recording

State Attorney Report

CAD log

Axon body worn camera video recordings of Griffin Hebel, Christopher Bonner, Joshua Bode, Jerrell Ogletree, and Dominic Chiuchiarelli

Audio recordings of interviews of Christopher Le, Javier Molina, Peter Rohleder, Israel Gerena, Justin Temples, Griffin Hebel, Brian Harris, Rose Marie Celestin, Christopher Bonner, Joshua Bode, and Dominic Chiuchiarelli

Video recordings of interviews of Christopher Bonner, Joshua Bode, and Dominic Chiuchiarelli

Florida Department of Law Enforcement investigative report OR-27-0343, with attachments

Ocoee Police Department use of force report

TASER pulse logs for Christopher Bonner, Joshua Bode, and Dominic Chiuchiarelli

Windemere Police Department training and personnel records for Griffin Hebel

Ocoee Police Department training and personnel records for Joshua Bode

Windemere Police Department miscellaneous lesson plans and training curriculum

Deposition transcripts, with exhibits, of Town of Windemere 30(b)(6) designees, Griffin Hebel, Joanne Grace, Brian Harris, Rose Marie Celestin, Christopher Bonner, Joshua Bode, and Dominic Chiuchiarelli

Ocoee Fire Department incident report

Health Central Hospital records for Jean Celestin


Kenneth R. Wallentine states as follows:

I.      In the instant matter I have relied upon the documents, pleadings, records, reports, and statements previously described.  I have formed a number of opinions based upon the aforementioned, as well as my experience, education, and familiarity with professional standards, practices, and publications.  My opinions, and a summary of the circumstances known or reported to me upon which those opinions are based, are set forth herein as follows.

**Abbreviated summary of reported events:**

On April 11, 2019, at 2327, Joanne Grace called the Ocoee Police Department and reported that she had just been punched in the eye by her brother, Jean Celestin ("Celestin"). Grace also told the dispatcher that her mother, Rose Marie Celestin, had also been punched and that she needed medical attention.[1] Grace told the dispatcher that she and Rose Marie Celestin fled from the home and were waiting in a car down the street. As much as two weeks prior, Rose Marie Celestin noted that Celestin was becoming delusional, telling her that she was not his mother and that the water in the home was infested and was killing him. He was also eating food that he would not normally eat. Grace also told the dispatcher that Celestin had been previously involuntarily committed for mental evaluations and that he was not currently taking any psychotropic medications. The dispatcher assigned officers to handle a "22" disturbance, signaling a report of domestic violence.

Ocoee Police Department Officers Joshua Bode, Christopher Bonner, and Dominic Chiuchiarelli were assigned to respond to the call at 322 Calliope Street in Ocoee, Florida. Officer Bode spoke with Grace and Rose Marie Celestin. Grace identified herself and Rose Marie Celestin as physicians and she stated that Celestin had hit both of them in the face. Grace and Rose Marie Celestin expressed their concern for an elderly aunt who was left behind, locked in her room, in the home with Celestin. They told Officer Bode that Celestin was bipolar and schizophrenic and that he was not taking medication.

Grace had her two children in the car. The children had witnessed Celestin assault Rose Marie Celestin. Grace told the officers that she could deal with the officers later and she went to her home. Officer Bode helped Rose Marie Celestin into his patrol car and he drove the short distance to the Celestin residence.

---

[1] Grace made the detailed report on her second call. The police dispatcher registered a brief initial call as a "911 hang-up" after the initial call was disconnected.

Rose-Marie Celestin stated Celestin suffered from schizophrenia and was bi-polar. She said that Celestin's medication had been recently changed and he appeared to be more aggressive and exhibited more signs of physical aggression over the past week. Officer Bonner arrived and Officer Bode briefed him on what he had learned.

Officer Bode, Officer Bonner, and Rose Marie Celestin approached the front door of the residence, knocked, and announced their presence. The officers saw Celestin peek through a window on the left side of the door. Officer Bode noticed that Celestin was holding something in his hand and Officer Bode immediately backed away.

Officer Bode knocked on the front door and announced, "Ocoee Police Department. Jean, could you come out here and talk to us about what occurred this evening?" Celestin questioned the officers about whether they were real police officers and asked to see their law enforcement certificates. Officer Bonner pointed out that the officers were wearing Ocoee Police Department uniforms and badges. Celestin became increasingly more agitated and louder and Officer Bode radioed for additional officers to come and assist.

Officer Bode could not see all of Celestin's body because Celestin was partially hidden behind the door frame. Officer Bode saw what he believed to be a television remote in one of Celestin's hands. He said, "he has something in his hand." The officers tried to persuade Celestin to come out of the house, but he refused and shut the door.

Celestin then opened the door again, but refused to come out. Officer Bonner pushed the door more fully open and moved to Celestin's left side, intending to restrain him. Officer Bonner told Celestin to "get back." Celestin began to struggle against Officer Bonner, pushing against him. Officer Bode then drew his TASER. As Celestin turned and the right side of his body became visible Officer Bode saw that he was holding a knife with a blade that he perceived to be approximately ten inches long.

Seeing the knife, Officer Bode fired his TASER into Celestin's center chest area. Officer Bode saw that the TASER had no neuromuscular incapacitating effect as Celestin swiped the

TASER probes from his chest. Celestin then advanced toward Officer Bode, pushing Officer Bode backward and causing him to drop his TASER.

As Celestin ran past the officers Officer Bonner fired his TASER into Celestin's back, achieving temporary neuromuscular incapacitation and causing Celestin to fall to the ground. Celestin quickly sat up and moved toward a pillar on the front porch. Officer Bode drew his firearm and gave commands to Celestin to get down on his stomach. Officer Bode was unaware whether Celestin still had the knife on his person or within his reach. Officer Bonner saw what he described as a "six or seven-inch steak knife" near Celestin after he fell to the ground. Celestin stated "okay, okay," however, he did not comply with the officers' directions and he began to reach into his right pants pocket. Officer Bonner told him to stop or he would fire the TASER again.

Officer Chiuchiarelli arrived at the scene. He approached Celestin to place him in a prone position for handcuffing. Celestin pushed Officer Chiuchiarelli away, causing his body worn camera to fall off. Celestin stood up and sprinted past Officer Bode. The officers initially did not know whether Celestin was holding the knife as he ran from them. Celestin ran down the driveway and across the street. Just then, Windermere Police Department Officer Griffin Hebel arrived.

Officer Hebel had responded to a call for emergency backup from the Ocoee police officers. Officer Hebel heard a radio transmission from an Ocoee Police officer, "challenging one." Officer Hebel understood that to mean the officer was holding a subject at gunpoint. Officer Hebel arrived, got out of his patrol car, and began walking towards the residence. Officer Hebel saw Celestin fleeing on foot from the residence and he heard the sound of a TASER being deployed. Officer Hebel observed three officers chasing Celestin. Officer Hebel ran toward Celestin. Officer Hebel tackled Celestin to the grass to thwart his escape. Officer Hebel injured his knees as he struck the ground. Officer Hebel tried to physically control Celestin's left arm.

As Celestin was on his stomach, Officers Bode, Bonner, Chiuchiarelli, and Hebel tried to secure him in handcuffs.

Officer Hebel gripped Celestin's left arm in an effort to present it for handcuffing. Officer Bode was successful in getting one handcuff on Celestin's left wrist. However, Celestin was able to pull his right arm away. Celestin's large body mass complicated handcuffing. Officer Brian Harris arrived from a nearby off-duty assignment. He held Celestin's left knee to the ground as the others attempted handcuffing. During the struggle Officer Chiuchiarelli deployed his TASER device in drive stun mode, though it seemed to have no effect. After a few seconds, Officer Bode was able to get the other handcuff on Celestin. Celestin continued to kick his legs. Officer Hebel stated that he had a hobble in his car.[2] He retrieved it and placed it on Celestin's ankles. The officers then stepped away from Celestin, who was then lying prone.

After a few seconds, Officer Harris asked whether Celestin was alright. Officer Harris commented that this might be a case of "excited delirium." Officer Chiuchiarelli noted that Celestin appeared to be unconscious and have water or spit bubbles coming from his mouth. They checked for a pulse and did not find one.

