

6/8/22

Andrew G. Celli, Jr.
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
600 Fifth Avenue at Rockefeller Center
New York, NY 10020


RE: Rose Marie Celestin v City of Ocoee, et al. Case No: 6:21-cv-896-RBD-EJK


## Introduction

At the request of counsel for Plaintiff Rose Marie Celestin in the above-referenced case, I have prepared this rebuttal report. I have been asked to review and comment on the report from Defendants' expert witness Dr. Gary M. Vilke, as well as portions of the reports of Dr. Mark Kroll, Dr. Hunsaker and John Peters, regarding the cause of death of Jean Samuel Celestin.

I am a board-certified Cardiologist practicing full time in cardiovascular diseases in Ventura, CA. I have been the Chair of the Division of Cardiology at Community Memorial Hospital for over a decade and am the current chair of the Department of Medicine. I have been a reviewer for the Medical Board of California and have testified regarding the Standard of Care for a Cardiologist for the state of California during the *Conrad Murray v. State of California* trial. A copy of my curriculum vitae, which includes a list of the publications I have authored in the last 10 years, is attached to this report as Exhibit A. A list of the cases in which I have testified as an expert at trial or by deposition during the last 4 years is attached as Exhibit B. My fee schedule is attached as Exhibit C.

I have extensive knowledge regarding the literature on prone restraint death, and I published a review article, "Prone restraint cardiac arrest: A comprehensive review of the scientific literature and an explanation of the physiology," (1) in *Medicine Science and the Law* last year. I have testified in court regarding prone restraint death.

Dr. Vilke's report has an extensive discussion of the events that occurred during the Defendant officers' encounter with Mr. Celestin. Although I may not agree with certain ways in which Dr. Vilke characterized the events, I will accept his characterizations and descriptions of the events for purposes of this report. My opinion is based on my education, training, and experience.
I hold my opinion to a reasonable degree of medical certainty. I reserve the right to amend this report after being presented with further information.


## Materials reviewed

Dr. Gary M. Vilke's expert report, dated May 20, 2022
Jean Samuel Celestin's Autopsy Report, Case # ME 2019-00061, dated April 12, 2019
John G. Peter's expert report, dated May 20, 2022
Dr. John C. Hunsaker's expert report, dated May 20, 2022
Body-Worn Camera videos from Officers Bode (PL001599), Bonner (PL001600), and Hebel (CELE 1269).
Mark Kroll's expert report, dated May 20, 2022



<u>Dr. Vilke's summary of officer's encounter with Mr. Celestin</u>

As discussed above, while not adopting or agreeing with Dr. Vilke's summary of the events underlying this lawsuit, I accept his summary for purposes of this report, unless stated otherwise. Dr. Vilke summarized the events as follows:

> After reviewing the above list of materials, it appears that on April 11, 2019, at approximately 2327 officers from the Ocoee and Windermere police departments arrived on scene for a disturbance call. Officers Bode and Bonner along with Ms. Celestin approached the front door of the Celestin's residence where her son, Mr. Jean Samuel Celestin was inside. Mr. Celestin had reportedly punched his mother, causing her to leave the house and call the police. Mr. Celestin had a history of bipolar and schizophrenia, was thought to not be taking his medications and had been Baker Acted in the past. Mr. Celestin was 33 years old, 5'9" and 258 lbs. at the time.

> The officers knocked on the door and Mr. Celestin opened the door. Mr. Celestin was asking some questions to the officers about their legitimacy. He was acting a bit agitated and paranoid. As the officers tried to get him to step outside, Mr. Celestin closed the door. When he opened the door the second time, Mr. Celestin was holding a large knife. Officer Bode deployed his TASER into Mr. Celestin's torso in probe mode with no evidence of neuromuscular incapacitation (NMI). The officers engaged in a brief scuffle as Mr. Celestin pushed his way out of the house knocking Officer Bode's TASER out of his hand. Officer Bonner then deployed his taser into Mr. Celestin's back, causing him to fall and drop the knife.

> Mr. Celestin sat on the porch against the pillar, apologized but would not follow commands given by the officers. Mr. Celestin pulled the TASER probes out of his body, reached into his pockets and then jumped up and ran down the driveway and across the street. Officer Chiuchiarelli had just arrived and was shoved by Mr. Celestin as he was running. Officer Chiuchiarelli deployed both of his TASER cartridges at Mr. Celestin. Officer Hebel, who also just arrived, tackled Mr. Celestin onto the grass. Officer Chiuchiarelli then deployed his TASER in drive stun mode into Mr. Celestin's right shoulder blade area. The officers were able to get Mr. Celestin handcuffed, and then a hobble restraint was placed around his ankles.

> Mr. Celestin was then noted to be in cardiac arrest. The officers started chest compressions and placed an automated external defibrillator (AED) and continued until paramedics arrived. Paramedics found the cardiac rhythm to be asystole, flatline. They performed resuscitative measures but never had a return of pulse. Mr. Celestin was transported to the emergency department where resuscitative efforts were continued, however, they were not successful and he was pronounced dead about 40 minutes after arrival to the hospital at 0056 on April 12, 2019.

> An autopsy was performed and the medical examiner recorded that the cause of death was: "Sudden cardiorespiratory arrest during subdual and restraint." Contributory



factors listed were recurrent depression with psychotic features, mild cardiac hypertrophy, and obesity. A brief timeline of selected events from Officer Bode's Axon Body Camera Video X81275968 labelled AXON_Body_2_Video_2019-04-11_2327 with times based on video time in right upper corner is included below:

| | |
|---|---|
| 3:33:25 | Samuel opens the door the first time for Officers Bode and Bonner. |
| 3:33:54 | Samuel questions if they are real cops. |
| 3:34:26 | Samuel closes the door. |
| 3:34:30 | Samuel re-opens the door and has a knife in his hand. |
| 3:34:35 | Samuel tries to close the door again, but Officer Bonner keeps it from closing. |
| 3:34:37 | Officer Bonner deployed his TASER into the upper right torso with no apparent effect as Samuel runs out of the house. |
| 3:34:43 | Officer Bonner deploys his TASER into Samuel's back and he falls down. |
| 3:34:50 | Officer Bode calls on radio TASER deployed. |
| 3:34:50 | Samuel is leaning up against a pillar on the house. |
| 3:35:02 | Samuel still not following commands and is not getting on his stomach. |
| 3:35:36 | Samuel tries to reach into his right pocket and is again warned not to. |
| 3:35:49 | Samuel gets up and starts running. |
| 3:35:50 | TASER heard but not effective, does not sound connected. |
| 3:35:53 | Another TASER is heard being deployed but not effective, does not sound connected. |
| 3:35:55 | Officer Bode calls on radio "one running." |
| 3:35:58 | Samuel is tackled to the ground by Officer Hebel and Officer Bonner and Officer Bode assist to try to handcuff. |
| 3:36:01 | Officers are struggling with Samuel and a TASER is heard deployed. |
| 3:36:04 | TASER heard and seen being used. |
| 3:36:13 | Handcuff heard clicking. |
| 3:36:23 | Officer yells "stop resisting" and TASER is heard. |
| 3:36:26 | Officer says "get me another cuff". |
| 3:36:37 | TASER used on back in drive stun for about 15 seconds then 4 more seconds. |
| 3:36:55 | Officer says "he's secure". |
| 3:36:59 | Samuel seen moving head up and down. |
| 3:37:22 | Officer says "stop" and to "stop kicking". |
| 3:37:22 | Officer says he has a hobble in the back of his car. |
| 3:38:39 | Hobble restraint is clipped through handcuffs. |
| 3:38:43 | Officer reports "subject is secured" and all officers are away from Samuel. |
| 3:39:02 | Officer asks if he's breathing. |
| 3:39:32 | Officers start to ask Samuel if he's awake. |
| 3:39:37 | Officers roll Samuel onto his back. |



3:39:51     Officer states not breathing and does not feel a pulse.
3:39:58     Officer says he has an AED in the back of the car.
3:40:01     Chest compressions started.
3:41:27     Officer with gloves opening airway.
3:41:29     AED in place and officers clear for assessment.
3:41:51     Shock not advised by AED.
3:41:55     Chest compressions resumed.
3:41:59     Officer asked if airway cleared, another said he tried but did not want to get his finger bit off.
3:43:16     Officer states he has a barrier mask if somebody wants to use it.
3:43:24     Officer states he does not want to put his hand in his mouth.
3:44:40     AED assesses rhythm.
3:45:03     Shock not advised.
3:47:47     EMS arrives on scene.
3:48:08     EMS at Samuel.
3:49:57     EMS takes over CPR.

A brief timeline of selected events from Officer Bonner's Axon Body Camera Video X81278804 labelled AXON_Body_2_Video_2019-04-11_2330 with times based on video time in right upper corner is included below:

3:35:58     Samuel is tackled to the ground by Officer Hebel, and Officers Bonner and Bode assist to try to handcuff.
3:36:23     Officer yells "stop resisting" and TASER is heard.
3:36:29     Officer Bonner heard extending baton.
3:36:31     Officer Bonner places baton on upper back across shoulder blades.
3:36:35     Samuel raises up and Officer Bonner removes baton.
3:36:37     TASER activated in drive stun, Officer Bonner with hand on Samuel's head for a few seconds until left hand pulled back by other officer.
3:36:49     Baton placed back on shoulders by Officer Bonner.
3:36:54     Samuel moans and lifts his head a little.
3:36:56     TASER activation ended.
3:37:01     Officer Bonner lifts one hand off baton.
3:37:09     Samuel moving head side to side a little.
3:37:17     Samuel moving head side to side a little.
3:37:23     Officer states to "stop kicking".
3:38:40     Officer Bonner gets up and removes baton.
3:38:43     Officer reports "subject is secured" and all officers are away from Samuel.



1. **"The actions of the officers to control and restrain Mr. Celestin did not cause or contribute to his cardiac arrest and death."**

I disagree with Dr. Vilke's first opinion, because the officers directly caused Mr. Celestin's cardiac arrest/death. Dr. Vilke estimates it took approximately 2 minutes and 45 seconds from the time the Defendant officers had hands on Mr. Celestin in the prone position until Mr. Celestin was hobbled and officers moved away. Dr. Vilke estimates Officer Bonner placed pressure on Mr. Celestin's upper back for approximately 2 minutes and 9 seconds.

During strenuous activity there is a great need to breathe in oxygen and breathe out carbon dioxide ($CO_2$), as oxygen is our main source for creating energy and carbon dioxide is the waste product. With significant physical activity, a significant acidosis (including lactic acid) is created in the body. pH is the method of measuring the balance of acid to base in our body. Normal pH in the body is 7.4. A person's respiratory drive with significant activity is a function of the body's $CO_2$ and pH level. As pH drops with activity, the body's natural response is to increase the rate and depth of breathing. By doing this, the amount of $CO_2$ exhaled by the lungs is increased and the amount of $CO_2$ in the body is thus decreased. This loss of $CO_2$ offsets the increased acidity of blood and brings pH closer to a normal range. This hyperventilation can lower partial pressure of $CO_2$ ($pCO_2$) as low as 15-20mmHg (normal is 40mmHg). Despite this hyperventilation, a decrease in $pCO_2$ only partially corrects for the low blood pH. This hyperventilation is **<u>critical</u>** to maintaining blood pH in a life sustainable range (2). During strenuous activity, our heart beats stronger and faster to maintain the increased need to move blood between the lungs and body in order to exchange oxygen and carbon dioxide. This increase in blood circulation or cardiac output is an important factor to maintaining safe levels of blood pH.

According to Dr. Vilke's report, Mr. Celestin was agitated and not compliant with officers. Mr. Celestin's psychotic mental state limited him from complying with officers. There was agitated behavior and a struggle that would cause significant activation of his sympathetic nervous system with release causing the heart to beat harder and faster and causing a significant metabolic acidosis. This type of exertional activity, with the muscles working harder than normal, creates lactic acid, lowers the pH, and makes the blood more acidic. Ho et al. measured blood pH, lactate and biochemical markers during various exercises to try to simulate encounters with police. It was noted that with just a 45-second simulation of a struggle, the pH was very low at 7.01 and was still low after 10 minutes of rest (3). Hick et al. published a case series on five restraint-associated deaths where the individuals had pH levels of 6.2 to 6.8. This pH was quite low compared to a study on primary cardiac arrests that showed pH of 7.2. Hick et al. also described five cases in subjects who did not die after a struggle with police, and who had an average pH of only 7.0 (4). Based on this research, Mr. Celestin likely had a significantly low pH during and as a result of his struggle with the Defendant officers.