The officers began to administer cardiopulmonary resuscitation. Officer Bonner retrieved an Automated External Defibrillator from his vehicle and he and Officer Chiuchiarelli applied it to Celestin. Just 14 seconds after broadcasting that the "subject is secured," the officers called for emergency medical personnel. Medics responded and provided medical assistance to Celestine. Celestin was taken to Health Central Hospital and later pronounced dead.

---

[2] Officer Hebel was referring to a hobble restraint device. Hobble restraint devices usually consist of a webbed, lightweight strap, one inch wide and approximately 42-52 inches long. The hobble restraint device also includes a self-locking latching clip at the end of the strap.

**Discussion and opinions:**

a. **Officer Hebel's physical force to capture and detain Celestin was consistent with generally accepted police training and practices.**

1. Officer Hebel was on duty in Windermere, a town neighboring the city of Ocoee. The Ocoee Police Department and the Windermere Police Department both share a police radio channel on the dispatch center operated by the Winter Garden Police Department. Thus, when a call for service is audibly dispatched by radio,[3] it is possible for Ocoee Police Department officers and Windermere Police Department officers to hear calls assigned in their respective jurisdictions and in the neighboring jurisdiction.

2. Officer Hebel heard the call for emergency backup from the Ocoee police officers at 322 Calliope Street in Ocoee.[4] Officer Hebel heard a radio transmission from an Ocoee Police officer, "challenging one." Officer Hebel understood that to mean the officer was holding a subject at gunpoint and perceived that there was a strong measure of urgency in the request for backup. Just as Officer Hebel arrived and began walking towards the residence and the Ocoee Police Department officers, Celestin pushed past Officers Bode and Bonner and fled on foot from the front porch of the residence. Officer Hebel heard the sound of a TASER being

_____

[3] An officer's assignment to a call for service may also be accomplished by text message via an in-car mobile data terminal, text message, or cellular telephone call.

[4] Officer Hebel did not read any of the call notes, or text messages for the Ocoee Police Department officers transmitted to the in-car mobile data terminals.

deployed.[5]  Officer Hebel saw Officers Bode, Chiuchiarelli, and Bonner chase

Celestin.

3.	The TASER electronic control device is designed to override the person's central

nervous system and incapacitate the person's neuromuscular control.  If both

probes make successful contact with a person, closing the electrical circuit, the

device delivers a small electric current through the wires into the person leading to

temporary neuromuscular incapacitation.  The TASER device derives its name

from the acronym for "Thomas A. Swift's Electric Rifle," a fictional device

featured in the 1911 serial novel, *Tom Swift and His Electric Rifle, or Daring*

*Adventures in Elephant Land*, starring science fiction protagonist Tom Swift.

Tom Swift's mythical electric rifle could fire bolts of electricity which would pass

harmlessly through wood, steel, water, and other barriers, to incapacitate a target

such as the rogue killer whale attacking the steamship *Soudalar* "with the speed of

an express train" in Chapter 9.

4.	Like Tom Swift's fictional invention, many misconceptions and myths surround

the TASER device and its capabilities.  Misstatements and generalizations in

---

[5]  Many of the documents and depositions refer to the "sound" of a TASER (also referred to as an electronic control device or ECD, and a conducted energy weapon or CEW) without further description and without acknowledging that there are diverse, distinct sounds emitted from a TASER device in operation.  Nor do the documents account for the proximity of the TASER device to the device recording the sound, the relative quality of the device microphone, or any audio interference.  When discharged from a distance, the TASER uses compressed nitrogen gas to propel two probes which are attached to the TASER by extremely thin wires. They are only 127 microns (millionths of a meter) or approximately 0.005 inches in diameter, thinner than some human hair.  The probe wires have a tensile strength of one and one-half to two pounds, meaning that very little force is needed to break them.

A clearly audible, even loud, rapid clicking sound generally indicates that the circuit is incomplete and that no energy is being continuously delivered to the subject.  *See* M. Kroll, *Significance of Sound During CEW Application*, Technical Report, pp. 1-3, 2013.  For example, the TASER X26 device hums quietly (51 decibels (dBA) at one meter) when it is making a completed circuit with a good connection capable of delivering an electrical charge.  The TASER X26 is significantly louder when it is *not* completing a circuit (79 dBA at one meter) – when it is arcing in the air across the electrodes.  It is often described as a "crackling" sound as opposed to a "clicking" or "humming" sound when connected with an intact completed circuit.

media reports and anecdotes have spawned a common myth that a subject briefly touched by a TASER will instantly collapse into extended unconsciousness and/or flaccid physical incapacitation.  In many popular movies, particularly films featuring Bruce Willis, TASER-like conducted energy weapons are fired at subjects who are instantly rendered unconscious for extended periods of time.  For example, in the movie *RED,*[6] Bruce Willis's character deploys a single-cartridge conducted energy weapon into three persons (each likely wearing concealed body armor) in the back seat.  The probes in the movie scene do not separate as would be essential to achieve temporary neuromuscular incapacitation.  As the two Secret Service agents and the Vice President are struck they immediately become fully unconscious and remain so until they are apparently removed from the car and leaned against a wall.  The film's fictional scene showing instant unconsciousness from the touch of a conducted energy weapon was completely ungrounded in fact.  The effects shown on the three men in the back of the limousine and struck by Willis's device are completely scientifically, medically, bioelectrically, and operationally impossible.  The scene is factually ridiculous (but it made for great escapist entertainment and the film was followed by a sequel).  In the sequel, *RED 2,*[7] the assassin played by Helen Mirren briefly touched Anthony Hopkins with a handheld stun gun and Hopkins immediately became comatose and fell backward in an unconscious state.  In many of Bruce Willis's thematically similar films, conducted energy weapons are shown to be capable of producing instant unconsciousness with even a brief touch.[8]  In each

---

[6]  *RED* (Retired Extremely Dangerous), 2010, Di Bonaventura Pictures.

[7]  *RED 2*, 2013, Di Bonaventura Pictures.

[8]  *Die Hard 2*, 1990, Gordon Company; *Striking Distance, 1993*, Columbia Pictures. Willis is not alone in his use of conducted energy weapons with mythical powers.  Tom Cruise, Dwayne "The Rock" Johnson, Jason Statham, and others favor such fictional devices.  Numerous other action films feature heroes and villains using conducted energy weapons to produce instant incapacitation with a single touch, such as *The Girl with the Dragon Tattoo*, 2011, Columbia

case, the actor's fictional response is without any basis in reality. A relatively small segment of the public has ever actually witnessed a conducted energy weapon deployment. Far fewer have experienced the effects. Nonetheless, major motion pictures such as these, coupled with inaccurate media reports, lead many to believe that devices like a TASER are universally successful in bringing a subject into submission by instantly rendering the subject unconscious and unable to persist in violent response. That belief is plainly mythical; it is just fictional nonsense. Officers quickly learn through training and experience that the myth doesn't begin to approach the reality that they encounter in daily police work.

5. Beyond a false belief that a TASER deployment will always knock a resisting subject to the ground and quickly end any struggle, a companion myth suggests that use of a TASER device is more likely to cause injury than options such as an impact weapon, pepper spray, physical struggle, or any other method of subdual. In fact, the exact opposite is true. Several peer-reviewed research studies conclude that deployment of a conducted energy weapon results in fewer injuries than when other force options are used to subdue a person. For example, a broad retrospective study of 60,000 police uses of force in the United Kingdom concluded that: "The injuries sustained by both subjects and Police Officers associated with TASER® use were compared and it was found that fewer injuries, as a proportion of use, were associated with TASER® than Police Dogs, baton or irritant spray or physical confrontation. The data examined 948 discharges of TASER® and recorded 159 attendances at the Emergency Department as a result. Only three hospital admissions were identified."[9] The paper concludes that the

---

Pictures; *Jack Reacher*, 2012, Paramount Pictures; *Peppermint*, 2018, STX Entertainment; *Fast & Furious Presents: Hobbs & Shaw*, 2019, Universal Pictures.