As physical activity and strain increases, a person has to breathe harder and faster to blow off $CO_2$ in order to maintain a normal acid-base balance (pH) in the body. The circulatory system also has to move blood faster to deliver oxygen to muscles for energy and deliver $CO_2$ to the lungs for removal. Mr. Celestin was in a condition requiring a significant amount of ventilation and circulation. When Officer Bonner placed pressure on Mr. Celestin's upper back, he decreased Mr. Celestin's ventilatory capacity as well as cardiac output, due to Mr. Celestin's placement in the prone position along with a weight force. Dr. Vilke estimated that Mr. Celestin was restrained for 2 minutes and 45 seconds, and that Officer Bonner placed weight on Mr. Celestin's back for 2 minutes and 9 seconds. In order to keep



Mr. Celestin down in the prone position, there must have been a significant weight force on Mr. Celestin's back as well as a force on Mr. Celestin's legs.  Due to a resulting decrease in ventilation, Mr. Celestin was unable to maintain his $pCO_2$ and pH within values needed to survive.  The prone position and weight force directly caused the decrease in ventilation and cardiac output to sustain Mr. Celestin's life.

Placing a person in the prone position along with weight on their back impedes the ability for the ribs to expand and decreases ventilation.  The weight on their back also increases pressure within the chest cavity, causing a decrease in blood-flow into the heart (thereby increasing intrathoracic pressure and decreasing venous return).   In Mr. Celestin's case, being in the prone position, with weight on his back and legs, pressed Mr. Celestin's abdomen against the floor and impeded the ability of his diaphragm to expand, decreasing ventilation.  Mr. Celestin had a very large abdominal girth.  The abdominal fat was pressing into the abdomen leaving little room to expand his diaphragm into the abdomen.  Weight on the back and legs also restricts flow up the venous blood vessel from the legs to the heart due to abdominal compression of the inferior vena cava, a major blood vessel in abdomen delivering blood to heart.  Mr. Celestin's large abdomen likely compressed the inferior vena cava thus limiting the blood flow from the lower body into the heart.  The decrease in blood flow to the heart will limit the amount of blood exiting the heart, decreasing the cardiac output (1).

A decrease in ventilation will lower the pH, thereby worsening a severe acidosis.  With a decrease in cardiac output, there will be less blood delivering oxygen to vital organs and less blood flowing in the pulmonary veins to deliver $CO_2$ to the lungs.  A combination of metabolic acidosis with a decrease in ventilation and cardiac output can lead to worsening acidosis, asystole or pulseless electrical activity arrhythmias and subsequent death (1).  In this case the more commonly found cardiac arrhythmia of asystole (flatline) was noted.

Dr. Vilke states that any weight placed on Mr. Celestin's upper back or shoulder would not significantly limit ventilations enough to cause asphyxiation.  I agree that the weight placed on Mr. Celestin's upper back and shoulders likely was not enough to cause hypoxia, but it was certainly enough to cause a significant decrease in ventilation (and cardiac output), with acidosis causing death.  A decrease in ventilation and cardiac output would occur immediately after the weight was placed on Mr. Celestin's upper back and shoulders, and a person can die within a short period of time under these circumstances, just as Mr. Celestin did.

The references regarding prone ventilation that Dr. Vilke relied on in his report were entirely based on research from his own lab at the University of California in San Diego.  Dr. Vilke's first and second references involved the testing of 15 healthy volunteers (ages 18–40 years), all non-obese with body mass indices (BMIs) under 30 kg/m$^2$.  The study volunteers were evaluated with pulmonary function studies (PFTs) including maximal voluntary ventilation (MVV), which is the most air a person can attempt to breath in and out and maintain over 12-15 seconds. Testing was performed while sitting, supine, prone and in prone maximal restraint position (hogtie) after 4 minutes of exercise on a bicycle. He reported a 13%-21% drop in ventilation, including a 21% drop in the MVV in the prone maximal restraint position. (5-6).   There were also some outliers noted that had a more significant degree of decreased ventilation.  The article also stated that "it is unlikely that this period of exercise would simulate all the physiologic alterations that may occur with struggle and agitation.  In addition, we did not reproduce the effects of trauma and psychological stress that often occur with apprehended individuals." In light of the differences between the conditions created by Dr. Vilke in his studies and



the conditions facing Mr. Celestin on the night of his death, Dr. Vilke's reliance on his studies to draw conclusions about Mr. Celestin's death should be viewed with skepticism.

His third study from this group measured PFTs in the sitting, supine and prone positions in 20 healthy men (ages 18–50 years), again, all with BMIs under 30 kg/m². The authors reported statistically significant reductions in PFT results, including a 16% reduction in MVV among participants who were only in the prone position (not restrained), compared to the sitting position. (7) His fourth study from his research group enrolled 10 healthy males (ages 18–45 years), and measured PFTs while individuals were in the prone maximal restraint position (PMRP) with up to 50lbs on their backs. This study showed a drop in ventilation by 19-22% (8).

Another study from the Vilke's group focused on nine obese subjects, but usual PFTs were not tested. (9) It would be expected with obesity and the prone position, there would be a significant increase in abdominal pressure causing a significant further decrease in ventilation. A large abdominal fat pad pressed against a hard surface will leave little room for the diaphragm to expand into the abdomen.

Dr. Vilke also mentions his fifth study, which included 30 healthy subjects (15 of whom were male), with an average age of 24.5 years and an average BMI of 24.5 kg/m², placed in PMRP with weights up to 200-225lbs on their backs. MVV was shown to drop 30% among participants at this high weight. Vilke implies in his report that this amount of weight would not cause physiologic changes that may cause death. I strongly disagree and feel a drop in ventilation by 30% is very significant. This is especially important in a person requiring a significant amount of ventilation to try to stay alive, as Mr. Celestin did based on his increased physical activity at the time of his restraint. The article Dr. Vilke authored states that "they could not reproduce all the conditions during which this type of restraint method is used in the field. In particular, while we had subjects restrained and maximally exerting themselves, we could not reproduce the psychological or other physiologic stresses associated with a field pursuit, struggle or trauma." (10) Dr. Vilke acknowledges that it is difficult to reproduce the types of real-world situations in which restraint would be used (11). His studies were performed on healthy volunteers, not in an actual real-life stressful situation, as Mr. Celestin was. I therefore disagree with Dr. Vilke's conclusions that, based on his studies, the impact of prone restraint on a person in Mr. Celestin's condition cannot be fatal.