[9] Stevenson, R., & Drummond-Smith, I. (2020). *Medical implications of Conducted Energy Devices in law enforcement*. Journal of Forensic and Legal Medicine, 101948. *See also,* Bozeman, Wm.P., Stopyra, J.P., Klinger, D.A., *et al. Injuries associated with police use of force*. J. Trauma & Acute Care Surgery 84, no. 3 (2018): 466-472. The use of a TASER device is

use of conducted energy weapons by police may be associated with injury, however, the overwhelming majority of such are classified as "minor." In addition to being taught that deployment of a conducted energy weapon carries the lowest risk of injury among the range of less-lethal force options, officers are taught that a conducted energy weapon is the only less-lethal option that has the potential for temporary incapacitation of a subject.

6.     Related to the false assertion that use of conducted energy weapons are more likely to result in injuries is the discredited myth that deployment in probe mode is likely to result in ventricular fibrillation. Officers are taught that ventricular fibrillation resulting from a probe mode deployment is "theoretically possible, but it is highly unlikely" and that substantial medical research counters this myth.[10] Officers learn in training that the incidence of a death associated with a conducted energy weapon deployment is exceedingly rare–approximately one death in 9,753,000 police/subject encounters. In other words, one is nearly ten times more likely to die by visiting a national park (1 per 1,000,000 visitors) than in a death associated with police deployment of a conducted energy weapon.[11]

---

believed by many medical experts to be preferable to the more traditional physical wrestling and grappling for control, since fighting and heavy physical exertion with repeated flexion and extension of the large muscle groups have a more deleterious effect on a patient's acid-base status by way of increased lactic acid production. Ho J.D., Dawes D.M., Nelson R.S., *et al. Acidosis and catecholamine evaluation following simulated law enforcement Use of force Encounters*. Acad. Emerg. Med. 2010, 12:E60-E6; Ho J.D., Dawes D.M., Cole J.B., *et al. Lactate and pH evaluation in exhausted humans with prolonged TASER® X26 exposure or continued exertion*. Forensic Sci. Int. 2009190:80-6; 43; Ho J.D., Dawes D.M., Bultman L.L., *et al. Prolonged TASER® use on exhausted humans does not worsen markers of acidosis*. Am. J. Emerg. Med. 2009; 27:413-8.

[10]  *See, e.g.*, Childers, R., Chan, T., Vilke, G. *TASER Conducted Electrical Weapons*. (Chapter Eight, pp. 279-312), *Clinical Forensic Medicine, A Physician's Guide*. Stark, Margaret M. (Ed.) (2020); Vilke, G., Chan, T., Bozeman, W. P., & Childers, R. *Emergency department evaluation after conducted energy weapon use: review of the literature for the clinician*. J. Emer. Med. 57(5), 740-746 (2019).

[11]  National Park Service Mortality Dashboard Key Statistics CY2014 - CY2016. https://www.nps.gov/orgs/1336/upload/CY14-CY16-Mortality-Dashboard-Key-Statistics.pdf Accessed May 19, 2022; Harrell, E. & Davis E., *Contacts Between Police and the Public, 2018 - Statistical Tables*. U.S. Dep't of Justice, Bureau of Justice Statistics Special Report NCJ 255730,

7.    Knowing only that the Ocoee Police Department officers had been sent to "some sort of domestic disturbance," and that the situation was so tense and dynamic that the officers were holding a subject at gunpoint, Officer Hebel ran toward Celestin to capture him. Officer Hebel tackled Celestin as he told Celestin to "get on the ground." Other officers shouted, "get down, get down!" Though they landed on the grass, Officer Hebel struck the pavement hard with both knees, injuring both of his knees.[12]

8.    A reasonable and well-trained officer would have attempted to capture Celestin and place him on the ground. Tackling Celestin as he ran was a proper option to capture him. Officers are taught that prone control generally facilitates maximum control for resistive subjects. Prone control is nearly always superior to standing control techniques for safety of the officers and subject. Officers are taught to shorten the duration of any physical struggle when reasonably possible. One of the purposes of rapidly controlling a subject is to minimize the effects of exertion on the subject. When officers quickly control a subject through prone control, it is often less likely that a more significant physical confrontation will ensue, thus making it less likely that officers will need to use additional and greater force.

9.    Even when a takedown technique is successful in taking the subject to the ground, the subject's movements and degree of resistance can significantly complicate the physical mechanics of the movements. Celestin physically resisted the officers' efforts to control his movements and get his arms into a position for handcuffing. Officers told Celestin to "stop resisting" numerous times and commanded him to "put your hands behind your back, Stop fighting!," and "Stop kicking!"

---

2020:1-14, December 2020.

[12] Officer Hebel had a prior injury to one of his knees. As he sat on the grass and assessed his injuries, he told one of the other officers that he had torn his anterior cruciate ligament the year prior. Officer Hebel was transported to the hospital for treatment of his knee injuries.

10.    One of the most fundamental practices taught to police officers is that arrested subjects should be handcuffed in nearly all circumstances.  Handcuffing a subject under arrest is something that officers are commonly taught as a reasonable safety precaution.  Officers are taught that handcuffing prior to any transport to jail is an essential practice.  Handcuffing may prevent the necessity of using force on the arrested subject and handcuffing helps protect the arrestee from self-harm.  A docile and cooperative arrestee may become aggressive, violent, or attempt self-harm when he or she recognizes that the arrest will lead to incarceration.

11.    Officer Hebel gripped Celestin's left arm in an effort to present it for handcuffing.  Officer Hebel perceived that Celestin was "displaying abnormal strength despite multiple officers trying to restrain him."  Officer Hebel had been trained in a five-point control method.  This is a common arrest control technique taught to officers across the nation.  It is used to control a resisting subject on the ground and to secure the subject's arms in handcuffs and, if necessary, to secure the subject's feet and legs in a hobble device, WRAP™, or similar restraint.  Officer Hebel was positioned at Celestin's upper left torso, which meant that he was responsible for controlling Celestin's left arm and hand.  Officer Hebel reported that another officer (Officer Chiuchiarelli) was trying to control Celestin's right arm, another officer was kneeling over Celestin's legs, and another officer (Officer Bode) was controlling Celestin's head, all actions consistent with a five-point control method.[13]

12.    Officer Bode was successful in getting one handcuff on Celestin's left wrist.  Celestin pulled his right arm away.  Officer Chiucharelli applied TASER drive

---

[13]  Other reports, video, and interviews suggest that it was initially Officer Chiuchiarelli trying to control Celestin's right arm, and Officer Bode initially controlling Celestin's head from a position kneeling over Celestin's legs.  Officer Bonner held a metal baton across Celestin's shoulders to keep him from raising up.  The officers shifted positions during the struggle and subsequent administration of cardiopulmonary resuscitation.

stuns to Celestin's torso.[14]  After a few seconds of struggling, and with other officers helping to control Celestin's arms and legs, Officer Bode was able to get the other handcuff on Celestin.  Nonetheless, Celestin still struggled against efforts to control him.

13.     Celestin continued to kick.  Officer Hebel told the other officers that he had a hobble in his car.  He retrieved it and placed it on Celestin's ankles, tightened the strap around the ankles, and affixed the strap to the handcuffs on Celestin's wrists. Connecting the strap to the handcuffs placed Celestin's knees at a bend of approximately 90 degrees, in a position proper hobble restraint position.

14.     Officer Hebel had completed training to apply the hobble restraint just one month prior.  He was taught how and when to apply the hobble restraint.  As part of the training, another officer placed the hobble restraint on Officer Hebel.  Officer Hebel had been taught that application of a hobble restraint was appropriate for controlling continued violent resistance and to limit a subject's ability to run away.  Officer Hebel concluded that applying the hobble restraint to Celestin was appropriate "based on all of his physical resistance and his continued kicking." Though Celestin had been handcuffed, and even though there were several officers present, the officers could reasonably believe that he might rise up and run again, just as he had done on the front porch.