Conspicuously absent from Dr. Vilke's report is any reference to several published trials from other groups in which authors identified significant decreases in lung capacity among participants held in a prone position and PMRP (12-16). Roeggla et al. placed 6 healthy young males with an average BMI of 23 kg/m² in a prone restraint position for 3 minutes and found that their PFTs dropped by 40%-42%. This decrease was described as "dramatic." (12). In a study done by Cary et al., 12 healthy subjects exercised by bicycle and then were tested during the post-exercise period while in the sitting position, prone position, and in the prone position with a 75 kg (165 lb) weight placed across each subject's back. The prone position with the added 75kg weight dropped PFTs by 31-35%. The authors concluded that these findings represented "marked reductions" in ventilatory capacity. (13)

Parkes et al. reported an average 25-28% drop in PFTs in a cohort of 14 healthy volunteers when they were positioned in prone restraint and described these findings as "significant." One participant in this study experienced a 57% drop. (14) Meredith et al. examined PFTs in 8 individuals (ages 45–80 years) with chronic obstructive pulmonary disease who were in the prone position and PMRP. Three of the 8 participants were unable to tolerate the prone position due to clinical symptoms and deterioration. No



statistically significant changes in PFTs were identified among the 5 participants who completed the study protocol. The authors concluded that response to the prone position and PMRP varied on a case-by-case basis. (15). Vilke also reported "certain outlier individuals." (5)

In another study, results presented by Barnett et al. revealed participants in the prone position experienced a 16% decrease in PFTs. (16) A decrease in PFTs at 10-11% was still noted with the "supported prone" position that served to reduce the extent of pressure on the anterior chest. This decrease was due predominately to pressure on the abdominal cavity, which was expected to decrease diaphragm expansion. Rib expansion was not limited in the "supported" prone position.

Dr. Vilke's opinion that the actions of the officers did not cause or contribute to Mr. Celestin's death is fatally flawed because it does not take into account any of the studies described above, which support the conclusion that Mr. Celestin, who was under duress and in a "fight or flight" response situation, needed the maximal amount of ventilation in order to breath off carbon dioxide (and breath in oxygen), but was placed in the prone position which restricted his ventilation, causing his death.

Dr. Vilke also fails to mention that the prone restraint position would have limited the blood circulation in Mr. Celestin's body. The prone position generates an increase in pressure in the chest cavity, which makes it difficult for the blood to enter the heart. The prone restraint position can also lead to abdominal restriction and obstructed blood flow from inferior vena cava to the heart. A decrease in blood entering the heart leads to a decrease in blood exiting the heart, or, in other words, a decrease in cardiac output. Dr. Vilke does cite in his report his own study on measuring cardiac output in the prone position. He enrolled 25 healthy subjects with an average age of 31 years and an average BMI of 26.6 $kg/m^2$. The subjects were placed in PMRP with up to 100 lbs. of weight placed on their backs. Dr. Vilke did not observe a statistically significant drop in cardiac indexes except for a 17% drop upon addition of the 50 lb. weight (17).

By contrast, results from studies carried out by other groups revealed significant decreases in cardiac output and IVC diameter under similar conditions. Roeggla et al. reported a 37% drop in cardiac output in patients held in prone restraint. (12) In a study involving healthy volunteers with an average age of 25 years with BMIs of 23 $kg/m^2$, Pump et al. reported an 18% decrease in stroke volume and an 11% decrease in cardiac output among participants who were in an unrestrained prone position (18). Relatedly, surgeons often perform procedures on patients who are placed in a prone position, so the prone position has been studied in literature focused on anesthesia. These studies revealed decreases in cardiac output as a result of the prone position that ranged from 17%–26% (19-21). Diminished cardiac output has been attributed to reduced venous return, direct effects on arterial filling, and reduced left ventricular compliance secondary to increased thoracic pressure. IVC compression is a recognized complication that can occur in patients placed in a prone position during surgery and has been reported to be exacerbated by abdominal compression. (22). Obese people are at higher risk of prone restraint death due to higher abdominal pressure in the prone position, (23) contributing to a decrease in ventilation and cardiac output.

An obese male such as Mr. Celestin, who is in prone restraint with pressure on his upper back and legs, will have an increase in chest and abdominal pressure and a decrease in cardiac output. Mr. Celestin was in a situation requiring a significant amount of blood circulation to deliver oxygen to the body and $CO_2$ to the lungs for removal. Dr. Vilke's first opinion is incorrect and unreliable because it does not consider how this restriction limited Mr. Celestin's blood flow and contributed to his death,.



Dr. Vilke states that the Defendant officers' holding of Mr. Celestin's legs had no impact on ventilation. I disagree. It is clear from the body-worn camera footage that the weight on Mr. Celestin's legs restricted him from lifting his chest and abdomen from the ground, which contributed to compression. The compression of Mr. Celestin's large abdomen contributed to a decrease in ventilation and cardiac output. Dr. Vilke in his own studies has shown that even the prone position alone (without restraint or weight on the back or legs) can reduce ventilation up to 16%. (7).

Dr. Vilke also states that leaving a subject's hands cuffed behind their back and applying a hobble restraint to the subject does not have clinically significant effects on ventilation. This also has been disproven by Dr. Vilke's own studies. In one of his studies, subjects in the prone position experienced an MVV drop of 16% (7) but he noted a drop in MVV at 21% (5) in subjects in PMRP when subjects were handcuffed and hobbled. Forced Vital Capacity (FVC) in the prone position alone was 10% (7), but for subjects in PMRP it was 14% and 15%. (8). So, based on Dr. Vilke's own studies, PMRP (i.e., handcuffs and hobble) decreases ventilation an additional 30-50% compared to the prone position alone, which can be significant.

Dr. Vilke's first opinion also ignores the importance of breathing a full volume of air. Even if a person is breathing to some extent, with air moving in and out of the body, that breathing is not necessarily adequate to support survival. A decrease in just 20% of ventilation (with 80% air movement) can be a significant reduction with observable negative effects. With an 80% movement of air, a person may be able to make sounds and words, but not have sufficient ventilation to maintain acid/base balance. A full volume of air is needed for survival.

In conclusion, Dr. Vilke's first opinion—that the actions of the Defendant officers to control and restrain Mr. Celestin (including prone restraint) did not cause or contribute to Mr. Celestin's cardiac arrest and death—is fatally flawed because it ignores the various studies on the impact of prone restraint on subjects' ability to ventilate, as described above, and discounts the inevitable conclusion from those studies that the prone restraint of Mr. Celestin caused his death.

2. "The use of the TASER on Mr. Celestin did not cause or contribute to his cardiac arrest or death."

Dr. Vilke's second opinion, as well as Dr. Kroll's opinion that drive-stun deployments do not enter into the calculus of subject risk and have no clinically significant physiological or pathological effects, are also incorrect. I do agree with Dr. Vilke and Dr. Kroll that the TASER probes were not located in close proximity to Mr. Celestin's heart and did not cause cardiac capture and ventricular fibrillation. But Officer Chiuchiarelli used 5 trigger pulls for a total activation time of 34 seconds. Officer Bode had one trigger pull for 5 seconds. Officer Bonner had 4 trigger pulls for a total activation time of 17 seconds. This is a total of 56 seconds of activation time. According to Dr. Vilke's opinion, only 4 of the 10 trigger pulls had an effect.