15.     Police officers are taught that proper application of a single hobble restraint and attaching the strap of the restraint to handcuffs to achieve a proper hobble restraint position is *not* hog-tying.  Hog-tying, as stated in Officer Harris's testimony, is "when you bring the ankles as close to the hands as you can and you're cinching or tightening the straps so that the ankle comes up to the hands.  But hobble is just

---

[14]  Officer Chiuchiarelli had also fired two TASER cartridges at Celestin as Celestin shoved him and ran past him, though he was not aware whether the probes struck and stayed in Celestin.

using the strap around the ankle to prevent further movement. You're not bringing the ankles too close to the hands as can you." Some not familiar with the distinction between a modern hobble restraint and a hog-tie may recklessly conflate the two. Officer Harris's definition is consistent with the oft-cited definition used by the Court of Appeals for the Tenth Circuit: "we understand such to involve the binding of the ankles to the wrists, behind the back, with 12 inches or less of separation."[15] Chief David Ogden provided defensive tactics training for the Windermere Police Department and a number of other central Florida agencies. In addition to being the Windermere Chief of Police, Chief Ogden is known as an expert in arrest control and defensive tactics training and practice. Chief Ogden trained Officer Hebel and other officers in the distinction between hog-tying –cinching tied ankles tightly to wrist restraints, creating an arched back and creating undue stress– and a proper hobble restraint position in which the knees are bent to a maximum angle of 90 degrees. (See illustration below)



16.     Officer Bonner testified that the use of the hobble restraint was reasonable in this situation because Celestin "was still a threat, he was still going to run if we didn't keep him down." A reasonable and well-trained officer would have used a hobble restraint to assist in controlling Celestin. Officer Hebel's application of the

---

[15]     *Cruz v. City of Laramie*, 239 F.3d 1183, 1188 (10th Cir. 2001).

hobble restraint to Celestin was reasonable and was consistent with generally accepted police policies, practices, and training.

b. **Officer Hebel properly assisted the Ocoee Police Department officers in the call for service at Plaintiff's residence.**

1.   Officer Hebel reasonably believed that he was responding to assist Ocoee Police Department officers dealing with a tense, uncertain, and rapidly-evolving situation. When he arrived, he took reasonable action to assist in capturing and controlling Celestin. Notwithstanding, Officer Hebel was in the position of being a support officer, a back-up officer from another jurisdiction. He was not the primary responsible officer for the investigation of the reported domestic assault.

2.   Officer Hebel did not call for a Crisis Intervention Team ("CIT") certified officer before attempting to capture Celestin. Officer Hebel was not aware at that point that there might be a mental health issue with Celestin. Even so, there were CIT-certified officers from Ocoee Police Department at the scene, including Officer Bonner. A CIT-certified officer presented with the same circumstances should have responded very much like Officer Hebel did. CIT is a comprehensive police officer mental health training program initially developed in Memphis through the work of the University of Memphis and Memphis Police Department law enforcement professionals. The optimal course consists of a one-week (40 hour) intensive program complete with a field practicum involving persons with mental illness who volunteer to assist with the training experience. Calling and waiting for a CIT-certified officer when Officer Hebel first saw Celestin running from the residence and the officers, would not fit the nationally-established model for CIT. CIT nationwide best practices prescribe that CIT serves as an adjunct community response for *non-acute* circumstances. Most CIT programs are focused on facilitating pre-arrest alternatives to incarceration and diversion from emergency medical services for persons who are mentally ill and/or emotionally disturbed

and who do not present an immediate danger. CIT training also includes discussion of de-escalation techniques. Officers are commonly taught that CIT intervention is not appropriate for dynamic, volatile scenes. Officers are taught that the immediate task is to resolve the threat element before any therapeutic or CIT intervention work can be considered. Given the primary focus of providing an alternative to incarceration or emergency medical care, even then a CIT intervention may not be prescribed until the situation is controlled.

3.      Whether a CIT-certified officer is present, or an officer trained in other de-escalation techniques is at the scene, a fundamental principle of law enforcement is that de-escalation through CIT-taught techniques, or any other method requires certain precedent conditions. As taught in the CIT course, CIT response is *not* the first choice for acute volatile situations. Virtually all de-escalation training programs note that some form of control is essential before de-escalating.[16] De-escalation is simply "the result of a combination of communication, empathy, instinct, and *sound officer safety tactics*."[17] The United States Department of Justice states: "De-escalation more broadly refers to the strategic slowing down of an incident in a manner that allows officers more time, distance, space and tactical flexibility during dynamic situations on the street."[18] Discussions and

---

[16] *See, e.g.*, V. Kliem, *Four Conditions for Effective De-Escalation*, https://www.lexipol.com/resources/blog/4-conditions-for-effective-de-escalation/ May 20, 2020. Kliem defines the tactical prerequisites to de-escalation as containment, control, contact, and communication; White, M.D., Orosco, C., *Police de-escalation training project a team effort.* PoliceOne, 17 Sept. 2021, https://www.police1.com/police-training/articles/police-de-escalation-training-project-a-team-eff ort-2QgTv0oIJ2rwxbuR/ (accessed May 19, 2022) ("Officers should not compromise their safety or increase the risk of physical harm to the public when applying de-escalation techniques").

[17] D. Griffith, *De-Escalation Training: Learning to Back Off*, POLICE Magazine, Mar. 2, 2016.

[18] *Justice Department Applauds Adoption of Police Department-Wide Tactical De-escalation Training Program in Seattle*, Press Release Number: 15-462, Office of Public Affairs, U.S. Department of Justice, April 16, 2015.

prescriptions of de-escalation have largely happened outside of an evidence-based approach. There is much that we have yet to learn about what de-escalation means and best practices for de-escalation in dynamic circumstances. De-escalation does *not* mean neglecting efforts toward reasonably achievable safety in a contact with a subject.

4. CIT training emphasizes the need for safety of all persons present and control of a scene before attempting possible mental health intervention through CIT resources. Officers are taught that it is a myth that the mentally ill are uniformly harmless and docile.[19] Mental illness can be associated with aggressive or violent behavior. However, persons living with a mental illness and receiving effective treatment are generally no more violent or dangerous than the rest of the population.

5. Officer Hebel attempted to control Celestin's left arm as he was abreast of his left shoulder. In doing so, he may have applied brief transitory downward pressure on Celestin's upper left back. However, examination of the video recordings and scrutiny of the interviews confirms the State Attorney's finding that "at no time did it appear that any of the officers involved placed their body weight on any part of Celestin's body in an attempt to subdue him."

6. Holding a subject in the prone position, whether by minimal downward pressure on an arm as was the case here, or by placing a knee on the subject's back, buttocks, hips, or legs, with the officer's other leg on the ground for stability, is a commonly taught technique. Officers are taught that this control move is often successful and is generally not injurious.[20]

---

[19] *See* Van Dorn, R., Volavka, J., & Johnson, N*., Mental disorder and violence: Is there a relationship beyond substance use?* Social Psychiatry and Psychiatric Epidemiology, 47, 487-503 (2012).

[20] Dr. Mark Kroll concluded: "In prior scientific studies, weights of up to 225 lbs. have been placed on a prone subject's back without causing any clinically significant respiratory

7.    In 1995, the Department of Justice released a brief synopsis of limited information then available about the phenomenon of "positional asphyxia" associated with certain forms of prone restraint. The brief document did not purport to be peer-reviewed, nor was it supported by scientific studies cited therein. I am not a medical doctor. I am familiar with a vast body of rigorous peer-reviewed research on the topic of prone restraint, much of which has been conducted subsequent to the 1995 flier. As a member of the Board of Directors of the Institute for the Prevention of In-Custody Death, I presented at and moderated symposia at which leading researchers presented their papers and studies on prone restraint. I have had extensive personal conversations with medical professionals and reviewed the published research on this topic by the leading subject matter experts, including Dr. Steven Karch, Dr. Darrell Ross,[21] Dr. Gary Vilke,[22] Dr. Christine Hall,[23] Dr. Tom Neuman, and others. I have repeatedly reviewed and attended presentations on Dr. Hall's 2015 epidemiological study considering prone restraint mortality, in which she and her fellow researchers examined 3,250,000 police/citizen contacts

---

impairment." Kroll, Mark W. PhD, FAIMBE; Brave, Michael A. MS, JD; Kleist, Scott R.§; Ritter, Mollie B. MS, PA; Ross, Darrell L. PhD; Karch, Steven B. MD. *Applied Force During Prone Restraint: Is Officer Weight a Factor?* American Journal of Forensic Medicine and Pathology: March 2019, Volume 40, Issue 1, pp. 1-7. *See also*, Hall CA, *et al.*, *Incidence and outcome of prone positioning following police use of force in a prospective, consecutive cohort of subjects*, Journal of Forensic and Legal Medicine (2012), doi:10.1016/j.jflm.2011.12.008 ("Prone positioning is common following police-public interactions.")