The stated goal of the use of a TASER in probe mode is neuromuscular incapacitation (NMI). Probe mode causes muscle contraction and can cause strain-related injuries. On the other hand, drive stun mode does not cause NMI; it causes pain.



Ho et al. showed that a single continuous 10-second TASER probed to the back of healthy subject decreased pH from 7.37 to 7.29 and increased lactic acid level to 5.49 immediately after the TASER deployment. At 4 minutes pH was 7.32 and lactic acid was still elevated at 5.31. At 6 minutes, pH was 7.33 and 4.76 respectfully (2). Subjects were noted to increase their respiratory rate and volume as after TASER deployment. This was to compensate and correct for the acidosis (breath off excess $CO_2$).

Dr. Vilke relied on two references to support his second opinion. In the first study, Vilke et al. reported that a single 5-second TASER probe deployment on a healthy subject had minimal decrease in pH, noting that lactic acid level increased from a baseline of 1.4 to 2.8 after one minute. At one minute there was also an increase in minute ventilation from 16 to 29 liters/minute (24). Just a single 5-second TASER deployment nearly doubled the respiratory volume. This increase in respiratory rate and breath depth occurs in order to compensate for the acidosis created by a TASER deployment of just 5 seconds. In the second article, Vilke et al. reported on the effect of TASER in probe mode after exercise. He did not evaluate the subjects immediately after the TASER deployment; instead he first evaluated the subjects 5 minutes after the TASER deployment coupled with exercise (25). The minute volume of the TASER-with-exercise group was 22 l/m compared the control group's 18.7 l/m with exercise alone, showing an 18% difference 5 minutes after the TASER deployment). Again, this increase in necessary respiratory volume to compensate for acidosis was due to the TASER.

Based on the studies described above, a TASER deployment of just 5-10 seconds would cause a significant increase in respiratory demands due to the acidosis created as well as the pain caused by that deployment. Those studies show that Mr. Celestin, who Dr. Vilke concedes underwent prolonged and multiple TASER deployments, likely had an increase in ventilation demands as a result of those deployments. Under the circumstances of multiple TASER deployments, sufficient ventilation would have been even more important. Prone restraint significantly impaired Mr. Celestin's ability to compensate for the acidosis created by the repeated TASER deployments. I understand that some of the TASER probe deployments may not have achieved NMI; regardless, even the effective deployments Dr. Vilke identifies likely had an effect that would have contributed significantly to Mr. Celestin's demand for ventilation. The TASER deployments that did not cause NMI still likely caused pain and muscle contraction that would increase ventilator demands. TASER drive stun deployments are designed to cause acute pain and can increase physiologic demands. The body responds to acute pain by activating it's "fight or flight" response. The sympathetic nervous system stimulates the brain to release catecholamines to increase the heart rate, blood pressure and breathing rate. I disagree with Dr. Kroll's opinion that drive-stuns do not enter into the calculus of subject risk. It may not cause NMI or significant muscle contraction, but the acute pain increases metabolic demands on the body which is dangerous in a person in prone restraint who requires an increase, not a decrease, in appropriate ventilation and circulatory response.

The following statement comes directly from a release agreement drafted by TASER: "[Conducted Electrical Weapon (CEW)] use causes physiologic and/or metabolic effects that may increase the risk of death or serious injury. These effects include changes in blood chemistry, blood pressure, respiration, heart rate and rhythm, and adrenaline and stress hormones, among others. In human studies of electrical discharge from a single CEW of up to 15 seconds, the effects on acid/base balance, creatine kinase, electrolytes, stress hormones, and vital signs were comparable to or less than changes expected from physical exertion similar to struggling, resistance, fighting, fleeing, or from the application of some other force tools or techniques. Some individuals may be particularly susceptible to the effects of CEW use. These susceptible individuals include the elderly, those with heart conditions, asthma or other



pulmonary conditions, and people suffering from excited delirium, profound agitation, severe exhaustion, drug intoxication or chronic drug abuse, and/or overexertion from physical struggle. In a physiologically or metabolically compromised person, any physiologic or metabolic change may cause or contribute to sudden death. Stress and Pain. CEW use, anticipation of use, or response to use can cause startle, panic, fear, anger, rage, temporary discomfort, pain, or stress which may be injurious or fatal to some people." (26)

In other words, the TASER company includes a warning regarding the dangers of TASER deployments that exceed 15 seconds.  The company warns that there is an increased risk for people with exertion from a physical struggle, and that such a struggle can cause a metabolic change such as metabolic acidosis that would put people in danger.  Because Dr. Vilke does not consider the studies described above or that the Defendant officers' repeated TASER deployments against Mr. Celestin agitated him further, increased his lactic acid, and contributed to an worsened acidosis and an increase in ventilatory demand, his opinion that the use of the TASER on Mr. Celestin did not cause or contribute to Mr. Celestin's cardiac arrest or death is incorrect.  The literature is clear that the TASER deployments put Mr. Celestin further in danger from the reduced ventilatory and circulation dynamics of prone restraint.


3.  **"I disagree with  plaintiff's experts, Dr. Michael Baden and Richard Masten who are critical of the CPR performed by the officers."**


I agree that survival from asystolic cardiac arrest is very low at around 4% (27).  That is why prevention of prone restraint cardiac arrest with secondary asystole is important, and Mr. Celestin's cardiac arrest could have been prevented by not keeping him in the prone position for such a long time.

However, even though there is a low of a chance of survival with asystole, there is potential for survival, and that does not mean first responders should not provide proper CPR.  To say otherwise is to basically take the position that it's never necessary to perform CPR or to perform it appropriately.

While a person is restrained in a prone position, it is important to check on the subject's breathing.  It is also important to monitor a subject's condition after TASER deployment.  There was a period of time where Mr. Celestin stopped moving and was likely in cardiac arrest.  However, the Defendant officers did not immediately check his pulse and breathing, causing a delay in recognizing Mr. Celestin had a cardiac and respiratory arrest.

I disagree with Dr. Vilke regarding the need to remove the handcuffs before beginning chest compressions.  Effective CPR requires a hard flat surface, which is why the ACC/AHA (28) recommends a backboard to provide a firm surface when possible.  Dr. Vilke ignores the fact that leaving handcuffs applied to a subject behind their back may interfere with chest compressions, because it prevents the lower back from being in contact with a hard surface. These circumstances are observable during the CPR initially performed on Mr. Celestin.  Mr. Celestin was having a cardiac arrest and so could not have been a threat to anyone, so the handcuffs should have been removed.  When people trained in CPR encounter someone who has a cardiac arrest and who is on a soft surface (such as a mattress), we take the time to place a backboard or to move the patient to a hard flat surface.  It takes very little time to remove handcuffs, so Mr. Celestin's handcuffs should have been removed before beginning chest compressions, to maximize their effectiveness.