[21] D. Ross, *Examining the liability issues associated with prone restraint deaths in detention*, Forensic Res. Crim. Int. J., vol. 7, no. 3, pp. 109-118, 2019; D. Ross and M. Hazlett, *A prospective analysis of the outcomes of violent prone restraint incidents in policing*, Forensic Res. Crim. Int. J., vol. 2, no. 1, p. 00040, 2016.

[22] D. Lasoff, C. Hall, W. Bozeman, T. Chan, E. Castillo, and G. Vilke, *Proning: outcomes of use of force followed with prone restraint*, J. Forensic Med., vol. 2, no. 2, pp. 1-3, 2017; C. A. Hall, A. M. McHale, A. S. Kader, L. C. Stewart, C. S. MacCarthy, and G. H. Fick, *Incidence and outcome of prone positioning following police use of force in a prospective, consecutive cohort of subjects*, J Forensic Leg. Med., vol. 19, no. 2, pp. 83-9, Feb 2012.

[23] C. Hall *et al.*, *Restraint in police use of force events: Examining sudden in-custody death for prone and not-prone positions*, Journal of Forensic and Legal Medicine, 2015.

involving 2,000 persons who were subject to prone restraint and found not a single death resulting therefrom. I was present when Dr. Darrell Ross presented his paper and responded to symposia participants' questions on his epidemiological study considering prone restraint mortality in 876,503 police/citizen contacts involving 1,085 persons who were subject to prone restraint and found not a single death resulting therefrom. In sum, a vast body of contemporary scientific research informs current police training and directly contradicts Plaintiff's expert's blithe assertion that placing "pressure upon his back as he lay prone, [is a] practice widely known by law enforcement officers to cause positional asphyxia and death."

8.     Much of the misinformation and many of the unsupported assumptions about positional asphyxia and prone restraint trace to the work of the late Dr. Donald Reay.[24]  Dr. Reay subsequently acknowledged his critics' challenges to his conclusions related to prone restraint "rested on sound methodology."  In particular, he conceded that the work of Dr. Tom Neuman and his colleagues was more reliable.[25]  Indeed, a federal district judge commented that Dr. Neuman's study "rests on exemplary methodology, [and] *eviscerates* Dr. Reay's conclusions" related to positional asphyxia and prone restraint.[26]

9.     Officer Hebel could not reasonably be expected to know about the debunking of so much commentary spawned nearly three decades ago by shoddy research and careless extrapolation of some coincidences into a certainty of causation.  Nor can any officer be charged with this depth of understanding of human physiology.

---

[24]  D. Reay, *Suspect Restraint and Sudden Death*, 65 (5) FBI Law Enf. Bull., 1996.

[25]  T. Chan, G. Vilke & T. Neuman, *Reexamination of Custody Restraint Position and Positional Asphyxia*, 19 (3) Amer. J. Forensic Med. Pathol. 201-205, 1998; G. DeLand, *The Positional Asphyxia Hypothesis, Pt. One: Fact or Fiction?*, The Sheriff, Sept. 2010, 73-74.

[26]  *Price v. County of San Diego*, 990 F.Supp. 1230, 1238 (S.D. Cal. 1998).

Officer Hebel could and should, however, know from his training relying on modern science, that use of a hobble restraint and downward pressure to control a struggling subject is both a reasonable and generally safe option to control a combative person.

10. Officer Hebel was injured in both knees during the tackle. His knees were bloody and bleeding and injured from the scuffle. He ignored the pain and injury during the struggle. As soon as he perceived that Celestin was effectively controlled, he leaned back. He recognized that there were multiple other officers to attend to Celestin. He knew that it was "their call," being in their city and having been dispatched to Officers Bode and Bonner. He did not further touch or move Celestin until a few minutes later when he was the first officer to check on Celestin and to begin CPR. Nor did any of the other officers rotate Celestin to his side.

11. When Officer Hebel heard Officer Harris ask whether Celestin was breathing, Officer Hebel turned from resting and checking his injuries and checked Celestin for a pulse. Finding none, Officer Hebel quickly began chest compressions. The video recordings show that he performed the prescribed strong presses on the chest and in the proper rhythm. He was "doing my best to ignore the pain in my knees to provide care to Celestin." Officer Hebel continued to give chest compressions as Officer Bonner applied an Automated External Defibrillator ("AED"). Officer Hebel only paused when the AED directed so, as the device assessed the cardiac sensors and calculated whether a shock was advisable. As Officer Hebel became increasingly spent, Officer Israel Gerena took over compressions until fire department medics arrived.

12. Officer Hebel performed "compression only" cardiopulmonary resuscitation ("CPR"). In 2008, many police agencies shifted CPR training to compression only training, meaning that no longer were officers taught to give breaths at

intervals. This shift was in response to the American Heart Association guidelines that prescribed compression only CPR as a better way to keep blood circulating to vital organs. Many agencies continue to teach compression only CPR, particularly in light of the increased risk of disease transmission with mouth-to-mouth rescue breaths. In my last CPR refresher course, I learned that mouth-to-mouth breaths were not recommended without the use of a medical-grade barrier mask and that consistent compressions are all that is "required." Many police departments prohibit or discourage rescue breaths without the use of an effective barrier mask with a one-way valve. It was reasonable and was consistent with generally accepted police policies, practices, and training for Officer Hebel to administer compression only CPR to Celestin.

13. During his deposition, Officer Hebel was asked to review the incident by viewing excerpts from his own video recording and from other officers' video recordings. The other officers' video recordings were captured by body worn cameras and thus showed events from those officers' positions and perspectives, not Officer Hebel's. The recordings were stopped, replayed, and he was asked about other officers' actions. In other words, he was asked to assess the situation from the perspective of someone else's "20/20 hindsight," to use Justice Rehnquist's language from *Graham v. Connor*, 490 U.S. 386 (1989). Officer Hebel was asked to discuss the deployment of a TASER device by Officer Chiuchiarelli.

14. During the struggle to control Celestin, Officer Hebel's focus of attention was on his own efforts to control Celestin's left arm, not on other officers' movements and actions, or their use of a TASER device. During the tense, uncertain, and rapidly-evolving struggle, Officer Hebel did not voice any direction to Officer Chiuchiarelli or other officers about their respective perceptions and actions. Nor could Officer Hebel accurately assess whether the TASER even made effective contact with Celestin and actually delivered any energy to his body at all.

15.     An officer has a duty to intervene and to take reasonable steps to protect a person from another officer's use of excessive force. Whether a duty to intervene is evident in a particular event must be considered in light of whether apparently unreasonable force was used and whether there was a realistic and reasonable opportunity to intervene. The duration of the incident is a significant factor in assessing whether a reasonable opportunity to intervene existed, particularly where the circumstances are rapidly changing and the struggle is relatively brief. Officer Hebel never observed any officer use force on Celestin that was readily apparent as improper or excessive. Obviously, Officer Hebel had no opportunity to see any force used during the events that happened prior to his arrival. Thus, there was no reasonable opportunity for Officer Hebel to intervene in any other officer's use of force on Celestin.

c.     **The Windermere Police Department properly selected, trained, and supervised Officer Hebel.**

1.     Officer Hebel was hired as a police officer by the Windermere Police Department on July 11, 2016. At the time that he began service as a police officer, Officer Hebel graduated the from the Seminole State Criminal Justice Academy, consisting of 770 hours of training, on July 8, 2016. Officer Hebel passed the State Officer Certification Examination and was granted a Florida Law Enforcement Officer Certificate by the Florida Department of Law Enforcement. The curriculum for the Seminole State Criminal Justice Academy includes all subjects meeting the minimum mandatory curriculum prescribed by the Florida Department of Law Enforcement. The Florida Law Enforcement Officer basic training program provides a curriculum that is substantially similar to programs offered throughout the nation and recognized as providing the essential pre-service training for law enforcement officers. The Florida Law Enforcement

Officer Certificate rendered Officer Hebel eligible for hiring as a municipal police officer.

2.    Windermere Police Department Sergeant Jayson Bonk completed a comprehensive background investigation once Chief David Ogden extended a conditional offer of employment to Officer Hebel.  The background investigation included a medical examination, psychological evaluation, criminal history search, credit and financial history assessment, driving record check, personal reference statements, residential history check (including search of criminal justice records for locations of Officer Hebel's prior residences), neighborhood reference canvas, military service record examination, employment history verification, criminal history check for Officer Hebel's co-habitant family members, drug screen, and a polygraph examination.  The background investigation was thorough and detailed, and it comported with police officer pre-employment background investigations typically conducted by municipal police agencies.