During the long wait for EMS, neither the Defendant officers nor anyone else gave respirations. The Defendant officers had an AED in the car, and one of the Defendant officers had a pocket mask but did not use it, and the others did not use it when he offered it to them. There is no medical reason not to use the pocket mask when the AED gave clear instructions to "give breath." I agree with Dr. Vilke that there is limited data on the benefit of lay bystanders delivering rescue breaths, but part of the reason is that bystanders are not confident doing mouth-to-mouth resuscitation as they do not have masks for protection. Lay people who witness a cardiac arrest will not perform CPR because they do not feel comfortable performing mouth-to-mouth resuscitation and thus avoid compressions too. Teaching compressions-only CPR is easier and people are more likely to perform this task at minimum. But the Defendant officers are first responders and received annual training in how to perform effective CPR, including mouth-to-mouth resuscitation, and they had the equipment (barrier masks) to enable them to provide mouth-to-mouth resuscitation safely. To say that rescue breathing would not have been beneficial to Mr. Celestin is akin to saying that, in the emergency room when Dr. Vilke is running a code with CPR, that giving respirations would not be beneficial. Dr. Vilke's opinion that the Defendant officers' failure to use any means of "artificial ventilation . . . did not impact the clinical outcome" ignores the bedrock principle that human survival depends on oxygen entering the body and circulating. Although Dr. Vilke may be correct that survival of an asystolic cardiac arrest is dismal, a better effort would have increased the chances of survival.

Based on my review of the body-worn camera footage, I also disagree with Dr. Vilke's opinion that the chest compressions were properly performed. The initial chest compression were given at a pace of less than 100 times per minute, which is the recommended pace.

4. **"I disagree with plaintiff's expert, Dr. Michael Baden, when he opines the 'Mr. Celestin's heart showed no evidence of disease that could cause or contribute to this death…'"**

I disagree with Dr. Vilke's opinion that Mr. Celestin's slightly enlarged and thickened heart caused or contributed to his death.

Although I agree with Dr. Vilke that a thickened or enlarged heart does place a subject at a higher risk of sudden cardiac arrest compared to a person with a heart of normal size and thickness, that increased risk is not relevant under the circumstances present at the time of Mr. Celestin's death and the observations of the medical examiner during his autopsy. As Cardiologists, when we deal with patients with idiopathic or hypertrophic cardiomyopathies, we risk-stratify these patients for risks of sudden cardiac death. If a patient is at a very high risk, we place a defibrillator, which is a special pacemaker that can shock the heart if needed. We do that to patients with thick hearts because they have the propensity to have ventricular arrhythmias causing sudden death. (29) Enlarged, thick, scarred and weakened hearts can cause arrhythmias such as ventricular tachycardia and fibrillation. (29,30) But Mr. Celestin died of asystole, not ventricular fibrillation or ventricular tachycardia. Because Mr. Celestin died of asystole and not a ventricular arrhythmia, the thickness or enlargement of Mr. Celestin's thickness of heart is not relevant. Indeed, even if Mr. Celestin had had a severely thickened heart, it would not and could not have caused a sudden asystolic arrest like the one he experienced. In any event, given Mr. Celestin's large body habitus (69 inches and 258 pounds), his heart size of 400g is within normal range, so I disagree with the premise that Mr. Celestin's heart was enlarged at all. (31)



Mr. Cellestin's arrhythmia was due to acidosis uncompensated from decreased ventilation and decrease in circulation from prone restraint. The decreased ventilation and circulation were not in any way related to the size of his heart.

Initial ventricular arrhythmias do eventually change to asystole but the fact that the Defendant officers placed the AED early after cardiac arrest and it advised no shock, the primary arrhythmia was asystole not a ventricular arrhythmia that would be found in a thickened heart. Ventricular arrhythmias degrade to asystole with a median time to deteriorate is estimated at 31 minutes, and at 12 minutes, 90% of these cases are not in asystole (32).

### Discussion of Dr. Peters' and Dr. Hunsaker's Opinions

I also disagree with the opinions of Mr. Peters that excited delirium is a legitimate phenomenon and of Dr. Hunsaker to the extent he opines that the medical examiner's formulation of Mr. Celestin's cause of death, which included that it was "an acute excited delirium type death," was, according to Dr. Hunsaker, "sound to a reasonable degree of medical and investigative probability." Excited delirium is a diagnostic term used by some people to describe a person who is agitated and delirious, usually when the agitation and delirium is paired with aggressive behavior, pain tolerance, extreme physical strength, and hyperthermia. Excited delirium is an outdated and a scientifically discredited concept, which has been promoted for the past several decades as an unproven rationale for ignoring the potentially fatal effects of prone restraint cardiac arrest when a death has occurred in police custody. Excited delirium has nearly exclusively been used as a cause of death when the death has occurred in law enforcement custody and provides an exculpatory explanation for a death that might otherwise be attributed to excessive use of force by law enforcement personnel. This diagnosis allows for deaths during law enforcement restraint to be ignored in favor of the excited delirium diagnosis.

A recently published article reviewed a database of all individual excited delirium and agitated delirium cases that have been described in the scientific literature (33). This exercise resulted in the identification of 61 articles describing individual cases of excited delirium or agitated delirium, amounting to 168 total cases. The fatal cases that were reviewed were more likely to involve the use restraint (at least 90% of fatal cases) than non-fatal cases (at least 68% of non-fatal cases). Cases were more likely to be fatal when law enforcement was the first responder on scene. The odds of fatality were 50 times greater if a person was hog- or hobble-tied. The results of the study indicated that a diagnosis of excited delirium and potentially fatal restraint are inextricably interwoven, and that in the absence of aggressive restraint, there is no evidence that excited delirium is a stand-alone fatal condition.

In the cases examined by that article, the risk of death could only be explained by restraint, rather than diagnosis of excited delirium. In light of this research, the medical examiner's reference to excited delirium in the autopsy report, and the embrace and defense of that report by both Dr. Hunsaker and Mr. Peters, is flawed and misleading. The findings of the article described above are relevant and applicable to the circumstances of Mr. Celestin's death, in that they point toward the aggressive restraint used on him as a far more likely cause of his cardiac arrest than any purported state of delirium and agitation, which carries little to no risk of sudden death.