3.    The background investigation completed by Sergeant Bonk met the requirements of Florida Statute § 943.13 and Florida Administrative Code Rule 11B-27.002(3). The background investigation revealed that Officer Hebel had no disqualifying events or characteristics that would prevent his certification as a Florida police officer.  The sum of the information contained in the background investigation report, coupled with the satisfactory status of the mandatory testing (drug screen, polygraph, psychological evaluation, etc.), showed that Officer Hebel was qualified to serve as a police officer.

4.    Police officers certified by the State of Florida are required to complete no less than 40 hours of in-service training every four years.  Subsequent to successfully completing police basic training, Officer Hebel regularly completed annual in-service training.  Additionally, Officer Hebel completed certain advanced

specialty training courses.  Officer Hebel successfully completed the necessary in-service training to maintain certification as a Florida police officer.  Officer Hebel continues to hold an active Florida Law Enforcement Officer Certificate and he did so at the time of this incident.  The Windermere Police Department could reasonably rely upon Officer Hebel's status as holding active certification to indicate that he had been properly trained under Florida Department of Law Enforcement physical, mental, and moral fitness standards and that he successfully completed the requisite basic police officer training.  Moreover, his continuing status as an actively certified police officer indicated that he was not subject to disciplinary action by the Florida Department of Law Enforcement for any misconduct.

5.      My review of Officer Hebel's training records shows that he was a well-trained officer who met and exceeded training requirements to serve as a police officer prior to and at the time of this incident.  My review of the file leads me to conclude that the Windermere Police Department has a policy and practice of training its officers in subjects and matters that the officers are reasonably likely to encounter in the course of their duties, including training in de-escalation techniques, enforcement of criminal laws, the use of force and other important subjects.  In addition, based on my review of the training documents, the Windermere Police Department had afforded to Officer Hebel additional excellent specialty training in the TASER operator course, Valencia College criminal laws course, defensive tactics takedown course, mountain bike operator course, autism awareness course, other miscellaneous courses, and regular in-service and firearms qualification training courses.

6.      Over the course of subsequent years, Officer Hebel received generally positive evaluations.  He was nearly always evaluated as "satisfactory" or "good" in most performance assessment categories and as "excellent" in some categories.  The

performance evaluations reflect a pattern of continuous improvement during his tenure.

7. Like many officers, Officer Hebel does not have a perfect performance record. For example, he was disciplined over an issue of tardiness in 2018. Also in 2018, he was suspended for 25 hours for cumulative violations related to an unintentional discharge of his handgun, damaging a computer, and two minor driving violations. Notably, it is highly unlikely that Officer Hebel would have ever been disciplined in connection with the unintentional discharge had he not affirmatively reported the incident to his supervisors.

8. Despite these relatively minor disciplinary issues, Officer Hebel continued to be praised by supervisors and citizens. For example, he received the Chief's Special Award in January 2019 for his "performance, productivity, and an attitude that was nothing less than exemplary." Officer Hebel also received a written commendation from Zachary Stoumbos for rescuing Mr. Stoumbos and his party when their boats were stranded.

9. The personnel evaluations, training records, and disciplinary history demonstrate that Officer Hebel's immediate and command level supervisors were well aware of his performance–both good and not-so-good. The fact that even very minor policy violations were documented and reprimands issued attest to an appropriately close level of performance monitoring and supervision. The supervision provided to Officer Hebel by the Windermere Police Department was reasonable and was consistent with generally accepted police policies and practices for police supervision.

d. **The Windermere Police Department written policies and procedures governing use of force are consistent with generally accepted police policies and practices.**

1. Police departments promulgate written policies to teach officers and to guide officers' responses to the manifold calls for service to which police are

summoned. Some policies, such as a use of force policy, provides officers with guidance and directives derived from statutes and judicial decisions. These policies may describe the manner in which actions, tasks, and operations are to be performed and/or limitations on how actions, tasks, and operations should be performed. The Windermere Police Department policy 8.1.2, guiding use of force, prescribes that an officer may strike or use physical force against a person when necessary in self-defense, in defense of another, to overcome physical resistance to lawful commands, or to prevent the escape of an arrested person.

2.    I am familiar with use of force policies of numerous public safety agencies, both in the State of Florida and throughout the United States. I am also familiar with best practice prescriptions of many professional public safety organizations, such as the International Association of Chiefs of Police and Commission on Law Enforcement Accreditation. Policies promulgated by these entities generally refer to the United States Supreme Court decision in *Graham v. Connor*, 490 U.S. 386 (1989). In *Graham v. Connor*, the Court propounded questions to measure the reasonableness of a particular use of force. The key considerations that an officer should consider in a use of force include:

a.    The severity of the crime at issue.

b.    Whether the suspect poses an immediate threat to the safety of officers or others, including himself.

c.    Whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

d.    Whether the officer must decide and act in compressed time and in circumstances that are "tense, uncertain, and rapidly evolving."

The Windermere Police Department use of force policy incorporates the *Graham v. Connor*-prescribed factors, stating: "A police officer must consider the following factors when using physical force: (a) the severity of the alleged crime

at issue; (b) whether the suspect poses an immediate threat to the safety of the officers or other; and (c) whether the suspect is actively resisting arrest or attempting to evade arrest by flight."

3.    The Windermere Police Department policy 8.1.4.A.2 provides that an officer "need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest.  The officer is justified in the use of any force [w]hich he or she reasonably believes to be necessary to defend himself or herself or another from bodily harm while making the arrest."  This provision is consistent with constitutional limitations on police force articulated in *Graham v. Connor* and its progeny in federal and state courts, as taught to officers throughout the nation, and with Florida Statute 776.05.

4.    The Windermere Police Department policy addressing the use of a hobble restraint device states that the device is to be used for "extremely combative subjects" who are a "danger to himself, an officer or the public."  The policy provides that at least two officers be present to assist in applying the hobble restraint device and advises that the preferred application restrains the ankles and secures the subject's legs with no less than a 90-degree bend at the subject's knees.  The secondary application is the straight leg application using two hobble restraint devices.  This policy is consistent with training commonly presented for application of a hobble restraint device and is consistent with policies and procedures in use in many police agencies across the nation.

II.    In reaching my opinions in this matter I have relied upon my training and experience in public safety acquired throughout my career.  A summary of my qualifications, publications, litigation history and fee schedule are recited herein.

III.    **My qualifications as an expert in this subject matter include the following:**  I am a law enforcement officer in the State of Utah.  I became certified as a law enforcement officer in

the State of Utah in 1982.  I am the Chief of the West Jordan (Utah) Police Department, where I oversee all police operations and investigations.  I am the Chair of the Governing Board of the Officer-Involved Critical Incident Investigations Teams in Salt Lake County, Utah.  I was formerly employed with the Utah Attorney General, where I served as the Chief of Law Enforcement.  After a period in private practice, I was employed as a Special Agent with the Utah Attorney General Investigation Division, where I coordinated a statewide use of force training initiative and coordinated officer-involved shooting investigations and other special investigations.  I also serve in a consultation role as Senior Legal Advisor for Lexipol, the nation's leading provider of law enforcement risk management resources.

I was formerly employed as a Bureau Chief at the Utah Department of Public Safety, Peace Officer Standards and Training Division, where I supervised investigations into allegations of improper and excessive force, officer integrity, and criminal acts alleged to have been committed by law enforcement officers and supervised in-service training administration and certification for all peace officers in the State of Utah.  I also supervised the police service dog training and certification program for the State of Utah.  I had responsibility for policy drafting and review for the parent agency, the Utah Department of Public Safety.

My duties included direct supervision and command of various investigative units and agents throughout the State of Utah, supervising law enforcement officers, forensic specialists, and technicians.  I commanded the State of Utah Child Abduction Response Team.  I commanded the State of Utah Officer-Involved Fatality Investigation Team.  I am a member of the Board of Review of the Utah Technical Assistance Program, consulting in cold case homicide and complex violent person crimes investigations.  In 2010, Governor Herbert selected me for the Governor's Leadership in Public Service award for my work in public safety leadership.