Mr. Peters argues that it is a "legitima[te] phenomenon." But phenomena do not cause deaths, diagnosable conditions cause deaths. Contrary to the carefully couched assertions of Dr. Hunsaker and Mr. Peters, excited delirium has been rejected as a valid diagnosis by the American Medical Association (AMA), and the American Psychiatric Association (APA). Indeed, in June of 2021, the AMA formally announced their opposition to the diagnosis of excited delirium. (34) The new AMA policy addresses reports that show a pattern of using the term "excited delirium" as justification for excessive police force. Specifically, the policy confirms the AMA's stance that current evidence does not support "excited delirium" as an official diagnosis, and opposes its use until a clear set of diagnostic criteria has been established and denounces "excited delirium" as a sole justification for law enforcement use of excessive force.

The APA adds that the term "excited delirium" (ExDs) is too non-specific to meaningfully describe and convey information about a person, and states that "excited delirium" should not be used until a clear set of diagnostic criteria are validated. (35) The APA has not recognized excited delirium as a mental disorder, and it is not included in the Diagnostic and Statistical Manual of Mental Disorders (DSM5). The DSM-5 recognizes Delirium, hyperactive type, but the symptoms of this condition differ in many ways from the symptoms typically attributed to excited delirium (e.g., superhuman strength, impervious to pain, etc.), so Mr. Peters' attempt to conflate the two diagnoses fails.


_____

Alon Steinberg, MD FACC

Date: 6/8/22



References

1. Steinberg A. Prone restraint cardiac arrest: A comprehensive review of the scientific literature and an explanation of the physiology. Med Sci Law July 2021. 8 25:25802420988370. doi: 10.1177/0025802420988370

2. Wardle WD, Katch FI, Katch VL. Exercise physiology: nutrition, energy, and human performance. Baltimore; Philadelphia: Wolters Kluwer Health/Lippincott Williams & Wilkins, 2015. p200, p264, pp.286-301, p337.

3. Ho JD, Dawes DM, Nelson RS, et al. Acidosis and Catecholamine Evaluation Following Simulated Law Enforcement "Use of Force" Encounters. Acad Emerg Med 2010; 17: e60–e68.

4. Hick JL, Smith SW, Lynch MT. Metabolic Acidosis in Restraint-associated Cardiac Arrest. A Case Series. Acad Emerg Med 1999; 6: 239–243.

5. Chan TC, Vilke GM, Neuman T, et al. Restraint position and positional asphyxia. Ann Emerg Med 1997; 30: 578–586.

6. Chan TC, Vilke GM, Neuman T: Reexamination of custandy restrain position and positional asphyxia. Am J Forensic Med Pathol 1998;19(3):201-205

7. Vilke, GM, Chan TC, Neuman, et al. Spirometry in normal subjects in sitting, prone and supine positions. Respir Care 2000;45(4):407-410.

8. Chan TC, Neuman T, Clausen J, et al. Weight Force During Prone Restraint and Respiratory Function. Am J Forensic Med Pathol 2004; 25: 185–189.

9. Sloane C, Chan TC, Kolkhorst F, et al. Evaluation of the ventilatory effects of the prone maximum restraint (PMR) position on obese human subjects. Forensic Sci Int 2014; 237: 86–89.

10. Michalewicz BA, Chan TC, Vilke GM, et al. Ventilatory and Metabolic Demands During Aggressive Physical Restraint in Healthy Adults. J Forensic Sci 2007; 52: 171–175.

11. Vilke GM. Retraint physiology: A review of the literature. J Forensic and Legal Med 75 (2020)

12. Roeggla G, Roeggla H, Moser B, et al. Cardiorespiratory Consequences of the Hobble Restraint. Acad Emerg Med 1999; 6: 1076–1077.

13. Cary NRB, Roberts CA, Cummin ARC, et al. The effect of simulated restraint in the prone position on cardiorespiratory function following exercise in humans. J Physiol 2000; 525: 30P-31P.

14. Parkes J, Carson R. Sudden death during restraint: do some positions affect lung function? Med Sci Law 2008; 48: 137–141.

15. Meredith C, Taslaq S, Kon OM et al. The cardiopulmonary effects of physical restraint insubjects with chronic obstructive pulmonary disease. J Clin Forensic Med. 2005;12(3):133-136.

16. Barnett R, Hanson P, Stirling C, et al. The physiological impact of upper limb position in prone restraint. Med Sci Law 2012; 53: 161–165.

17. Savaser DJ, Campbell C, Castillo EM, et al. The effect of the prone maximal restraint position with and without weight force on cardiac output and other hemodynamic measures. J Forensic Leg Med 2013; 20: 991–995.

18. Pump B, Talleruphuus U, Christensen NJ, et al. Effects of supine, prone, and lateral positions on cardiovascular and renal variables in humans. Am J Physiol Integr Comp Physiol 2002; 283: R174–R180.

19. Backofen JE. Hemodynamic changes with prone position during general anesthesia. Anesth Analg 1985; 64: 194–194.

20. Sudheer PS, Logan SW, Ateleanu B, et al. Haemodynamic effects of the prone position: a comparison of propofol total intravenous and inhalation anaesthesia. Anaesthesia 2006; 61: 138–141.



21.    Yokoyama M, Ueda W, Hirakawa M, et al. Hemodynamic effect of the prone position during anesthesia. Acta Anaesthesiol Scand 1991; 35: 741–744.

22.    Edgcombe H, Carter K, Yarrow S. Anaesthesia in the prone position. Br J Anaesth 2008; 100: 165–183

23.    Han IH, Son DW, Nam KH, Choi BK, Song GS. The effect of body mass index on intra-abdominal pressure and blood loss in lumbar spine surgery. J Korean Neurosurg Soc. 2012;51:81-85. doi: 10.3340/jkns.2012.51.2.81.

24.    Villke GM Sloane CM, Couton KD et al.  Physiological effets of a conducted electrical weapon on human subjects.  Ann Emerg Med, 2007 Nov ;50(5):569-7

25.    Vilke GM, Sloane CM, Suffecool, et al.  Physiologic effects of the TASER after exercise.  Acad Emerg Med. 2009. Aug; 16(8):704-710

26.    https://my.axon.com/s/training-resources-agreements-release?language=en_US

27.    Chan PS, McNally B, Tang F et al.  Recent Trends in Survival from Out-of-Hospital Cardiac Arrest in the United States.  Circulation 2014; 130:1876-1882.

28.    Adult Basic Life Support.  2010 American Heart Association Guidelines for Cardiopulmonary Resuscitation and Emergency Cardiovascular Care.  Circulation. 2010;122:S685–S705

29.    Ommen SR, Seema M, Burke M et al.  2020 AHA/ACC Guideline for the Diagnosis and Treatment of Patients with Hypertrophic Cardiomyopathy. Circulation 2020;142:e558-e631

30.    Mahony CO, Jichi F, Pavlou. A novel clinical risk prediction model for sudden death in hypertrophic cardiomyopathy (HCM Risk-SCD).  European Heart Journal 35. 2014.