IV.     I currently serve on the Use of Force Standards and the K9 Standards Committees of the Utah Peace Officer Training and Standards Division, articulating the standards for use of force by police officers and deployment of police service dogs.  I was formerly responsible for providing delivery of the Basic Training Curriculum related to all legal subjects, as well as certain tactical

subjects, at the Utah Law Enforcement Academy.  I continue to teach at the Utah Law

Enforcement Academy.  I am the author of the police academy curriculum currently in use for

several subjects, including, but not limited to, use of force, reasonable force, use of force and

police service dog teams, search and seizure, search and seizure for police service dog teams, and

use of force/firearms instructor liability.  I am certified by the Force Science Research Center as a

Realistic De-Escalation Instructor, a course certified by the International Association of Directors

of Law Enforcement Standards and Training.  I am a certified POST Firearms Instructor, and

often served as the lead instructor for POST Firearms courses.  I am certified by the Force

Science Research Center as a Force Science Analyst® and an Advanced Force Science

Specialist®.  I am a former certified TASER® Instructor.  I am a certified Excited Delirium and

Sudden Death Investigation Instructor.  I was certified by the Los Angeles Police Department in

Officer-Involved Shooting Investigation.  In 2011, I was certified by the Institute for the

Prevention of Sudden In-Custody Death as an instructor in restraint systems.

V.      I am a licensed attorney, having practiced law since 1990.  I am admitted to practice

before the United States Supreme Court, the Courts of Appeals for the Fifth and Tenth Circuits,

and the State and Federal courts in the State of Utah.  I am a former Chief Deputy County

Attorney and a former Utah Attorney General designated prosecutor.  I am a Master of the Bench

of the American Inns of Court, Inn One, where I also serve as the past-President of the Inn of

Court.  I serve as an Administrative Law Judge for the State of Utah and for various counties and

cities in Utah, providing hearing officer and appellate hearing services for hearings involving

allegations of police officer misconduct for a variety of state agencies and municipalities.  I was

formerly on the faculty of Excelsior College, teaching Criminal Procedure, Evidence and

Management Strategies for Public Safety.

VI.      In addition to my primary employment, I occasionally consult and provide expert witness

opinions on police procedures, and use of force issues.  I occasionally perform in-custody death

investigations and officer-involved shooting death investigations for agencies which may lack the

requisite expertise.  I have served on several International Association of Chiefs of Police Policy

Center working groups and presently serve on the Search Warrants policy working group. I am a consultant to the Utah Risk Management Mutual Association, the state's largest insurer of public safety agencies, on matters of officer conduct and discipline, hiring and screening practices, use of force, and police pursuit policies. I am the co-founder of a best practices advisory group that developed comprehensive model policies and best practices under the authority of the Utah Chiefs of Police Association, the Utah Sheriffs' Association and various state law enforcement agencies. These policies serve as a model for all Utah public safety agencies. I am the author of a number of model policies for law enforcement agencies, and have provided policy drafting and policy review services for several agencies, including policy drafting responsibility for large law enforcement agencies. I have served as a contract consultant to the United States Department of Justice, assigned to provide technical assistance and management consulting to various public safety entities in the United States.

VII. I participate and serve in a number of community and professional capacities. Professional activities pertinent to law enforcement include serving as the president of the Utah Chiefs of Police Association. I am a member of the Board of Governance of the Statewide Information and Analysis Center, Utah's unified intelligence fusion center. I represent the Utah Chiefs of Police Association on the League of Cities and Towns Listen, Love, Learn Task Force, creating strategies for police reform and relations with communities of color. I am a founding member of First Steps to More Trust, an initiative to join young persons in the BIPOC community with young public safety professionals in leadership training and community engagement. In 2021, I was recognized by D.A.R.E. America as the "Law Enforcement Executive of the Year." In 2022, I was named as the "Utah Police Chief of the Year" by the Utah Chiefs of Police Association. Also in 2022, upon nomination of the Attorney General, I was named as the "Utah Public Safety Officer of the Year" the Utah Best of State Foundation. I am the Chair of the Governing Board of the Officer-Involved Critical Incident Investigations Teams in Salt Lake County, Utah, and have direct command of Officer-Involved Critical Incident Investigations Team IV. I am the former Chair of the Salt Lake County Law Enforcement

Administrators and Directors Association.  I am a member of the Board of Directors of the Institute for the Prevention of Sudden In-Custody Death, member of the Board of Advisors, Association of Force Investigations, member of the International Association of Chiefs of Police and the Utah Chiefs of Police Association, member of the National Tactical Officers Association, former member of the International Association of Law Enforcement Firearms Instructors, member of the United States Police Canine Association, former member of the Board of Directors of Crisis Intervention Team Utah, Past-President of the Utah Peace Officers Association, former Board Member of the Utah SWAT Association, past member of the board of directors of the NAACP, Salt Lake City branch, and board member of the Utah Law Enforcement Legislative Committee.  I formerly served as a gubernatorial appointee to the Council on Peace Officer Standards and Training.  I am a former member of the Scientific Working Group on Dog and Orthogonal Detector Guidelines, a national scientific best practices organization sponsored by the Federal Bureau of Investigation, the Department of Homeland Security, and the Transportation Security Administration, with support coordinated by the International Forensic Research Institute at Florida International University.  I have been a presenter at a variety of professional conferences and seminars, including presenting on use of force training at the annual convention of the International Association of Chiefs of Police and the International Conference of the Institute for the Prevention of Sudden In-Custody Death.

VIII.   From 1994 to 2014, I was a consultant with the K9 Academy for Law Enforcement and the International Police Canine Conference.  My principal responsibilities included providing use of force training, civil liability instruction, and search and seizure instruction.  I have provided police service dog training and certification standards consultation for two police service dog organizations, including a western regional group and one of the major national groups.  I serve as a consultant for the California Narcotic and Explosive Canine Association and have been a featured lecturer at their annual training conferences over the past decade.

IX.     I am a Senior Legal Advisor for Lexipol.  In that capacity, I have assisted in the drafting and review of use of force and other policies in current use by more than 3,300 public safety agencies in the United States.

X.      **My publications (limited to ten years) include the following:**  I have previously published a number of other professional articles, many of which have been subjected to peer review.  My most recent book, *Preparing for an Active Shooter Threat*, was published in June 2020 by Blue360 Media.  Another book, *Street Legal: A Guide to Pre-trial Criminal Procedure for Police, Prosecutors, and Defenders*, 2nd edition, was published in 2020 by the American Bar Association Publishing Division.  *The K9 Officer's Legal Handbook*, 3rd ed., was published in February 2019.  My other published works include:  *An Outward Mindset Powering Multicultural Policing,* Police Chief, V. 89, No. 4 (2022); *Mitigating Suicide Threat Response Risks*, Police Chief, V. 86, No. 3 (2019); *Avoiding a Peer Support Pitfall*, Police Chief, V. 85, No. 3 (2018); *Should I Stay or Should I Go?*, POLICE, October 2017, *Hill v. Miracle: Adapting the Graham Standard to Non-Criminal Interventions*, Police Chief (August 2017): 18–19; *Armstrong v. Village of Pinehurst: Training and Policy Implications for Police*, Police Chief, V. 83, No. 6 (2016); *Supreme Court Decision Casts Doubt on Hotel Registry Ordinances*, Police Chief, V. 81, No. 10 (2015); *Body Worn Cameras: Plan Before Your Office Buys In*, The Sheriff (June 2015); *Legal Risks of Failing to Care for Children of Arrested Persons*, Police Chief, V. 81, No. 10 (2014);  *A Rational Foundation for Use of Force Policy, Training and Assessment*, 2014 (2) AELE Mo. L. J. 101.

XI.     **My fee schedule (through December 1, 2022) is established as follows:** I charge $300.00 per hour for examination of reports and documents, site visits, interviews, administrative tribunal, deposition or court testimony, with a minimum of $1,200.00 for deposition or court testimony.  I bill for actual travel expenses and a travel fee of $1,200.00 per day/part-day for travel to western states and $1,800.00 per day/part-day outside western states.