31.    https://labs.feinberg.northwestern.edu/webster/heart_weight/

32.    Kroll, MW, Walcott, GP, Ideker, RE.  The Stability of Electrically Induced Ventricular Fibrillation. 34th Annual International Conference of IEEE EMBS. San Diego, California, USA, 28 Aug 2012

33.    Strömmer EMF, Leith W, Zeegers MP, Freeman MD. The role of restraint in fatal excited delirium: a research synthesis and pooled analysis. Forensic Sci Med Pathol. Forensic Science, Medicine and Pathology; 2020;16:680–92.

34.    https://www.ama-assn.org/press-center/press-releases/new-ama-policy-opposes-excited-delirium-diagnosis

35.    https://www.psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-Use-of-Term-Excited-Delirium.pdf

# Exhibit A

# CURRICULUM VITAE

# ALON ABRAHAM STEINBERG, M.D. F.A.C.C.

## *PERSONAL INFORMATION*

| | |
|---|---|
| Date of Birth: | April 20, 1967 |
| Place of Birth: | New York, NY |
| Email | aloncardio@gmail.com |

## PROFESSIONAL INFORMATION

**Member and partner of Cardiology Associates Medical Group, an eight person single specialty Cardiology practice in Ventura County, California since 1/2005.**

**Office Address:**  Cardiology Associates Medical Group, Inc.
168 N. Brent Street #503
Ventura, CA  93003
(805) 653-0101
(805) 641-0434 (FAX)

Cardiology Associates Medical Group, Inc.
1701 Solar Drive #150
Oxnard, CA  93030
(805) 278-4020
(805) 278-4015 (FAX)

**California Medical License:**  #C51240

## *CURRENT HOSPITAL PRIVILEGES*

Community Memorial Hospital
147 N. Brent Street
Ventura, CA 93003

St Johns Regional Medical Center
1600 N. Rose Avenue Oxnard, CA 93030

## *EDUCATION:*

**COLLEGE**:          University of Texas, Austin TX
                     BA Mathematics 1985-1988 with high honors

**MEDICAL**:          University of Texas Medical Branch
                     Galveston, TX
                     MD 1988-1992

## *POST GRADUATE TRAINING:*

**RESIDENCY**:        Internal Medicine
                     Jackson Memorial Hospital
                     University of Miami, Miami FL
                     July 1992 - June 1995

**FELLOWSHIP**:       Cardiovascular Disease
                     University of Florida Hospitals
                     Jacksonville, FL
                     Chairman- Theodore Bass, MD
                     July 1995 – June 1998

**ADDITIONAL:**       Cardiovascular MRI
                     Berlin Heart Institute
                     Director- Eike Nagel, MD
                     Sept. 2004 – Sept. 2005  (3 months total).

                     Cardiovascular CT
                     Tennessee Heart Institute
                     Director- Tracy Q Callister, MD
                     May, 2006

## *PRIOR WORK EXPERIENCE*

Attending Cardiologist
Post Doctoral Associate/Clinical Instructor
University of Florida Health Science Center
Memorial Hospital
Jacksonville, FL
July 1998 – December 1998

Cardiologist in Private Practice
Lake Champlain Cardiology Associates
Plattsburgh, NY
Feb. 1999 to Dec. 2005

**CERTIFICATIONS**

American Board of Internal Medicine, Cardiovascular Disease valid till 12/2026
Certification Board of Nuclear Cardiology, valid till 3/2023


*MEMBERSHIPS/ASSOCIATIONS/OTHER*

Chair of the Division of Cardiology at Community Memorial Hospital. Ventura, California, since 2009

Chair of Department of Medicine at Community Memorial Hospital. Ventura, California, since 2021

Clinical Assistant Professor, Western University Health Sciences College medical residency programs

Expert reviewer and consultant for the Medical Board of the State of California since 2006. Gave testimony for State of California in case of Conrad Murray versus State of California, 2011.

Seaview Independent Physician Association (network of over 300 physicians). Utilization and review committee member.

Medical Director of Nuclear Cardiology and Radiation Safety Officer at Cardiology Associates Medical Group since 2005

Medical Director of Cardiac Rehabilitation, Community Memorial Hospital, Ventura, California

Axis Clinical Trials, Consulting Cardiologist and Clinical Investigator

Ventura Clinical Trials, Chief Medical Officer and Clinical Investigator

California and Ventura County Medical Associations

Fellow of the American College of Cardiology

# RECENT PUBLICATIONS

Steinberg A. Prone Restraint Cardiac Arrest: A Comprehensive Review of the Scientific Literature and an Explanation of the Physiology. Med Sci Law 2021; 61(3):215-226. DOI:10.1177/0025802420988370

Steinberg A. Response to: Response to: Prone restraint cardiac arrest: A comprehensive review of the scientific literature and an explanation of the physiology. Med Sci Law 2021; epub letter:1-2. DOI:10.1177/00258024211025226

Steinberg A. Response to: The prone position paradox. Med Sci Law 2021; epub letter:1-2. DOI:10.1177/00258024211051544.

Steinberg A, Hazan S. The Microbiome and the Heart.  Practical Gastroenterology April 2018 • Volume XLII, Issue 4

# Exhibit B



6/6/22

**EXPERT ALON STEINBERG MD FACC**

**TESTIMONY HISTORY – JUNE 2018 TO JUNE 2022**

*Grano vs. State of New Mexico*, May 2nd, 2022 for Plaintiff-side attorney Joe Romero

*Barrera vs. City of Woodland*, Sept 23rd, 2021 for Plaintiff-side attorney Neil Gahlawat

*Perez vs. City of Fresno*, Sept 10th, 2021 for Plaintiff-side attorney Neil Gahlawat

*Waymire vs. Ethridge*, August 9th, 2021 for Defense-side attorney DeDe Holden

*Bayfront Holdings, Lp And Gerald Conrad v. Dart Container Of Michigan, LLC*, June 22, 2021 for Defense-side attorney Rachel Sanders

*Salcido vs City of Whitier*, March 7, 2019 for Plaintiff-side attorney Barbara Hadsell

*Tashi S. Farmer, et al. vs. Las Vegas Metropolitan Police Department*, October 24, 2018 for Plaintiff-side attorney Fred Sayre

2

# Exhibit C



6/6/22

**EXPERT ALON STEINBERG MD FACC**

<u>**FEE SCHEDULE**</u>

500 dollars/hour for chart/records review, research, consultation, report preparation, court or deposition preparation and phone calls
200 dollars/hour for travel
1000 dollars/hour for Deposition
5000 dollars/day for Court appearance.