XII.    **My prior experience as an expert witness (limited to the past four years) includes the following cases:**  I have been qualified as an expert in the subject matter of police

procedures, including use of TASER® devices, police use of force, shootings and wrongful death claims, search and seizure, police service dog use, both in drug detection and dog bites, and I have never had a court decline to find that I am a qualified expert witness.  I have testified and/or provided depositions and trial testimony in the following cases which may be generally related to the subject of the instant litigation in the past four years:  *Brown v. City of Phoenix*,  No. 2:20 cv 02087 DLR JZB, United States District Court for the District of Arizona, 2021.  Trial testimony given on behalf of defendants.  *Coleman v. City of Tempe*, No. 2:17-cv-02570 PHX DLR, United States District Court for the District of Arizona, 2021.  Trial testimony given on behalf of defendants.  Subject matter: police use of force.  *Khalaj & Youmarin v. City of Phoenix, et al.*, CV-17-01199-PHX-GMS, United States District Court for the District of Arizona, 2021.  Deposition testimony given on behalf of defendants.  Subject matter: wrongful detention.  *Gomez-Guerrero v. Villafuerte*, No. 20 L 70, 19th Judicial Circuit Court, Lake County, Illinois.  Deposition testimony given on behalf of defendants.  Subject matter: wrongful death.  *Bueno v. Howard, et al.*, No. 2:16-cv-03450- DGC-JZB, United States District Court for the District of Arizona, 2021.  Trial testimony given on behalf of defendants.  Subject matter: police use of force.  *Lane v. City of Mesa*, No. 2:19-cv-00852-DJH, United States District Court for the District of Arizona, 2021.  Deposition testimony given on behalf of defendant.  Subject matter: wrongful death.  *Mitchell v. City of Cedar Rapids*, No. LACV087209, Iowa District Court for Linn County, 2021.  Deposition testimony given on behalf of defendant.  Subject matter: wrongful death.  *Johnson v. City of Mesa*, No. 2:19-CV-02827-JAT-JZB, United States District Court for the District of Arizona, 2020.  Deposition testimony given on behalf of defendant.  Subject matter: police use of force.  *Ortega v. United States of America*, No. CV-19-08110-PCT-JAT, United States District Court for the District of Arizona, 2020.  Deposition testimony given on behalf of defendant.  Subject matter: police custody.  *Peralta v. Arizona Department of Public Safety*, No. CV-17-01868-DJH-BSB, United States District Court for the District of Arizona, 2020.  Trial testimony given on behalf of defendant.  Subject matter: police custody.  *Krakana & Zinn v. City of Scottsdale*, No. CV-17-01813-PHX-JJT, United States

District Court for the District of Arizona, 2020.  Trial testimony given on behalf of defendant.  Subject matter: police tactical operation.  *A.C. v. County of Santa Barbara*, No. 2:18-CV-3694 SK, United States District Court for the Central District of California, 2019.  Deposition testimony given on behalf of defendant.  Subject matter: police use of force.  *Smith v. City of Waterloo*, Case No. LACV133172, District Court for Black Hawk County, Iowa, 2019.  Trial testimony given on behalf of defendants.  Subject matter: emergency vehicle operation.  *Mould v. City of Tempe*, No. CV2016-018161, United States District Court for the District of Arizona, 2019.  Trial and deposition testimony given on behalf of defendant.  Subject matter: wrongful death.  *Castro v. State of Arizona*, Case No. 2:18-cv-00753-SRB, United States District Court for the District of Arizona, 2019.  Deposition testimony given on behalf of defendants.  Subject matter: police use of force.  *Lawrence v. Las Vegas Metro Police Department*, No. 2:16-cv-03039-JCM-NJK, United States District Court for the District of Nevada, 2019,  Deposition testimony given on behalf of defendants.  Subject matter: wrongful death.  *Webb v. City of Waterloo*, No. 6:17-cv-2001-CJW-MAR, United States District Court for the Northern District of Iowa.  Deposition testimony given on behalf of defendants.  Subject matter: police use of force.  *Charboneneau v. Demings*, No. 2017-CA-010862-O, Ninth Judicial District Court, Orange County, Florida, 2019.  Hearing testimony given on behalf of defendants.  Subject matter: use of force.  *Carsons v. Black Bear Reserve Homeowners Association, Inc., et al.*, No. 35-2015-CA-001910, Fifth Judicial District Court, Lake County, Florida, 2018.  Deposition testimony given on behalf of defendants.  Subject matter: investigative procedures.  *Mould v. City of Tempe*, No. CV2016-018161, United States District Court for the District of Arizona, 2018.  Deposition testimony given on behalf of defendant.  Subject matter: wrongful death.  *McSwain v. United States*, No. 2:15-cv-01321, United States District Court for the District of Nevada, 2018.  Trial testimony given on behalf of defendant.  Subject matter: negligence.  *Rodriguez v. City of West Covina*, No. 2:17-CV-0138 CBM, United States District Court for the Central District of California, 2018.  Deposition testimony given on behalf of defendant.  Subject matter: police canines.  *Mims v. City of Charlotte*, No. 2014-CVS-23815, Superior Court of

North Carolina, 2018. Trial and deposition testimony given on behalf of the defendants. Subject matter: wrongful death. *Chastang v. Levy*, No. 6:17-ev-00538-0r1-37 DCI, United States District Court for the Middle District of Florida, 2018. Deposition testimony given on behalf of defendant. Subject matter: police defensive deadly force.

The observations and opinions stated herein are based on the materials provided to me for consideration, and are preliminary insofar as additional information may be provided to me through the course of discovery and other incidents of the litigation process. They are based on the best information presently known to me. I have assumed the general accuracy of the documents, statements, and reports, excepting those expressed as opinions and those conflicting one with another and/or conflicting with objective evidence, that were provided to me. The opinions herein may be supplemented and/or revised upon receipt of additional information, including, but not limited to, further deposition testimony, consideration of any report submitted by Plaintiff's experts, further investigation and/or further witness interviews. I may supplement this report upon completion of depositions of witnesses in this matter and/or upon being provided with other investigative documents, and/or diagrams, video, and photographs.

My trial testimony may be supported by exhibits that include the pleadings, documents, statements, depositions, diagrams, photographs, and reports listed herein, as well as illustrative evidence such as a visual presentation of computer-generated slides and visual images projected onto a screen, charts, graphs, or illustrations created to better illustrate the aforementioned documents. The exhibits, testimony aids, or list of references used as a summary of, support for, and/or graphic depiction or illustrative description, summary, or synopsis, for the information, statements, summaries, and opinions in this report specifically include, but are not limited to, each (or any compilation, synopsis, summary, demonstrative, illustration, or graphic) pleading, document, statement, deposition, diagram, photograph/image, report, citation, reference, paper, book, illustration, graphic, chart, drawing, diagram, table, PowerPoint® slide, set, or deck, picture, image, and/or video in this report, referenced or cited in this report, or included in any of the references to this report. These may be utilized as exhibits, explanatory, or demonstrative

aids to support deposition and/or trial testimony, or for any other purpose.  These exhibits specifically include any illustrative evidence such as visual presentation of computer-generated slides and visual images projected onto a screen, charts, graphs, or illustrations created to better illustrate the aforementioned exhibits.  I reserve the right to create, use, utilize PowerPoint or other graphics or illustrations, or compilations, as exhibits at deposition, trial, or for any other purpose after submission of this report.

## CONCLUSION

The events begun by Celestin's assault on his sister and his mother on April 11, 2019, indisputably brought great tragedy to Plaintiff.  What began as an effort to ascertain what was behind the assaults and a check on the elderly aunt still in Plaintiff's home soon became an effort to control an uncooperative subject.  The officers were faced with a challenging, uncertain, tense, and rapidly-evolving situation once they were confronted with Celestin holding a knife and advancing toward them.

Officer Hebel response to Ocoee Police Department officers' urgent call for help was consistent with generally accepted police training and practices.  Officer Hebel's tackling Celestin after he suddenly ran from the three officers dealing with him on the front porch was reasonable and was consistent with generally accepted police policies, practices, and training.  Officer Hebel properly assisted the Ocoee Police Department officers in capturing and controlling Celestin, and in subsequently performing CPR on Celestin.  The Windermere Police Department selection, training, and supervision of Officer Hebel was consistent with generally accepted police training and practices.

Kenneth R. Wallentine
May 20, 2022